0210140

# UNITED STATES OF AMERICA
# BEFORE FEDERAL TRADE COMMISSION

**COMMISSIONERS:**
    Timothy J. Muris, Chairman
    Sheila F. Anthony
    Mozelle W. Thompson
    Orson Swindle
    Thomas B. Leary

| | |
|---|---|
| In the Matter of<br><br>**QUEST DIAGNOSTICS INCORPORATED**, a corporation, and<br>**UNILAB CORPORATION**, a corporation. | Docket No. C-4074 |

## ORDER TO MAINTAIN ASSETS
[Public Record Version]

The Federal Trade Commission ("Commission"), having initiated an investigation of the proposed acquisition by Respondent Quest Diagnostics Incorporated ("Quest Diagnostics") of Respondent Unilab Corporation ("Unilab"), hereinafter referred to as "Respondents," and Respondents having been furnished thereafter with a copy of a draft of Complaint that the Bureau of Competition proposed to present to the Commission for its consideration and which, if issued by the Commission, would charge Respondents with violations of Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, and Section 5 of the Federal Trade Commission Act, as amended, 15 U.S.C. § 45; and

Respondents, their attorneys, and counsel for the Commission having thereafter executed an Agreement Containing Consent Orders ("Consent Agreement"), containing an admission by Respondents of all the jurisdictional facts set forth in the aforesaid draft of Complaint, a statement that the signing of said Consent Agreement is for settlement purposes only and does not constitute an admission by Respondents that the law has been violated as alleged in such Complaint, or that the facts as alleged in such Complaint, other than jurisdictional facts, are true, and waivers and other provisions as required by the Commission's Rules; and

The Commission having thereafter considered the matter and having determined that it had reason to believe that Respondents have violated the said Acts, and that a Complaint should issue stating its charges in that respect, and having determined to accept the executed Consent Agreement and to place such Consent Agreement on the public record for a period of thirty (30) days for the receipt and consideration of public comments, now in further conformity with the procedure described in Commission Rule 2.34, 16 C.F.R. § 2.34, the Commission hereby issues its Complaint, makes the following jurisdictional finding and issues this Order to Maintain Assets:

    1. Respondent Quest Diagnostics is a corporation organized, existing, and doing business under and by virtue of the laws of the State of Delaware, with its office and principal place of business located at One Malcolm Avenue,

LX-0649-0001

Teterboro, New Jersey, 07608.

2. Respondent Unilab is a corporation organized, existing, and doing business under and by virtue of the laws of the State of Delaware, with its office and principal place of business located at 18448 Oxnard Street, Tarzana, CA, 91356.

3. The Federal Trade Commission has jurisdiction of the subject matter of this proceeding and of Respondents, and the proceeding is in the public interest.

## ORDER

### I.

**IT IS ORDERED** that, as used in this Order to Maintain Assets, the following definitions and provisions shall apply:

A. "Quest Diagnostics" means Quest Diagnostics Incorporated, its directors, officers, employees, agents, representatives, predecessors, successors, and assigns; its joint ventures, subsidiaries, divisions, groups and affiliates controlled by Quest Diagnostics Incorporated, and the respective directors, officers, employees, agents, representatives, successors, and assigns of each.

B. "Unilab" means Unilab Corporation, its directors, officers, employees, agents, representatives, predecessors, successors, and assigns; its joint ventures, subsidiaries, divisions, groups and affiliates controlled by Unilab Corporation, and the respective directors, officers, employees, agents, representatives, successors, and assigns of each.

C. "Acquisition" means the exchange offer contemplated by Agreement and Plan of Merger dated April 2, 2002, and all amendments thereto, whereby Quest Diagnostics agreed to acquire all of the issued and outstanding voting securities of Unilab in exchange for cash, stock of Quest Diagnostics, or a combination of cash and stock of Quest Diagnostics.

D. "Acquisition Date" means the date the Acquisition is consummated.

E. "Agency(ies)" means any governmental regulatory authority or authorities in the United States responsible for granting approval(s), clearance(s), qualification(s), license(s), or permit(s) for any aspect of the research, development, manufacture, marketing, distribution, or sale of Clinical Laboratory Testing Services.

F. "Clinical Laboratory Testing Services" means the full range of products and services provided by a clinical laboratory, including, but not limited to, the drawing, collection, and transportation of specimens over a coordinated courier route system; stat, routine, and esoteric clinical testing; the computerized tracking of specimens for testing, record-keeping, and billing functions; and the electronic communication of test results and other necessary data to Customers.

G. "Clinical Laboratory Testing Services Managerial Employees" means the current senior managers of Respondent Quest Diagnostics, identified in non-public Appendix A, attached to this Order to Maintain Assets.

H. "Closing Date" means the date on which Respondents and the Commission-approved Acquirer consummate the transactions contemplated by the Divestiture Agreement.

I. "Commission" means the Federal Trade Commission.

J. "Commission-approved Acquirer" means the Person approved by the Commission to acquire assets pursuant to the Decision and Order, including LabCorp as the acquirer of the Purchased Assets pursuant to the LabCorp Purchase Agreement, if the Commission does not require that, pursuant to Paragraphs II.C. or II.D. of the Decision and Order, Respondents rescind the divestiture and transfer of the Purchased Assets.

K. "Confidential Business Information" means all customer-specific pricing information, customer-specific discounts, and customer-specific supply or service requirements or preferences relating to the provision of Clinical Laboratory Testing Services by Quest Diagnostics in Northern California prior to the Acquisition Date (or the Closing Date as applicable if either the Outpatient Clinical Laboratory Testing Services Assets or Quest Diagnostics' Northern California Clinical Laboratory Testing Services Assets are divested).

L. "Customer" means any Person who orders or refers Clinical Laboratory Testing Services.

M. "Divestiture Agreement" means any agreement between Respondents and a Commission-approved Acquirer (or between Divestiture Trustee and a Commission-approved Acquirer), as well as all amendments, exhibits, attachments, agreements, and schedules thereto, related to the divestiture of the Purchased Assets (or the Outpatient Clinical Laboratory Testing Services Assets or Quest Diagnostics' Northern California Clinical Laboratory Testing Services Assets, if divested) that has been approved by the Commission to accomplish the requirements of the Decision and Order.

N. "Divestiture Trustee" means the trustee appointed by the Commission pursuant to Paragraph IV. of the Decision and Order.

O. "Firewalled Employees" means all employees of Respondents that remain in the employment of Respondents after the Acquisition Date who, after the Acquisition Date, directly participate (irrespective of the portion of working time involved) in the marketing, contracting, or sales of Clinical Laboratory Testing Services to Customers or Payers in Northern California.

P. "LabCorp" means Laboratory Corporation of America Holdings, a corporation organized, existing, and doing business under and by virtue of the laws of the State of Delaware, with its offices and principal place of business located at 358 South Main Street, Burlington, North Carolina 27215.

Q. "LabCorp Purchase Agreement" means the Asset Purchase Agreement entered into between Quest Diagnostics Clinical Laboratories, Inc. and Laboratory Corporation of America Holdings, as well as all amendments, exhibits, attachments, agreements, and schedules thereto, dated February 3, 2003. The LabCorp Purchase Agreement is attached to this Order to Maintain Assets as non-public Appendix B.

R. "Northern California" means all counties in California north of, but not

including, San Luis Obispo, Kern, and San Bernardino counties.

S. "Outpatient Clinical Laboratory Testing Services Assets" means the following:

1. at the option of the Commission-approved Acquirer, any or all of Quest Diagnostics' assets, tangible and intangible, relating to Quest Diagnostics' Northern California Outpatient Clinical Laboratory Testing Services Business, including, without limitation, the following:

    a. all PSCs, Stat Labs, and the full-service clinical laboratory located in Dublin, California, and all related assets, including, without limitation, all:

    (1) real property interests (including fee simple interests and real property leasehold interests), together with all buildings and other structures, facilities, or improvements, currently or hereafter located thereon;

    (2) easements, rights, and appurtenances;

    (3) to the extent assignable, licenses, permits, registrations, certificates, consents, orders, accreditations, certificates of need, approvals, franchises, and similar authorizations required under applicable law or by applicable Agencies for the operation of the PSCs, Stat Labs, and the full-service clinical laboratory as currently operated by Quest Diagnostics;

    (4) equipment and instruments related to providing Clinical Laboratory Testing Services; and

    (5) other equipment, supplies, furniture, fixtures, vehicles, and other tangible personal property;

    b. all assets relating to the provision of courier services;

    c. all agreements with Payers (except hospital clinical laboratories and independent clinical laboratories) in effect as of the Acquisition Date, and all rights related thereto, to the extent such agreements are assignable;
    d. a copy of all books, records, and files (electronic and hard-copy) related to the foregoing; and

2. at the option of the Commission-approved Acquirer, the Managed Care Laboratory Services Agreement between Unilab and Sutter Medical Foundation-North Bay, dated November 1, 2002, and all of Unilab's assets, tangible and intangible, relating to that agreement, including, without limitation, the following:

    a. all PSCs and Stat Labs relating to that agreement located in Sonoma County, California; and all related assets, including, without limitation, all:

    (1) real property interests (including fee simple interests and real property leasehold interests), together with all buildings and other structures, facilities, or improvements, currently or hereafter

**457**

      located thereon;

      (2) easements, rights, and appurtenances;

      (3) to the extent assignable, licenses, permits registrations, certificates, consents, orders, accreditations, certificates of need, approvals, franchises and similar authorizations required under applicable law or by applicable Agencies for the operation of such PSCs and Stat Labs;

      (4) equipment and instruments related to providing Clinical Laboratory Testing Services; and

      (5) other equipment, supplies, furniture, fixtures, vehicles, and other tangible personal property;

*provided, however,* that, for purposes of this subparagraph I.S.2.a. only, "Outpatient Clinical Laboratory Testing Services Assets" does not include any PSCs or Stat Labs located outside of Sonoma County, California;
b. all assets relating to the provision of courier services to such PSCs and Stat Labs; and

c. a copy of all books, records, and files (electronic and hard-copy) related to the foregoing.
"Outpatient Clinical Laboratory Testing Services Assets" does not include:

a. rights to the name Quest Diagnostics, SmithKline Beecham Clinical Laboratories, Unilab, or any variations of the foregoing names;

b. any tangible personal property located outside of Northern California or in the offices of Customers;

c. Respondents' Medicare and Medicaid licenses and provider agreements;

d. the Nichols Institute;

e. any computers, servers, or other hardware that are used throughout Quest Diagnostics; and

f. any computer programs and other software, patents, trade secrets, know-how, or proprietary information owned or licensed by the Respondents or their affiliates, including without limitation Quest Diagnostics' laboratory information systems and billing system; *provided, however,* that Respondents shall convey to the Commission-approved Acquirer (to the extent permitted by the third-party licensee if Respondents license the computer programs and other software, patents, trade secrets, know-how, or proprietary information from a third party) the right to use any software, patents, trade secrets, know-how, or proprietary information that is needed to operate the assets divested to the Commission-approved Acquirer and that the Commission-approved Acquirer is unable, using commercially-reasonable efforts, to obtain from other third parties on commercially-reasonable terms and conditions.

LX-0649-0005

*Provided, however*, that, with respect to assets that are to be divested pursuant to this Order, Respondents need not divest assets that the Commission-approved Acquirer chooses not to acquire only if the acquirer chooses not to acquire such assets and the Commission approves the divestiture without such assets.

T. "PSC" means a patient service center or any other facility where specimens are drawn and collected for the purpose of providing Clinical Laboratory Testing Services.

U. "Payer" means any Person that pays for Clinical Laboratory Testing Services including, without limitation, the following: (1) the Customer; (2) the patient; (3) Medicare or Medicaid; or (4) a third party who pays the bill on behalf of the patient, such as an insurance company, employer, or managed-care provider, including Physician Groups.

V. "Person" means any natural person, partnership, association, or corporate or governmental organization or entity.

W. "Physician Group" means any group medical practice, individual practice association, physician service organization, management service organization, medical foundation, or physician/hospital organization, that provides, or through which physicians contract to provide, physician services to enrollees of pre-paid health plans.

X. "Purchased Assets" means the assets described in the LabCorp Purchase Agreement.

Y. "Quest Diagnostics Firewalled Employees" means the employees of Respondent Quest Diagnostics who, at the time Respondents executed the Agreement Containing Consent Orders, directly participated (irrespective of the portion of working time involved) in the marketing, contracting, or sales of Clinical Laboratory Testing Services to Customers or Payers in Northern California and who have not been or who are not being offered employment by LabCorp pursuant to the LabCorp Purchase Agreement and who, after the Acquisition Date, will directly participate (irrespective of the portion of working time involved) in the marketing, contracting, or sales of Clinical Laboratory Testing Services to Customers or Payers in Northern California.

Z. "Quest Diagnostics' Northern California Outpatient Clinical Laboratory Testing Services Business" means Quest Diagnostics' business of providing Clinical Laboratory Testing Services (regardless of type of Payer) in Northern California to Customers, other than hospital clinical laboratories and independent clinical laboratories, as that business existed prior to the Acquisition Date.

AA. "Quest Diagnostics' Northern California Clinical Laboratory Testing Services Business" means Quest Diagnostics' business of providing Clinical Laboratory Testing Services (regardless of type of Payer) in Northern California to Customers, including hospital clinical laboratories and independent clinical laboratories, as that business existed prior to the Acquisition Date.

AB. "Quest Diagnostics' Northern California Clinical Laboratory Testing Services Assets" means:
    1. all of the Outpatient Clinical Laboratory Testing Services Assets, and

 2. all other assets, tangible and intangible, relating to Quest Diagnostics' Northern California Clinical Laboratory Testing Services Business.

"Quest Diagnostics' Northern California Clinical Laboratory Testing Services Assets" does not include:

 a. rights to the name Quest Diagnostics, SmithKline Beecham Clinical Laboratories, Unilab, or any variations of the foregoing names;

 b. any tangible personal property located outside of Northern California or in the offices of Customers;

 c. Respondents' Medicare and Medicaid licenses and provider agreements;

 d. the Nichols Institute;

 e. any computers, servers, or other hardware that are used throughout Quest Diagnostics; and

 f. any computer programs and other software, patents, trade secrets, know-how, or proprietary information owned or licensed by the Respondents or their affiliates, including without limitation Quest Diagnostics' laboratory information systems and billing system; *provided, however,* that Respondents shall convey to the Commission-approved Acquirer (to the extent permitted by the third-party licensee if Respondents license the computer programs and other software, patents, trade secrets, know-how, or proprietary information from a third party) the right to use any software, patents, trade secrets, know-how, or proprietary information that is needed to operate the assets divested to the Commission-approved Acquirer and that the Commission-approved Acquirer is unable, using commercially-reasonable efforts, to obtain from other third parties on commercially-reasonable terms and conditions.

AC. "Respondents" means Quest Diagnostics and Unilab, individually and collectively.

AD. "Stat Lab" means a clinical laboratory testing facility with rapid response capability, in which clinical laboratory tests can be quickly performed for Customers that require rapid turn-around (less than 24 hours).

## II.

**IT IS FURTHER ORDERED** that from the date this Order to Maintain Assets becomes final:

A. Respondents shall take such actions as are necessary to maintain the viability, marketability, and competitiveness of Quest Diagnostics' Northern California Clinical Laboratory Testing Services Assets, and shall prevent the destruction, removal, wasting, deterioration, sale, disposition, transfer, or

impairment of Quest Diagnostics' Northern California Clinical Laboratory Testing Services Assets, except for ordinary wear and tear.

B. Respondents shall maintain the operations of Quest Diagnostics' Northern California Clinical Laboratory Testing Services Assets in the ordinary course of business and in accordance with past practice (including regular repair and maintenance of Quest Diagnostics' Northern California Clinical Laboratory Testing Services Assets) and shall use their best efforts to preserve the existing relationships with physicians, Payers, suppliers, vendors, Customers, employees, and others having business relations with Quest Diagnostics' Northern California Clinical Laboratory Testing Services Assets. Respondents' responsibilities shall include, but are not limited to:

    1. providing Quest Diagnostics' Northern California Clinical Laboratory Testing Services Assets with sufficient working capital to operate Quest Diagnostics' Northern California Clinical Laboratory Testing Services Assets at least at current rates of operation, to the extent that those assets have not been transferred, to meet all capital calls with respect to Quest Diagnostics' Northern California Clinical Laboratory Testing Services Assets and to carry on, at least at their scheduled pace, to the extent that those assets have not been transferred, all capital projects, business plans and promotional activities for Quest Diagnostics' Northern California Clinical Laboratory Testing Services Assets;

    2. continuing, at least at their scheduled pace, to the extent that those assets have not been transferred, any additional expenditures for Quest Diagnostics' Northern California Clinical Laboratory Testing Services Assets authorized as of the Closing Date;

    3. making available for use by Quest Diagnostics' Northern California Clinical Laboratory Testing Services Assets funds sufficient to perform all necessary routine maintenance to, and replacements of, Quest Diagnostics' Northern California Clinical Laboratory Testing Services Assets;

    4. providing Quest Diagnostics' Northern California Clinical Laboratory Testing Services Assets with such funds as are necessary to maintain the viability, marketability, and competitiveness of Quest Diagnostics' Northern California Clinical Laboratory Testing Services Assets;

    5. providing such support services to Quest Diagnostics' Northern California Clinical Laboratory Testing Services Assets as were being provided to this business by Respondents on the Closing Date;

    6. continuing to provide Clinical Laboratory Testing Services, at the same quality and level of service as Respondents provided during the twelve (12) months prior to the date the Consent Agreement was signed by Respondents, satisfying all regulatory requirements and consistent with standard industry practices, until such time as the Interim Monitor, in consultation with Commission staff and the Commission-approved Acquirer, determines that the transfer of the Purchased Assets (or the Outpatient Clinical Laboratory Testing Services Assets or Quest Diagnostics' Northern California Clinical Laboratory Testing Services Assets, if divested) is complete; and

    7. cooperate with the Interim Trustee in the performance of his or her obligations pursuant to Paragraph III. of this Order to Maintain Assets.

C. From the Closing Date through the date six (6) months following the last transfer of the Purchased Assets (or the Outpatient Clinical Laboratory Testing Services Assets or Quest Diagnostics' Northern California Clinical Laboratory Testing Services Assets, if divested):

    1. Respondents shall not disclose or convey, directly or indirectly, to Firewalled Employees any Confidential Business Information relating to the assets divested and transferred to the Commission-approved Acquirer pursuant to this Order to Maintain Assets; and

    2. Firewalled Employees shall not solicit or access any Confidential Business Information relating to the assets divested and transferred to the Commission-approved Acquirer pursuant to this Order to Maintain Assets from any other of Respondents' employees;

*provided, however,* that nothing contained herein shall prohibit Respondents' employees from using Confidential Business Information to respond to inquiries from Customers requesting information relating to that Customer's own account; and *provided, further,* that only for purposes of the divestiture of the Purchased Assets, nothing contained herein shall prohibit Quest Diagnostics Firewalled Employees (and, following the completion of the divestiture and transfer of all of the Purchased Assets, all other Firewalled Employees) from using, soliciting, or having access to Confidential Business Information relating to any physician not included in the database that Respondents are required to create and transfer to LabCorp pursuant to the LabCorp Purchase Agreement as contemplated by Paragraph II.F. of the Decision and Order.

    3. Prior to the Closing Date, Respondents shall develop and implement procedures to assure that such Confidential Business Information is not disclosed or conveyed to Firewalled Employees and that Firewalled Employees do not solicit or access such Confidential Business Information from any other of Respondents' employees consistent with the requirements of this Paragraph II.C.

D. electronic notification to the Firewalled Employees and all of Respondents' employees who have access to Confidential Business Information relating to the assets divested to the Commission-approved Acquirer pursuant to this Order to Maintain Assets of the restrictions on the disclosure and solicitation of Confidential Business Information relating to the Purchased Assets (or the Outpatient Clinical Laboratory Testing Services Assets or Quest Diagnostics' Northern California Clinical Laboratory Testing Services Assets, if divested) by Respondents' personnel. At the same time, if not provided earlier, Respondents shall provide a copy of such notification to employees by e-mail with return receipt requested or similar transmission, and keep an electronic file of such receipts for one (1) year after the Closing Date. Respondents shall provide a copy of the form of such notification to the Commission-approved Acquirer, the Interim Monitor, and the Commission. Respondents shall also obtain from the Firewalled Employees an agreement to abide by the applicable restrictions. Such agreement and notification shall be in substantially the form set forth in the "Notice of the Divestiture and Employee Agreement to Maintain Confidential Business Information" attached as Appendix C to this Order to Maintain Assets.

E. For a period of one (1) year following the date the divestiture and transfer are completed, Respondents shall not, directly or indirectly, solicit, induce, or attempt to solicit or induce any employees of Respondent who have accepted offers of employment with the Commission-approved Acquirer to terminate

their employment relationship with the Commission-approved Acquirer unless the individual has been terminated by the Commission-approved Acquirer; *provided, however,* a violation of this provision will not occur if: (1) Respondents advertise for employees in newspapers, trade publications, or other media not targeted specifically at the employees, or (2) Respondents hire employees who apply for employment with Respondents, as long as such employees were not solicited by Respondents in violation of this Paragraph II.E.

F. Respondents shall provide all Clinical Laboratory Testing Services Managerial Employees with reasonable financial incentives to continue in their positions until the Closing Date. Such incentives shall include a continuation of all employee benefits offered by Respondents until the Closing Date for the divestiture of the Purchased Assets (or the Outpatient Clinical Laboratory Testing Services Assets or Quest Diagnostics' Northern California Clinical Laboratory Testing Services Assets, if divested), including regularly scheduled raises and bonuses, and a vesting of all pension benefits (as permitted by law). In addition, Respondents shall provide a retention incentive to the Clinical Laboratory Testing Services Managerial Employees who accept employment with the Commission-approved Acquirer equal to ten (10) percent of such employee's total annual cash compensation for the year 2002 under the following terms:

    1. five (5) percent of the incentive to be paid upon the employee's completion of six (6) months of continuous employment with the Commission-approved Acquirer after the Closing Date, and

    2. the remaining five (5) percent to be paid upon the employee's completion of one (1) year continuous employment with the Commission-approved Acquirer after the Closing Date.

G. Respondents shall not, in connection with divestiture and transfer of the Purchased Assets (or the Outpatient Clinical Laboratory Testing Services Assets or Quest Diagnostics' Northern California Clinical Laboratory Testing Services Assets, if divested), interfere with the employment by the Commission-approved Acquirer of any employee of Respondents with responsibilities relating primarily to the Purchased Assets (or the Outpatient Clinical Laboratory Testing Services Assets or Quest Diagnostics' Northern California Clinical Laboratory Testing Services Assets, if divested), shall not offer any incentive to such employees to decline employment with the Commission-approved Acquirer or to accept other employment with Respondents in lieu of accepting employment with the Commission-approved Acquirer, and shall remove any other impediments that may deter such employees from accepting employment with the Commission-approved Acquirer, including, but not limited to, any confidentiality provisions relating to the Purchased Assets (or the Outpatient Clinical Laboratory Testing Services Assets or Quest Diagnostics' Northern California Clinical Laboratory Testing Services Assets, if divested) or any non-compete or confidentiality provisions of employment or other contracts with Respondents that would affect the ability of those individuals to be employed by the Commission-approved Acquirer; *provided, however,* that if Respondents comply with the terms of the LabCorp Purchase Agreement relating to the solicitation and employment by LabCorp of employees of the Respondents, and if the Commission does not require rescission of the divestiture and transfer of the Purchased Assets, then the Respondents shall have no further obligations pursuant to this Paragraph II.G.; and *provided, further,* that nothing in this Paragraph II.G. shall be construed to require the Respondents to terminate the employment of any employee.

H. Respondents shall adhere to and abide by the Divestiture Agreement incorporated by reference into this Order to Maintain Assets and made a part hereof.

### III.

**IT IS FURTHER ORDERED** that:

A. At any time after Respondents sign the Consent Agreement, the Commission may appoint an Interim Monitor to assure that Respondents expeditiously comply with all of their obligations and perform all of their responsibilities as required by this Order to Maintain Assets and by the Decision and Order (collectively, "the Orders") and to monitor the Commission-approved Acquirer's reasonable diligence in effectuating the divestiture and transfer of assets pursuant to a Divestiture Agreement.

B. If an Interim Monitor is appointed pursuant to Paragraph III.A. of this Order to Maintain Assets or Paragraph III.A. of the Decision and Order in this matter, Respondents shall consent to the following terms and conditions regarding the powers, duties, authorities, and responsibilities of the Interim Monitor:

    1. The Commission shall select the Interim Monitor, subject to the consent of Respondents, which consent shall not be unreasonably withheld. If neither Respondent has opposed, in writing, including the reasons for opposing, the selection of a proposed Interim Monitor within ten (10) days after notice by the staff of the Commission to Respondents of the identity of any proposed Interim Monitor, Respondents shall be deemed to have consented to the selection of the proposed Interim Monitor.

    2. The Interim Monitor shall have the power and authority to monitor the Respondents' compliance with the terms of the Orders and the Commission-approved Acquirer's reasonable diligence in effectuating the divestiture and transfer of assets pursuant to a Divestiture Agreement, and shall exercise such power and authority and carry out the duties and responsibilities of the Interim Monitor in a manner consistent with the purposes of the Orders and in consultation with the Commission.

    3. Not later than ten (10) days after appointment of the Interim Monitor, Respondents shall execute an agreement that, subject to the prior approval of the Commission, confers on the Interim Monitor all the rights and powers necessary to permit the Interim Monitor to monitor Respondents' compliance with the relevant terms of the Orders and the Commission-approved Acquirer's reasonable diligence in effectuating the divestiture and transfer of assets pursuant to a Divestiture Agreement in a manner consistent with the purposes of the Orders.

    4. The Interim Monitor shall serve until the last obligation under the Orders pertaining to the Interim Monitor's service has been fully performed; *provided, however,* that the Commission may extend or modify this period as may be necessary or appropriate to accomplish the purposes of the Orders.

    5. Subject to any legally recognized privilege, the Interim Monitor shall have full and complete access to Respondents' personnel, books, documents, or records kept in the normal course of business, facilities

and technical information, and any other relevant information as the Interim Monitor may reasonably request, relating to Respondents' compliance with their obligations under the Orders, including, but not limited to, their obligations relating to the Purchased Assets (or the Outpatient Clinical Laboratory Testing Services Assets or Quest Diagnostics' Northern California Clinical Laboratory Testing Services Assets, if divested). Respondents shall cooperate with any reasonable request of the Interim Monitor and shall take no action to interfere with or impede the Interim Monitor's ability to monitor Respondents' compliance with the Orders.

6. The Interim Monitor shall serve, without bond or other security, at the expense of Respondents on such reasonable and customary terms and conditions as the Commission may set. The Interim Monitor shall have authority to employ, at the expense of the Respondents, such consultants, accountants, attorneys and other representatives and assistants as are reasonably necessary to carry out the Interim Monitor's duties and responsibilities. The Interim Monitor shall account for all expenses incurred, including fees for services rendered, subject to the approval of the Commission. The Commission may, among other things, require the Interim Monitor and each of the Monitor's consultants, accountants, attorneys, and other representatives and assistants to sign an appropriate confidentiality agreement relating to Commission materials and information received in connection with the performance of the Interim Monitor's duties.

7. Respondents shall indemnify the Interim Monitor and hold the Interim Monitor harmless against any losses, claims, damages, liabilities, or expenses arising out of, or in connection with, the performance of the Interim Monitor's duties, including all reasonable fees of counsel and other reasonable expenses incurred in connection with the preparations for, or defense of, any claim, whether or not resulting in any liability, except to the extent that such losses, claims, damages, liabilities, or expenses result from misfeasance, gross negligence, willful or wanton acts, or bad faith by the Interim Monitor.

8. If the Commission determines that the Interim Monitor has ceased to act or failed to act diligently, the Commission may appoint a substitute Interim Monitor in the same manner as provided in Paragraph III.A. of this Order to Maintain Assets or Paragraph III.A. of the Decision and Order in this matter.

9. The Commission may on its own initiative, or at the request of the Interim Monitor, issue such additional orders or directions as may be necessary or appropriate to assure compliance with the requirements of the Orders.

10. Respondents shall report to the Interim Monitor in accordance with the requirements of Paragraph IV. of this Order to Maintain Assets and Paragraph V. of the Decision and Order and/or as otherwise provided in any agreement approved by the Commission. The Interim Monitor shall evaluate the reports submitted to the Interim Monitor by Respondents, and any reports submitted by the Commission-approved Acquirer with respect to the performance of Respondents' obligations under the Orders or the Divestiture Agreement. Within one (1) month from the date the Interim Monitor receives these reports, the Interim Monitor shall report in

writing to the Commission concerning compliance by Respondents with the provisions of the Orders.

11. Respondents may require the Interim Monitor and each of the Interim Monitor's consultants, accountants, attorneys, and other representatives and assistants to sign a customary confidentiality agreement; *provided, however*, such agreement shall not restrict the Interim Monitor from providing any information to the Commission.

C. The Interim Monitor appointed pursuant to Paragraph III.A. of this Order to Maintain Assets may be the same Person appointed as Divestiture Trustee pursuant to Paragraph IV. of the Decision and Order in this matter.

## IV.

**IT IS FURTHER ORDERED** that, beginning thirty (30) days after the initial report is required to be filed pursuant to the Agreement Containing Consent Orders in this matter, and every sixty (60) days thereafter until Respondents have fully complied with these obligations pursuant to this Order to Maintain Assets, Respondents shall submit to the Commission and the Interim Monitor verified written reports setting forth in detail the manner and form in which they intend to comply, are complying, and have complied with Paragraph II. of this Order. Respondents shall include in their reports, among other things that are required from time to time, a full description of the efforts being made to comply with this Order to Maintain Assets, subject to any legally recognized privilege, including copies of all written and electronic communications to and from the parties, all internal memoranda, and all reports and recommendations concerning the completion of such obligations.

## V.

**IT IS FURTHER ORDERED** that Respondents shall notify the Commission at least thirty (30) days prior to any proposed change in either corporate Respondent such as dissolution, assignment, sale resulting in the emergence of a successor corporation or the creation or dissolution of subsidiaries or any other change in the corporation that may affect compliance obligations arising out of this Order to Maintain Assets.

## VI.

**IT IS FURTHER ORDERED** that, for the purposes of determining or securing compliance with this Order to Maintain Assets, and subject to any legally recognized privilege, and upon written request with reasonable notice to Respondents, Respondents shall permit any duly authorized representatives of the Commission:

A. Access, during office hours of Respondents and in the presence of counsel, to all facilities and access to inspect and copy all books, ledgers, accounts, correspondence, memoranda, and all other records and documents in the possession or under the control of Respondents relating to compliance with this Order to Maintain Assets; and

B. Upon five (5) days' notice to Respondents and without restraint or interference from Respondents, to interview officers, directors, or employees of Respondents, who may have counsel present, regarding such matters.

## VII.

LX-0649-0013

**IT IS FURTHER ORDERED** that this Order to Maintain Assets shall terminate on the earlier of:

A. Three (3) business days after the Commission withdraws its acceptance of the Consent Agreement pursuant to the provisions of Commission Rule 2.34, 16 C.F.R. § 2.34; or

B. The day after the divestiture and transfer of all of the Purchased Assets (or the Outpatient Clinical Laboratory Testing Services Assets or Quest Diagnostics' Northern California Clinical Laboratory Testing Services Assets, if divested), as described in and required by the attached Decision and Order, is completed and the Interim Monitor, in consultation with Commission staff and the Commission-approved Acquirer, notifies the Commission that the Commission-approved Acquirer's transition is complete.

By the Commission.

Donald S. Clark
Secretary

SEAL

ISSUED: February 21, 2003

## NON-PUBLIC APPENDIX A
## TO THE ORDER TO MAINTAIN ASSETS

*Management Employees*
[Redacted From Public Record Version]

## NON-PUBLIC APPENDIX B
## TO THE ORDER TO MAINTAIN ASSETS

*LabCorp Purchase Agreement*
[Redacted From Public Record Version]

## APPENDIX C
## TO THE ORDER TO MAINTAIN ASSETS

Notice of the Divestiture and
Employee Agreement to Maintain Confidential Business Information

### SALES EMPLOYEE NOTICE AND SALES EMPLOYEE AGREEMENT

On [date], Quest Diagnostics Incorporated and Unilab Corporation entered into an agreement with the Federal Trade Commission in connection with Quest Diagnostics' acquisition of Unilab. Pursuant to that agreement, the Federal Trade Commission will issue a number of Orders imposing obligations on the combined company and its employees. As an employee of the combined company, you must comply with certain provisions of the Orders.

In general, the Orders require Quest Diagnostics to transfer to Laboratory Corporation of America Holdings ("LabCorp"):

LX-0649-0014

- 46 patient service centers ("PSCs"), four of which are rapid response laboratories
- An assignment of three Quest Diagnostics IPA agreements (Alta Bates Medical Group, Brown & Toland Medical Group, and Affinity Medical Group) and one Unilab IPA agreement (Sutter Medical Foundation- North Bay)
- Account information for physicians whose patients have used the PSCs being transferred to LabCorp, as discussed below.

The Orders require that the PSCs and rapid response laboratories and the IPA agreements be transferred to LabCorp during a six-month period, and that during the course of that six-month period, no actions can be taken that detract from the value or the competitive viability of the assets to be transferred or of any remaining assets of Quest Diagnostics in Northern California. In addition, the Orders require Quest Diagnostics to allow LabCorp to make employment offers to certain employees of Quest Diagnostics and Unilab.

Under the Orders, Quest Diagnostics will be required to provide LabCorp with account set-up information (including pricing, service and logistics) for all physicians who are affiliated with any of the four IPAs listed above and all physicians who referred at least 8 specimens to the 46 patient service centers during either October, November or December 2002. The Orders provide that All Quest Diagnostics employees who are involved with marketing, contracting or sales in Northern California ("sales employees") may not solicit or have access to any customer-specific pricing information, customer-specific discounts and customer-specific supply or service requirements or preferences with respect to these physician accounts prior to the acquisition of Unilab. There are approximately ____ accounts, including ___ IPA accounts, at Quest Diagnostics that are covered by this restriction, including certain accounts for which you may be currently responsible. All Unilab sales employees are prohibited from soliciting or having access to any of this Quest Diagnostics' customer-specific information on any customer of Quest Diagnostics (regardless of whether any of the customer's patients utilized the PSCs), even if the customer is also a customer of Unilab.

All Quest Diagnostics sales employees will be informed of the names of the accounts to which the this prohibition applies. Sales employees will not have access to this customer-specific information on these physician accounts from the company's computer systems. Note that the prohibition applies to all customer-specific information, whether in paper or electronic format. If you have any documents or electronic files containing any of this information in your possession, please contact _____ so that we may remove that information from your files. Do not attempt to access customer-specific information on these physicians accounts from any source, including the Company's computer systems or any paper files, or from any non-sales employees who have access to this information as discussed below.

If any of your (or any other) customers have any questions regarding their account, they may continue to call their customer solutions contact or other service personnel as may be appropriate. Customers solutions employees, as well as billing and certain other employees, will continue to have access to the above-mentioned customer specific information with respect to these physician accounts for billing purposes, for customer service purposes, or for any other non-sales purpose. However, these employees are prohibited from supplying any customer-specific information to sales employees. Accordingly, please do not request customer-specific information regarding any of the physician accounts covered by the Orders. Instead, if any physician account covered by the Orders has any questions that you cannot answer

LX-0649-0015

because of this restriction, please refer the account to a person who has access to the information and may answer their questions.

By receiving this notice, you hereby acknowledge that you have been informed of the above prohibitions. We will notify you when Quest Diagnostics' obligations under the Orders are completed and the prohibitions on certain conduct discussed above come to an end.

Please note that you are not prohibited from making any sales calls on any of the physicians covered by this prohibition or from obtaining from these physician customers any information that is otherwise covered by the Orders. You can turn such information over to [customer solutions] to be input in the Company's information systems.

You must sign this acknowledgment and agree to abide by the above prohibitions.

Any violation of the FTC's Orders may subject Quest Diagnostics, Unilab or the combined company to civil penalties and will lead to disciplinary action, including termination of employment.

### CONTACT PERSON

If you have questions regarding the contents of this notice or whether information in your possession should be removed from your files, you should contact _____ at _____-_____-_____, e-mail address:_____.

### ACKNOWLEDGMENT

I, _____(print name), hereby acknowledge that I have read the above notification and agree to abide by its provisions.