

Quest
Diagnostics

SIX SIGMA QUALITY

ADVANCED INFORMATION TECHNOLOGY

# Earning Your Trust

ACCESS & CONVENIENCE

INNOVATIVE SCIENCE & MEDICINE

**2003** ANNUAL REPORT

LX-0650-0001

| | | | |
|---|---|---|---|
| **Net Revenues**<br>($ billions) | **Net Income***<br>($ millions) | **Operating Income***<br>($ millions) | **Net Earnings Per Diluted Share***<br>(dollars) |

| Compound Annual Growth Rate (1999-2003) | 21% | 61% | 46% | 46% |
|---|---|---|---|---|

## FINANCIAL HIGHLIGHTS

Years Ended December 31

| (in millions, except per share data) | 2003 | 2002 | % Increase |
|---|---|---|---|
| Net Revenues | $ 4,738 | $ 4,108 | 15% |
| Net Income | 437 | 322 | 36% |
| Operating Income | 796 | 592 | 34% |
| Net Earnings Per Diluted Share | 4.12 | 3.23 | 28% |

*Reflects adjustment for the change in goodwill accounting. In addition, these measures exclude losses on debt extinguishment and provisions for restructurings and other special charges. A reconciliation of these measures and the most directly comparable financial measures under generally accepted accounting principles can be found following the attached 2003 Annual Report on Form 10-K.

LX-0650-0002

Earning Your Trust...
an aspiration expressed by many,
often as a symbolic gesture.

At Quest Diagnostics,
it energizes everything we do.

What does "Earning Your Trust" mean to us? Building a high level of confidence, grounded in integrity, supporting your needs: the cumulative result of countless actions taken over a period of days, months and years. We are committed to earn your trust as we perform vital diagnostic tests that provide answers to improve patient health. Every business day, more than half a million people and their families entrust Quest Diagnostics to tell their doctors whether they are healthy or ill. We care deeply and take this responsibility very seriously. We seek to earn your trust in all aspects of our business, in each and every encounter with patients, and in all of our dealings with customers, business partners, fellow employees and shareholders.

1

LX-0650-0003



**Quest Diagnostics**

**OUR VISION**
Dedicated people improving the health of patients through unsurpassed diagnostic insights

**OUR CORE VALUES**
Quality, Integrity, Innovation, Accountability, Collaboration, Leadership

**BUSINESS PROFILE**
Quest Diagnostics Incorporated is the nation's leading provider of diagnostic testing, information and services, providing insights that enable healthcare professionals to make decisions that improve health. The company offers the broadest access to diagnostic testing services through its national network of laboratories and patient service centers, and provides interpretive consultation through its extensive medical and scientific staff. Quest Diagnostics is the leading provider of esoteric testing, including gene-based medical testing, and provides advanced information technology solutions to improve patient care. Additional company information is available at: www.questdiagnostics.com.

2

**473**

LX-0650-0004



**Kenneth W. Freeman**
Chairman and
Chief Executive Officer

**Surya N. Mohapatra, Ph.D.**
President and
Chief Operating Officer and
CEO-Elect

## TO OUR FELLOW SHAREHOLDERS, CUSTOMERS AND EMPLOYEES:

Quest Diagnostics delivered another year of outstanding performance in 2003. We reported excellent financial results and continued to invest for the future, building on strength as the clear industry leader in nearly every facet of our vital and growing industry.

Laboratory test results impact more than 70% of healthcare decisions. Although these results are critically important in helping physicians determine whether patients are healthy or ill, they represent less than 3% of healthcare spending in the United States. The intrinsic value of the services we provide ensures we have a critical role to play in serving patient needs and sets the stage for consistent, strong financial performance for years to come.

### 2003 FINANCIAL PERFORMANCE

In 2003, earnings per share grew 28% to $4.12, continuing our track record of outstanding long-term growth. Revenues grew 15% to $4.7 billion, fueled by the acquisition of Unilab Corporation, ongoing pricing discipline, and continuing rapid growth of gene-based and esoteric testing services. Revenue growth was impacted during the year by weakness in employment levels nationwide and the increasing number of uninsured Americans.

3

LX-0650-0005

We have taken several actions to accelerate the company's internally driven growth, including expanding our sales force and providing enhanced training and tools, and taking Six Sigma quality processes to the next level to drive greater customer satisfaction. As the year ended, we saw initial encouraging signs that these actions are producing results.

We generated $663 million in cash flow from operations during the year. We put cash to work through continuing capital investments in facilities and information technology and the acquisition of Unilab. We began to aggressively repurchase shares, approximately $260 million of the $600 million authorized in 2003. Additionally, as a sign of confidence in our ongoing ability to generate strong cash flows, we declared our first quarterly dividend, 15 cents a share, which was paid in January of this year.

The company achieved another important milestone during 2003, as we implemented a CEO succession plan to ensure a smooth and orderly transition in senior leadership.

## OUR VALUE PROPOSITION

We are creating a culture that puts patients first. The people of Quest Diagnostics offer a unique value proposition based on four strategic pillars, which are described in the pages that follow:

- **Six Sigma Quality**
  Pursuing perfection in all that we do through rigorous process improvement using Six Sigma quality methodologies.

- **Access and Convenience**
  Offering the broadest access to convenient laboratory services to physicians and their patients.

- **Innovative Science and Medicine**
  Introducing new diagnostic tests and services that improve health.

- **Advanced Information Technology**
  Providing information technology solutions that enable more effective and efficient patient encounters with the healthcare system.

We are excited about long-term prospects for the industry and our company. The population continues to grow and age, yielding more patients who will progressively require more diagnostic tests when they visit the doctor. The rapid development of genomics and proteomics, innovative testing platforms, and the application of new information technologies will enable us to continue to offer new tests and Internet solutions that help physicians help patients.

Quest Diagnostics' unique value proposition for customers enables us to maintain our commitment to pricing discipline. Healthcare payers recognize the value we provide and the investments we continue to make to enhance it.

4

LX-0650-0006

**OUR FOCUS**

We are very well positioned to build on our considerable strengths to generate growth, and are clearly focused on flawless execution. Our employees are driven to achieve exceptional results by the values and vision of Quest Diagnostics.

The company is built on a firm foundation of six values: Quality, Integrity, Innovation, Accountability, Collaboration and Leadership. These are not just words; they have real meaning for our more than 37,000 employees and guide the way each of us performs every day. For everything from the quality of our laboratory testing to the integrity of financial results, our phlebotomists, couriers, specimen accessioners, physicians, scientists, medical technologists and staff professionals are united in striving to earn the trust of physicians, patients and shareholders.

"Dedicated people improving the health of patients through unsurpassed diagnostic insights." That's our vision. It is the source of our passion for the patient and the reason we all come to work each day.

Thank you for placing your trust in us. We look forward to building a great future together.

**Kenneth W. Freeman**
Chairman and
Chief Executive Officer

**Surya N. Mohapatra, Ph.D.**
President and Chief Operating Officer
and CEO-Elect

By the Annual Meeting of Stockholders on May 4, 2004, Surya N. Mohapatra, Ph.D. will succeed Kenneth W. Freeman as the Chief Executive Officer, culminating a smooth and orderly transition process initiated last year. Kenneth W. Freeman has served as Chairman and Chief Executive Officer of Quest Diagnostics since its inception in 1997, and for almost two years before that prior to its spin-off from Corning Incorporated.

5

LX-0650-0007



Six Sigma, a disciplined approach to reduce errors and strive for perfection, plays an integral part in all processes at Quest Diagnostics. All of our employees, including Basem Iskaros, M.D., Senior Staff Pathologist (right); Mara Musi, Billing Customer Service Representative (bottom, left); and Nick Giorgio, Technologist, Automated Chemistry (below, left), are committed to providing the highest quality in everything we do.

# SIX SIGMA QUALITY





LX-0650-0008

## WHAT MATTERS MOST...

When a doctor orders laboratory testing for you or a loved one, quality is the only thing that really matters. We dedicate time, effort, and resources to ensure the highest quality in everything we do – to earn the trust of our physicians and patients.

At Quest Diagnostics, we strive for perfection. Our goal is to ensure highly appropriate patient care by continually improving the quality of the processes we use inside and outside the laboratory. We focus on every aspect of what we do.

We use a methodology called Six Sigma that provides the framework for setting performance goals based on customer requirements. It also helps us measure results and identify ways to continually improve the processes we use in every part of the business. Our more than 37,000 employees have been taught the basics of Six Sigma. Nearly 1,000 employees have undergone more rigorous training and lead quality improvement projects. We have completed more than 1,000 projects that have improved quality in our operations, from speeding the time it takes to provide a doctor with test results, to reducing wait times at patient service centers, to improving the accuracy of our billing process.

## RIGOROUS QUALITY ASSURANCE

Clinical laboratories are subject to stringent regulations imposed by federal, state and local government agencies. All Quest Diagnostics laboratories are accredited by the College of American Pathologists (CAP), an independent non-governmental organization of board-certified pathologists. Additionally, Quest Diagnostics' own internal quality assurance processes exceed the standards set by accrediting agencies, and include periodic random reviews of completed anatomic pathology cases and clinical pathology assays.

We invest to ensure that we have highly trained and skilled people, and we support the continuing education of our medical professionals to enable them to keep up with the latest advances in diagnostic anatomic pathology and clinical pathology.

Striving to provide the highest quality helps to clearly distinguish us from the competition.







From Top:
**Jessie Lee, M.D.**
Associate Director,
Dermatopathology
**Brian Geschwindt**
Associate Master Black Belt,
Six Sigma
**Vasundhara Untawale, M.D.**
Associate Director,
Urologic Pathology

LX-0650-0009



# ACCESS & CONVENIENCE

Nobody offers more access to critical healthcare testing services than Quest Diagnostics, thanks to hardworking employees like Lorenzo Wright, Client Services Representative (above, left); Vicki Franzson, Logistics Department Supervisor (above, right); and John Duffy, Courier (top). We offer almost 2,000 conveniently located patient service centers and operate our own logistics network that transports more than half a million specimens to our laboratories every business day, rain or shine.

479

LX-0650-0010

## GIVING PATIENTS WHAT THEY WANT

We earn our customers' trust by making critical laboratory services easy to access and convenient to use.

Quest Diagnostics offers the greatest access for patients to laboratory services with almost 2,000 conveniently located patient service centers across the country. Through our ongoing relationships with most major managed care organizations, we provide members of health plans access to high quality laboratory services.

Friendly and skilled phlebotomists make it convenient for patients to have their specimens collected. We continue to improve the patient experience in our patient service centers. For example, in 2003, we introduced flexible advance scheduling in certain locations to shorten patient visits and also accommodate patients with special needs, such as infants and the elderly.

Our commitment to Six Sigma quality has helped us improve service levels by focusing on giving patients what they want – prompt, courteous access to patient service centers and customer service representatives. Almost 40 million patients visited our patient service centers last year, yet even during peak times, we still see most patients within 20 minutes or less. And at our call centers, customer service representatives answer the phone on average in about 20 seconds, which qualifies as world-class service in any industry.

To make our services more convenient and efficient for physicians and hospitals, we invest in our own logistics network that includes more than 4,000 professional couriers and a fleet of 3,000 vehicles and 14 aircraft. Each business day, rain or shine, they successfully transport more than half a million specimens from doctors' offices, clinics, hospitals and our own patient service centers to our full-service laboratories, serving major metropolitan areas around the country. Our extensive logistics capabilities provide customers and patients with accurate and timely test results they can trust.

## RATED #1 BY HOSPITALS

Our efforts are being recognized. In an independent survey of hospitals by the industry news source Washington G-2 Reports, Quest Diagnostics outperformed the competition. We ranked first for Fastest Turnaround Time, Best Overall Value and Best Problem Resolution among major reference labs.

Patients turn to our website (www.questdiagnostics.com) to learn more about laboratory tests in easy-to-understand, non-technical terms, to have billing questions answered, or to pay online.





*From top:*
**Ethel Jimenez**
*Client Service Representative*
**Judi Hendricks**
*Branch Operations*
*Training Specialist*

9

LX-0650-0011



# INNOVATIVE SCIENCE & MEDICINE

Quest Diagnostics employees, such as Leza Gallo, M.D., Director Cytopathology (top, left) and Elsie Arroyo, Cytotechnologist (top, right), help physicians diagnose and treat disease. We are committed to continuously expanding our test offerings that can help to improve the lives of patients. In 2003, we enhanced colorectal cancer screening testing with inSure™, a non-invasive fecal immunochemical test. The brush-based sample collection method is uncomplicated and easy to use and has the potential to improve patients' adherence to recommended colorectal cancer screening guidelines.

**481**

LX-0650-0012

## NEW DIAGNOSTIC TESTS

Doctors trust Quest Diagnostics to develop and introduce new tests that continually improve their ability to diagnose, treat or manage the treatment of disease. During the past year, we expanded test offerings in many areas, including cardiovascular disease and cancer, the two leading causes of death in the United States.

*Cardiovascular disease.* Doctors have traditionally relied on lipid measures, including low-density lipoprotein (LDL, or "bad") cholesterol, high-density lipoprotein (HDL, or "good") cholesterol and triglycerides to monitor and treat patients for cardiovascular disease. However, half of all heart attack victims do not have high total cholesterol. Increasingly doctors are also demanding markers of cardiac risk that are independent of LDL or HDL cholesterol. One such fast-growing test is Cardio CRP, which measures inflammation.

*Cancer.* Late in 2003, we enhanced colorectal cancer screening testing with InSure™, a non-invasive fecal immunochemical test. The brush-based sample collection method is uncomplicated and easy to use and has the potential to improve patients' adherence to recommended colorectal cancer screening guidelines. After a review of various colorectal cancer screening technologies, The American Cancer Society concluded that immunochemical tests are more patient-friendly than other kinds of fecal occult blood tests such as guaiac-based tests. The InSure test was quickly covered by the major national health plans.

## PAST PIONEER, FUTURE NAVIGATOR

In the past, we have pioneered numerous tests to aid in the diagnosis of cardiovascular disease, cancer, diabetes, endocrine disorders and many other illnesses. Today we are pioneering the use of gene-based tools. From viral load and drug resistance testing for HIV/AIDS and hepatitis C patients to genetic predisposition testing for cystic fibrosis to high-risk human papillomavirus DNA testing, Quest Diagnostics is the leader in gene-based testing, with annual revenues of more than $500 million.

To provide the most innovative tests, scientists at Quest Diagnostics continue to develop tests in-house and collaborate with other technology pioneers.

One day, biochips may help individuals learn about their own genetic predisposition to disease and help their physicians tailor individualized treatment regimens. In 2003, we became the first commercial laboratory to begin developing tests using biochips. These silicon or glass wafers, which contain arrays of microscopic test probes, have the potential to change the way laboratories operate – just as microchips revolutionized computer technology.

Leading through innovation builds trust with our doctors and improves patient care.





*From top:*
**Maher Albitar, M.D.**
*Medical Director,*
*Hematopathology*
**Jon Nakamoto, M.D., Ph.D.**
*Managing Director,*
*Quest Diagnostics Nichols Institute*
**Mervyn Sahud, M.D., F.A.C.P**
*Medical Director,*
*Coagulation*

11

LX-0650-0013



Advanced information technology solutions provide a competitive edge for Quest Diagnostics. In 2003 clients' usage of our unique online test ordering and results reporting system more than doubled. These solutions help physicians to save time, reduce errors and improve patient care. Quest Diagnostics Data Center employees such as Evelyn Leiva, Computer Operations Support Representative, and Steven E. Smith, Sr., Operations Specialist, help provide a secure, state-of-the-art information technology network.

# ADVANCED
# INFORMATION
# TECHNOLOGY

LX-0650-0014

## THE ONLINE EDGE IS EMAXX®

We provide industry-leading information technology solutions that earn the trust of doctors by enabling them to spend more time diagnosing and treating patients.

Physician clients more than doubled their use of our online test ordering and results reporting system in 2003. Our Quest on Demand® online technology solution gives physicians tools to track a patient's historical test results over time. It also reduces data entry errors and improves billing accuracy.

Our innovative eMaxx Internet-based physician portal provides a unique capability for physicians and creates a competitive edge. eMaxx gives physicians access to patient-centric clinical information, including lab results, with advanced tools and reporting features — all in a secure single storage area, called a Clinical Data Repository. With eMaxx, physicians can access multiple sites and services to order lab tests and prescriptions online and streamline administrative tasks, including patient eligibility verification. This is all accomplished through a single sign-on, saving time and money, and improving patient care. eMaxx will enable large physician practices to establish clinical integration, connecting doctors to share data, set standards of care and monitor treatment patterns.

## CHARTMAXX® PROPELS EFFICIENT SOLUTIONS

In addition, our ChartMaxx enterprise-wide electronic patient record solution has been adopted by many of the leading hospitals in North America. ChartMaxx is an electronic patient record system that brings together all of a hospital system's available patient records, including lab and radiology results, insurance information and billing history in one easy-to-use electronic file. Once patient records have been assembled in ChartMaxx, physicians and hospital administrators are offered a variety of options for viewing a patient's medical and account records. MedPlus®, our healthcare information technology subsidiary that developed eMaxx and ChartMaxx, was recognized by KLAS Enterprises, a healthcare information technology research firm, as the number one document management and imaging vendor for the second consecutive year.

Our advanced information technology solutions help physician and hospital customers manage and share information in ways that benefit patients. They build customer loyalty and trust and help clearly differentiate Quest Diagnostics from our competitors.





*From top:*
**Art Diaz**
*Systems Engineer*
**Clinton McBean**
*National Help Desk Analyst*

13

LX-0650-0015

## BOARD OF DIRECTORS

**KENNETH D. BRODY**
Co-Founder
Taconic Capital Advisors, LLC
New York, New York

**WILLIAM F. BUEHLER**
Retired Vice Chairman
Xerox Corporation
Stamford, Connecticut

**MARY A. CIRILLO**
Chairman
OPCENTER, LLC
New York, New York

**JAMES F. FLAHERTY III**
President and CEO
Health Care Property
Investors, Inc.
Newport Beach, California

**KENNETH W. FREEMAN**
Chairman and
Chief Executive Officer
Quest Diagnostics Incorporated
Teterboro, New Jersey

**WILLIAM R. GRANT**
Chairman
Galen Associates
New York, New York

**ROSANNE HAGGERTY**
Founder and President
Common Ground Community
New York, New York

**SURYA N. MOHAPATRA, PH.D.**
President and
Chief Operating Officer and
CEO-Elect
Quest Diagnostics Incorporated
Teterboro, New Jersey

**DAN C. STANZIONE, PH.D. \***
President Emeritus
Bell Laboratories
Lucent Technologies Incorporated
Murray Hill, New Jersey

**GAIL R. WILENSKY, PH.D.**
John M. Olin Senior Fellow
Project HOPE
Bethesda, Maryland

**JACK B. ZIEGLER**
President
Worldwide Consumer Healthcare
GlaxoSmithKline
Philadelphia, Pennsylvania

\* Lead Independent Director

## EXECUTIVE OFFICERS

**KENNETH W. FREEMAN**
Chairman and
Chief Executive Officer

**SURYA N. MOHAPATRA, PH.D.**
President and
Chief Operating Officer and
CEO-Elect

**ROBERT A. HAGEMANN**
Senior Vice President and
Chief Financial Officer

**GERALD C. MARRONE**
Senior Vice President,
Administration

**MICHAEL E. PREVOZNIK**
Senior Vice President and
General Counsel

**DAVID M. ZEWE**
Senior Vice President,
Diagnostic Testing Operations

## CORPORATE OFFICERS

**CATHERINE T. DOHERTY**
Vice President,
Office of the CEO

**DELBERT A. FISHER, M.D.**
Vice President,
Science and Innovation

**JEAN-MARC HALBOUT, PH.D.**
Vice President and
Chief Information Officer

**RICHARD A. MAHONEY**
Vice President,
Healthcare Information Solutions

**JOAN E. MILLER, PH.D.**
Vice President,
Hospital Business

**DAVID W. NORGARD**
Vice President,
Human Resources

**LAURE E. PARK**
Vice President,
Investor Relations

**ROBERT E. PETERS**
Vice President,
Sales and Marketing

**JOYCE G. SCHWARTZ, M.D.**
Vice President and
Chief Laboratory Officer

14

LX-0650-0016

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, DC 20549**

**FORM 10-K**



Annual Report Pursuant to Section 13 or 15(d) of
the Securities Exchange Act of 1934
For the Fiscal Year Ended December 31, 2003
Commission File Number 1-12215

# Quest Diagnostics Incorporated

One Malcolm Avenue, Teterboro, NJ 07608
(201) 393-5000

**Delaware**
*(State of Incorporation)*

**16-1387862**
*(I.R.S. Employer Identification Number)*

**Securities registered pursuant to Section 12(b) of the Act:**

| *Title of Each Class* | *Name of Each Exchange on Which Registered* |
|---|---|
| Common Stock with attached Preferred Share Purchase Right | New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act:**   None

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes   X   No _____

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K. [  ]

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Act).
Yes   X   No _____

As of June 30, 2003, the aggregate market value of the approximately 83 million shares of voting and non-voting common equity held by non-affiliates of the registrant was approximately $5.3 billion, based on the closing price on such date of the registrant's Common Stock on the New York Stock Exchange.

As of February 23, 2004, there were outstanding 103,604,635 shares of Common Stock, $.01 par value.

Documents Incorporated by Reference

| **Document** | **Part of Form 10-K into which incorporated** |
|---|---|
| Portions of the registrant's Proxy Statement to be filed by April 29, 2004 . . . | Part III |

Such Proxy Statement, except for portions thereof, which have been specifically incorporated by reference, shall not be deemed "filed" as part of this report on Form 10-K.

LX-0650-0017

PART I

Item 1. Business

Overview

We are the nation's leading provider of diagnostic testing, information and related services, providing insights that enable physicians, hospitals, managed care organizations and other healthcare professionals to make decisions to improve health. We offer patients and physicians the broadest access to diagnostic laboratory services through our national network of laboratories and patient service centers. We provide interpretive consultation through the largest medical and scientific staff in the industry, with over 300 physicians and Ph.D.'s around the country. We are the leading provider of esoteric testing, including gene-based testing, and testing for drugs of abuse. We are also a leading provider of anatomic pathology services and testing for clinical trials. We empower healthcare organizations and clinicians with state-of-the-art information technology solutions that can improve practice management and patient care.

During 2003, we generated net revenues of $4.7 billion and processed over 130 million requisitions for testing. Each requisition form accompanies a patient specimen, indicating the tests to be performed and the party to be billed for the tests. Our customers include physicians, hospitals, managed care organizations, employers, governmental institutions and other commercial clinical laboratories.

We currently operate a nationwide network of approximately 1,925 patient service centers, principal laboratories located in more than 30 major metropolitan areas throughout the United States, and approximately 155 smaller "rapid response" laboratories (including, in each case, facilities operated at our joint ventures). We are the only company in our industry to provide full esoteric testing services, including gene-based testing, on both coasts through our Quest Diagnostics Nichols Institute facilities, located in San Juan Capistrano, California and Chantilly, Virginia. We also have laboratory facilities in Mexico City, Mexico and San Juan, Puerto Rico and near London, England.

We are a Delaware corporation. We sometimes refer to our subsidiaries and ourselves as the "Company". We are the successor to MetPath Inc., a New York corporation that was organized in 1967. From 1982 to 1996, we were a subsidiary of Corning Incorporated, or Corning. On December 31, 1996, Corning distributed all of the outstanding shares of our common stock to the stockholders of Corning. In August 1999, we completed the acquisition of SmithKline Beecham Clinical Laboratories, Inc., or SBCL, which operated the clinical laboratory business of SmithKline Beecham plc, or SmithKline Beecham.

Our principal executive offices are located at One Malcolm Avenue, Teterboro, New Jersey 07608, telephone number: (201) 393-5000. Our filings with the Securities and Exchange Commission, or the SEC, including our annual report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and amendments to those reports, are available free of charge on our website as soon as reasonably practicable after they are filed with, or furnished to, the SEC. Our Internet website is located at http://www.questdiagnostics.com.

The United States Clinical Laboratory Testing Market

Clinical laboratory testing is an essential element in the delivery of healthcare services. Physicians use laboratory tests to assist in the detection, diagnosis, evaluation, monitoring and treatment of diseases and other medical conditions. Clinical laboratory testing is generally categorized as clinical testing and anatomic pathology testing. Clinical testing is performed on body fluids, such as blood and urine. Anatomic pathology testing is performed on tissues and other samples, such as human cells. Most clinical laboratory tests are considered routine and can be performed by most commercial clinical laboratories. Tests that are not routine and that require more sophisticated equipment and highly skilled personnel are considered esoteric tests. Esoteric tests, including gene-based tests, are generally referred to laboratories that specialize in performing those tests.

We believe that the United States diagnostic testing industry had over $37 billion in annual revenues in 2003. Most laboratory tests are performed by one of three types of laboratories: commercial clinical laboratories; hospital-affiliated laboratories; and physician-office laboratories. In 2003, we believe that hospital-affiliated laboratories performed over one-half of the clinical laboratory tests in the United States, commercial clinical laboratories performed approximately one-third of those tests, and physician-office laboratories performed the balance.

The underlying fundamentals of the diagnostic testing industry have improved since the early to mid-1990s, which was a period of declining reimbursement and reduced test utilization. During the early 1990s, the

487

LX-0650-0018

industry was negatively impacted by changes in government regulation and investigations into various billing practices. In addition, the rapid growth of managed care, as a result of the need to reduce overall healthcare costs, and excess laboratory testing capacity, led to revenue and profit declines across the diagnostic testing industry, which in turn led to industry consolidation, particularly among commercial laboratories. As a result of these dynamics, fewer but larger commercial laboratories have emerged, which have greater economies of scale, rigorous programs designed to assure compliance with government billing regulations and other laws, and a more disciplined approach to pricing services. These changes have resulted in improved profitability and a reduced risk of non-compliance with complex government regulations. At the same time, a slowdown in the growth of managed care and decreasing influence by managed care organizations on the ordering of clinical laboratory testing by physicians has contributed to renewed growth in testing volumes and further improvements in profitability since 1999. Partially offsetting these favorable trends have been changes in the United States economy during the last several years, which have resulted in an increase in the number of unemployed and uninsured. In addition, in an attempt to slow the rapidly rising costs of healthcare, employers and healthcare insurers have made design changes to healthcare plans which shift a larger portion of healthcare costs to consumers. We believe these factors have reduced the utilization of healthcare services in general. Orders for laboratory testing are generated from physician offices, hospitals and employers. As such, factors such as the number of unemployed and uninsured and design changes in healthcare plans, which impact the level of employment or the number of physicians' office and hospital visits, will impact the utilization of laboratory testing.

We believe the diagnostic testing industry has continued to grow during the last several years despite the slowdown in the United States economy and the changes in healthcare plan design, and that growth will accelerate as the economy improves. In addition, over the longer term, growth is expected to accelerate as a result of the following factors:

- general expansion and aging of the United States population;

- continuing research and development in the area of genomics and proteomics, which is expected to yield new, more sophisticated and specialized diagnostic tests;

- increasing recognition by consumers and payers of the value of early detection and prevention, which can be provided through laboratory testing, as a means to improve health and reduce the overall cost of healthcare; and

- increasing affordability of tests due to advances in technology and cost efficiencies.

## Business Strategy

Our mission is to be recognized by our customers and employees as the best provider of comprehensive and innovative diagnostic testing, information and related services. The principal components of this strategy are to:

- *Compete Through Providing the Highest Quality Services:* We intend to become recognized as the quality leader in the healthcare services industry. We continue to implement our Six Sigma and standardization initiatives throughout all aspects of our organization. Six Sigma is a management approach that requires a thorough understanding of customer needs and requirements, root cause analysis, process improvements and rigorous tracking and measuring. We have integrated our Six Sigma initiative with our initiative to standardize operations and processes across the Company by adopting identified Company best practices. We plan to continue these initiatives during the next several years and expect that successful implementation of these initiatives will result in measurable improvements in customer satisfaction as well as significant economic benefits.

- *Capitalize on Our Leading Position Within the Laboratory Testing Market:* We are the leader in the core clinical laboratory testing business offering the broadest national access to clinical laboratory testing services, with facilities in substantially all of the major metropolitan areas in the United States. We currently operate a nationwide network of approximately 1,925 patient service centers, principal laboratories located in more than 30 major metropolitan areas throughout the United States and about 155 smaller "rapid response" laboratories that enable us to serve physicians, managed care organizations, hospitals, employers and other healthcare providers and their patients throughout the United States. We believe that customers will increasingly seek to utilize laboratory testing providers that have a nationwide presence and offer a comprehensive range of services and that, as a result, we will be able to profitably enhance our market position.

2

LX-0650-0019

- *Continue to Lead Innovation:* We intend to build upon our reputation as a leading innovator in the clinical laboratory industry by continuing to introduce new tests, technology and services. As the industry leader with the largest and broadest network and the leading provider of esoteric testing, including gene-based testing, we believe that we are the best partner for developers of new technology and tests to introduce their products to the marketplace. Through our relationship with members of the academic community, pharmaceutical and biotechnology firms, and emerging medical technology companies that develop and commercialize novel diagnostics, pharmaceutical and device technologies, we believe that we are one of the leaders in transferring technical innovation to the market (see "Our Services—New Test Introductions").

We believe that, with the unveiling of the human genome, new genes and the linkages of genes with disease will continue to be discovered at an accelerating pace, leading to research that will result in ever more complex and thorough predictive, diagnostic and therapeutic testing. We believe that we are well positioned to capture much of this growth.

We continue to invest in the development and improvement of our information technology products for customers and providers by developing differentiated products that will provide friendlier, easier access to ordering and resulting of laboratory tests and patient-centric information. In February 2003, we launched our proprietary eMaxx® Internet portal to physicians nationwide, which enables doctors to order diagnostic tests and review laboratory results online, as well as check patients' insurance eligibility in real time and view clinical information from many sources.

- *Pursue Strategic Growth Opportunities:* We intend to continue to leverage our network in order to capitalize on targeted strategic growth opportunities both inside and outside our core clinical laboratory testing business. These opportunities are more fully described under "Strategic Growth Opportunities" and include expanding our gene-based and specialty testing capabilities, developing information technology products for customers and providers, expanding our geographic presence across the United States, and continuing to make selective acquisitions.

- *Leverage Our Satisfaction Model:* Our approach to conducting business states that satisfied employees lead to satisfied customers, which in turn benefits our stockholders. We regularly survey our employees and customers and follow up on their concerns. We emphasize skills training for all employees and leadership training for our supervisory employees, which includes Six Sigma training to manage high-impact quality improvement projects throughout our organization, and annual compliance training. We are committed to engaging each of our employees with dignity and respect and expect them to treat our customers the same way. We believe that our treatment and training of employees, together with our competitive pay and benefits, helps increase employee satisfaction and performance, thereby enabling us to provide better services to our customers.

## Recent Acquisitions

On February 28, 2003, we completed the acquisition of Unilab Corporation, or Unilab, the leading commercial clinical laboratory in California. In connection with the acquisition, we issued approximately 7.4 million shares of Quest Diagnostics common stock (including 0.3 million shares of Quest Diagnostics common stock reserved for outstanding stock options of Unilab which were converted upon the completion of the acquisition into options to acquire shares of Quest Diagnostics common stock), paid $297 million in cash and repaid $220 million of debt, representing substantially all of Unilab's then existing outstanding indebtedness.

In connection with the acquisition of Unilab, as part of a settlement agreement with the United States Federal Trade Commission, we entered into an agreement to sell to Laboratory Corporation of America Holdings, Inc., or LabCorp, certain assets in northern California for $4.5 million, including the assignment of agreements with four independent physician associations, or IPA, and leases for 46 patient service centers (five of which also serve as rapid response laboratories). Approximately $27 million in annual net revenues were generated by capitated fees under the IPA contracts and associated fee-for-service testing for physicians whose patients use these patient service centers, as well as from specimens received directly from the IPA physicians. We completed the transfer of assets and assignment of the IPA agreements to LabCorp during the third quarter of 2003.

As part of the Unilab acquisition, we acquired all of Unilab's operations, including its primary testing facilities in Los Angeles, San Jose and Sacramento, California, approximately 365 patient service centers, 35 rapid response laboratories and approximately 4,100 employees. Following the sale of certain assets to LabCorp, we closed our previously owned clinical laboratory in the San Francisco Bay area and completed the integration

3

LX-0650-0020

of remaining customers in the northern California area to Unilab's laboratories in San Jose and Sacramento. We continue to have two laboratories in the Los Angeles metropolitan area (our facilities in Van Nuys and Tarzana). We plan to open a new regional laboratory in the Los Angeles metropolitan area and then integrate our business in the Los Angeles metropolitan area into the new facility. We expect to incur up to $20 million of costs through 2005 to integrate Unilab and our existing California operations. Upon completion of the Unilab integration, we expect to realize approximately $25 million to $30 million of annual synergies. We expect to achieve this annual rate of synergies by the end of 2005.

On April 1, 2002, we acquired American Medical Laboratories, Incorporated, or AML, and an affiliated company of AML, LabPortal, Inc., a provider of electronic connectivity products, in an all-cash transaction valued at approximately $500 million, which included the assumption of approximately $160 million in debt. AML was a national provider of esoteric testing to hospitals and specialty physicians and a leading provider of diagnostic testing services in the Nevada and metropolitan Washington, D.C. markets. The Company's Chantilly, Virginia laboratory, acquired as part of the AML acquisition, has become our primary esoteric testing laboratory and hospital service center for the eastern United States, complementing our Nichols Institute esoteric testing facility in San Juan Capistrano, California. Esoteric testing volumes have been redirected within our national network to provide customers with improved turnaround time and customer service. We have completed the transition of certain routine clinical laboratory testing previously performed in the Chantilly, Virginia laboratory to other testing facilities within our regional laboratory network.

Following an acquisition, the integration process requires the dedication of significant management resources, which could result in a loss of momentum in the activities of our business and may cause an interruption of, or deterioration in, our services as a result of the following difficulties, among others:

- a loss of key customers or employees;
- inconsistencies in standards, controls, procedures and policies between the acquired company and our existing operations may make it more difficult to implement and harmonize company-wide financial, accounting, billing, information and other systems;
- failure to maintain the quality of services that the Company has historically provided;
- diversion of management's attention from the day-to-day business of our Company as a result of the need to deal with the foregoing disruptions and difficulties; and
- the added costs of dealing with such disruptions.

Since most of our clinical laboratory testing is performed under arrangements that are terminable at will or on short notice, any interruption of, or deterioration in, our services may also result in a customer's decision to stop using us for clinical laboratory testing. These events could have a material adverse impact on our business. However, management believes that the successful implementation of our integration plans and our value proposition based on expanded patient access, our broad testing capabilities and most importantly, the quality of the services we provide, will mitigate customer attrition.

## Our Services

Our laboratory testing business consists of routine testing, esoteric testing, and clinical trials testing. Routine testing generates approximately 80% of our net revenues. esoteric and gene-based testing generates approximately 16% of our net revenues. and clinical trials testing generates less than 3% of our net revenues. We derive less than 2% of our net revenues from foreign operations.

### Routine Testing

Routine tests measure various important bodily health parameters such as the functions of the kidney, heart, liver, thyroid and other organs. Commonly ordered tests include:

- blood cholesterol level tests;
- complete blood cell counts;
- Pap tests;
- HIV-related tests;
- urinalyses;
- pregnancy and other prenatal tests; and
- alcohol and other substance-abuse tests.

4

LX-0650-0021

We perform routine testing through our network of major laboratories, rapid response laboratories, or "stat" labs, and patient service centers. We also perform routine testing at the hospital laboratories we manage. Major laboratories offer a full line of routine clinical tests. Rapid response laboratories are local facilities where we can quickly perform an abbreviated group of routine tests for customers that require rapid turnaround times. Patient service centers are facilities where specimens are collected. These centers are typically located in or near a building used by medical professionals.

We operate 24 hours a day, 365 days a year. We perform and report most routine procedures within 24 hours. Most test results are delivered electronically.

### Esoteric Testing

Esoteric tests are those tests that require more sophisticated technology, equipment and materials, professional "hands-on" attention and more highly skilled professional and technical personnel, and may be performed less frequently than routine tests. Because it is not cost-effective for most clinical laboratories to perform a low volume of esoteric tests in-house, they generally refer many of these tests to an esoteric clinical testing laboratory that specializes in performing these more complex tests. Due to their complexity, esoteric tests are generally reimbursed at higher levels than routine tests.

Our two esoteric testing laboratories, which conduct business as Quest Diagnostics Nichols Institute, are among the leading esoteric clinical testing laboratories in the world. In 1998, our esoteric testing laboratory in San Juan Capistrano, California, became the first clinical laboratory in North America to achieve ISO-9001 certification. Our esoteric testing laboratory in Chantilly, Virginia, acquired as part of the AML acquisition, now enables us to provide full esoteric testing services, including gene-based testing, on the east coast. Our two esoteric testing laboratories perform hundreds of esoteric tests that are not routinely performed by our regional laboratories. These esoteric tests are generally in the following fields:

- endocrinology and metabolism (the study of glands, their hormone secretions and their effects on body growth and metabolism);

- genetics (the study of chromosomes, genes and their protein products and effects);

- hematology (the study of blood and bone marrow cells) and coagulation (the process of blood clotting);

- immunology (the study of the immune system including antibodies, immune system cells and their effects);

- microbiology and infectious diseases (the study of microscopic forms of life including bacteria, viruses, fungi and other infectious agents);

- oncology (the study of abnormal cell growth including benign tumors and cancer);

- serology (a science dealing with the body fluids and their analysis, including antibodies, proteins and other characteristics);

- special chemistry (more sophisticated testing requiring special expertise and technology); and

- toxicology (the study of chemicals and drugs and their effects on the body's metabolism).

### New Test Introductions

We intend to build upon our reputation as a leading innovator in the clinical laboratory industry by continuing to introduce new diagnostic tests. As the industry leader with the largest and broadest network and the leading provider of esoteric testing, including gene-based testing, we believe that we are the best partner for developers of new technology and tests to introduce their products to the marketplace.

During 2003, we continued to be a leading innovator in the industry through both tests that we developed at Nichols Institute, the largest provider of molecular diagnostic testing in the United States, as well as through relationships with technology developers. During 2003, we developed and introduced:

- more than 15 comprehensive panels utilizing our menu of over 100 tests to assist physicians with diagnosis and management of patients with bleeding or blood clotting disorders;

- over 15 new infectious disease tests including DNA assays for West Nile and SARS infection; and

- a biomarker assay that provides information on recurrence risk and biologic behavior of node negative breast cancer to guide therapy for the 30% of women with node negative disease.

5

LX-0650-0022

During 2003, we inaugurated a molecular endocrinology laboratory, with introduction of the first commercial DNA tests for central and nephrogenic Diabetes Insipidus (DI), Congenital Adrenal Hyperplasia (CAH), and Thyroid Hormone Resistance (THR). The DI tests bypass the complicated perturbation tests used for differential diagnosis of the several disorders. CAH testing is offered as a DNA analysis for the most common mutations and as a CAH complete gene sequencing for the 60 deleterious mutations known to be associated with this wide spectrum of adrenal function disorders. The THR testing provides definitive diagnosis for children with hypothyroidism of variable extent associated with the defective hormone receptor.

Through our relationship with members of the academic community and pharmaceutical and biotechnology firms, as well as our collaboration with emerging medical technology companies that develop and commercialize novel diagnostics, pharmaceutical and device technologies, we believe that we are one of the leaders in transferring technical innovation to the market. During 2003, we entered into a variety of strategic technology arrangements including:

- an agreement with Enterix, Inc. under which we have begun to offer the Insure™ test, an FDA- cleared fecal immunochemical screening test for colorectal cancer. Unlike other non-invasive colorectal cancer screening technologies, the Insure™ test is easy for patients to use and requires no handling of fecal matter;

- an agreement with diaDexus under which we are expanding our heart disease test offering through the Lp-PLA2 test, which enables physicians to detect a new risk factor for cardiovascular disease by measuring levels of the enzyme lipoprotein-associated phospholipase A2; and

- a relationship with Thermo Electron under which we are developing a biochip-based test for the detection of cystic fibrosis (CF) gene mutations during prenatal screening.

Through our research and development, marketing and commercial alliance with Roche Diagnostics, we were the first laboratory to offer several new tests developed by Roche, including its Elecsys NT-proBNP test (which aids in the diagnosis of congestive heart failure). Our relationship with Celera Diagnostics gives us access to potentially significant markers for the risk of cardiovascular disease, the leading cause of death in the United States, and diabetes. Our relationship with Correlogic Systems has gained access to its new ovarian cancer blood test, which we hope will be available to the marketplace in 2004 and will be the first protein pattern recognition blood test to detect ovarian cancer in women who are already considered high risk.

We believe that, with the unveiling of the human genome, new genes and the linkages of genes with disease will continue to be discovered at an accelerating pace, leading to research that will result in ever more complex and thorough predictive, diagnostic and therapeutic testing. We believe that we are well positioned to capture much of this growth.

### Clinical Trials Testing

We believe that we are the world's second largest provider of clinical laboratory testing performed in connection with clinical research trials on new drugs in the world. Clinical research trials are required by the Food and Drug Administration, or FDA, and other international regulatory authorities to assess the safety and efficacy of new drugs. We have clinical trials testing centers in the United States and in England. We also provide clinical trials testing in Australia, Singapore, and South Africa through arrangements with third parties. Clinical trials involving new drugs are increasingly being performed both inside and outside the United States. Approximately 45% of our net revenues from clinical trials testing in 2003 represented testing for GlaxoSmithKline plc, or GSK. We currently have a long-term contractual relationship with GSK, under which we are the primary provider of testing to support GSK's clinical trials testing requirements worldwide.

### Other Services and Products

We manufacture and market diagnostic test kits and systems primarily for esoteric testing under the Nichols Institute Diagnostics brand name. These are sold principally to hospitals, clinical laboratories and dialysis centers, both domestically and internationally. Our MedPlus subsidiary is a developer and integrator of clinical connectivity and data management solutions for healthcare organizations and clinicians primarily through its ChartMaxx* electronic medical record system. During 2003, we began deploying eMaxx*, a new physician's Internet portal across the United States. The Internet portal was developed by MedPlus and can provide physicians a "patient-centric" view of laboratory test results and other clinical information on-line.

6

LX-0650-0023

## Payers and Customers

We provide testing services to a broad range of healthcare providers. We consider a "payer" as the party that pays for the test and a "customer" as the party who refers the test to us. Depending on the billing arrangement and applicable law, the payer may be (1) the physician or other party (such as another laboratory or an employer) who referred the testing to us, (2) the patient, or (3) a third party who pays the bill for the patient, such as an insurance company, Medicare or Medicaid. Some states, including New York, New Jersey and Rhode Island, prohibit us from billing physician clients. We consider a managed care organization as both our customer and a payer, when it contracts with us on an exclusive or semi-exclusive basis on behalf of its patients.

During 2003, only two customers accounted for more than 5% of our net revenues, and no single customer accounted for more than 7% of our net revenues. We believe that the loss of any one of our customers would not have a material adverse effect on our financial condition, results of operations or cash flows.

### Payers

The following table shows current estimates of the breakdown of the percentage of our total volume of requisitions and total clinical laboratory net revenues during 2003 applicable to each payer group:

|  | Requisition Volume as % of Total Volume | Net Revenues as % of Total Clinical Laboratory Net Revenues |
|---|---|---|
| Patient | 2%– 5% | 5%–10% |
| Medicare and Medicaid | 15%–20% | 15%– 20% |
| Physicians, Hospitals, Employers and Other Monthly-Billed Payers | 35%–40% | 20%–25% |
| Third Party Fee-for-Service | 30%–35% | 40%–45% |
| Managed Care-Capitated | 10%–15% | 5%–10% |

### Customers

#### Physicians

Physicians requiring testing for patients are the primary source of our clinical laboratory testing volume. We typically bill physician accounts on a fee-for-service basis. Fees billed to physicians are based on the laboratory's client fee schedule and are typically negotiated. Fees billed to patients and insurance companies are based on the laboratory's patient fee schedule, subject to any limitations on fees negotiated with the insurance companies or with physicians on behalf of their patients. Medicare and Medicaid reimbursements are based on fee schedules set by governmental authorities.

#### Managed Care Organizations and Other Insurance Providers

Health insurers, which typically contract with a limited number of clinical laboratories for their members, represent approximately one-half of our total testing volumes and one-half of our net revenues. Larger health insurers typically prefer to use large commercial clinical laboratories because they can provide services on a national or regional basis and can manage networks of local or regional laboratories to provide even broader access to their members and physicians. In addition, larger laboratories are better able to achieve the low-cost structures necessary to profitably service large health insurers and can provide test utilization data across their various plans in a consistent format. In certain markets, such as California, many health insurers delegate their covered members to independent physician associations, which in turn contract with laboratories for clinical laboratory services.

Over the last decade, health insurers have been consolidating, resulting in fewer but larger insurers with significant bargaining power in negotiating fee arrangements with healthcare providers, including clinical laboratories. These health insurers demand that clinical laboratory service providers accept discounted fee structures or assume all or a portion of the financial risk associated with providing testing services to their members through capitated payment contracts. Under these capitated payment contracts, the Company and health insurers agree to a predetermined monthly contractual rate for each member of the health insurer's plan regardless of the number or cost of services provided by the Company. Some services, such as various esoteric tests, new technologies and anatomic pathology services, may be carved out from a capitated rate and, if carved

7

LX-0650-0024

out, are charged on a fee-for-service basis. We work closely with health insurers as they evaluate new tests; however, as innovation in the testing area increases, there is no guarantee that health insurers will agree to carve out these services or reimburse them at rates that reflect the true cost or value associated with such services.

In recent years, there has been a shift in the way major insurers contract with clinical laboratories. Health insurers have begun to offer more freedom of choice to their affiliated physicians, including greater freedom to determine which laboratory to use and which tests to order. Accordingly, most of our agreements with major health insurers are non-exclusive contracts. As a result, under these non-exclusive arrangements, physicians have more freedom of choice in selecting laboratories, and laboratories are likely to compete more on the basis of service and quality rather than price alone. Also, health insurers have been giving patients greater freedom of choice and patients have increasingly been selecting plans (such as preferred provider organizations and consumer driven plans) that offer a greater choice of providers. Pricing for these preferred provider organizations is typically negotiated on a fee-for-service basis, which generally results in higher revenue per requisition than under a capitated fee arrangement. Despite these trends, health insurers continue to aggressively seek cost reductions in order to keep their premiums to their customers competitive. If we are unable to agree on pricing with a health insurer, we would become a "non-participating" provider and could then only bill the ordering physician or the patient rather than the health insurer. This "non-participating" status could lead to loss of business since the physician is likely to refer testing to a participating provider whose testing is covered by the patient's health insurance benefit plan. We cannot assure investors that we will continue to be successful in negotiating contracts with major insurers. Loss of multiple major insurer or other payer agreements could have a material adverse effect on our financial condition, results of operations and cash flows.

We offer QuestNet™, an innovative product to develop and manage a customized network of clinical laboratory providers for health insurers. Through QuestNet™, physicians and members are provided multiple choices for clinical laboratory testing while health insurers realize cost reductions under a single capitated arrangement.

*Hospitals*

We provide services to hospitals throughout the United States that vary from esoteric testing to helping manage their laboratories. We believe that we are the industry's market leader in servicing hospitals. Our hospital customers account for approximately 13% of our net revenues, the majority of which represents services billed to the hospitals under reference testing arrangements, based on negotiated fee schedules, for certain testing that the hospitals do not perform internally. Hospitals generally maintain an on-site laboratory to perform testing on patients and refer less frequently needed and highly specialized procedures to outside laboratories, which typically charge the hospitals on a negotiated fee-for-service basis. We believe that most hospital laboratories perform approximately 90% to 95% of their patients' clinical laboratory tests. In addition, many hospitals compete with commercial clinical laboratories for outreach (non-hospital patients) testing. Most physicians have admitting privileges or other relationships with hospitals as part of their medical practice. Many hospitals leverage their relationships with community physicians and encourage the physicians to send their outreach testing to the hospital's laboratory. In addition, hospitals that own physician practices generally require the physicians to refer tests to the hospital's affiliated laboratory. As a result, hospital-affiliated laboratories can be both customers and competitors for commercial clinical laboratories.

During 2002, in conjunction with the acquisition of AML, we launched dedicated sales and service teams focused on serving the unique needs of hospital customers. We believe that the combination of full-service, bi-coastal esoteric testing capabilities, medical and scientific professionals for consultation, innovative connectivity products, focus on Six Sigma quality and dedicated sales and service professionals has positioned us to be a partner of choice for hospital customers.

We have joint venture arrangements with leading integrated health delivery networks in several metropolitan areas. These joint venture arrangements, which provide testing for affiliated hospitals as well as for unaffiliated physicians and other healthcare providers in their geographic areas, serve as our principal laboratory facilities in their service areas. Typically, we have either a majority ownership interest in, or day-to-day management responsibilities for, our hospital joint venture relationships. We also manage the laboratories at a number of other hospitals.

8

LX-0650-0025

*Employers, Governmental Institutions and Other Clinical Laboratories*

We provide testing services to federal, state and local governmental agencies and to large employers. We believe that we are the leading provider of clinical laboratory testing to employers for drugs of abuse. We also provide wellness testing to employers to enable employees to take an active role in improving their health. Testing services for employers account for approximately 3% of our net revenues. The volume of testing services for employers, which generally have relatively low profit margins, has declined significantly during 2001 through 2003 driven by a slowdown in hiring. We also perform esoteric testing services for other commercial clinical laboratories that do not have a full range of testing capabilities. All of these customers are charged on a fee-for-service basis.

*Consumers*

Consumers are becoming increasingly interested in managing their own health and health records. Currently, almost all the testing we perform is ordered directly by a physician, who then receives the test results. However, over time, we believe that consumers will increasingly want to order clinical laboratory tests themselves. To that end, we offer a focused menu of clinical laboratory testing directly to consumers in certain states. Consumers pay for and receive the test results directly. In each case, a physician reviews the order and result. We believe this market will continue to grow over time.

## Sales and Marketing

We market to and service our customers through our direct sales force, customer service and patient service representatives and couriers.

We focus our sales efforts on obtaining and retaining profitable accounts. We have an active account management process to evaluate the profitability of all of our accounts. Where appropriate, we change the service levels, terminate accounts that are not profitable or adjust pricing.

Our sales force is organized by customer type with the majority of representatives focused on marketing laboratory services to physicians, including specialty physicians such as oncologists, cardiologists and gastroenterologists. Additionally, we have a managed care sales organization that maintains relationships with regional and national insurance and managed care organizations. We also have a hospital sales organization that focuses on meeting the unique needs of hospitals and leverages the specialized capabilities of our Nichols Institute esoteric testing laboratories. Supporting our hospital and physician sales teams are genomics and esoteric testing specialists, who are specially trained and focused on marketing and selling more complex tests to our customers. A smaller portion of our sales force focuses on selling substance-of-abuse testing to employers.

Customer service representatives perform a number of services for patients and customers. They monitor services, answer questions and help resolve problems. Our couriers pick up specimens from most clients daily.

Our corporate marketing function is organized by customer and is responsible for developing and executing marketing strategies, new product launches, and promotional and advertising support. The marketing function is also responsible for customer satisfaction surveys, market research, tradeshow administration, database marketing tools, and marketplace trending and analysis.

## Strategic Growth Opportunities

In addition to expanding our core clinical laboratory business through internal growth and pursuing our strategy to become a leading provider of medical information, we intend to continue to leverage our network in order to capitalize on targeted growth opportunities both inside and outside our core laboratory testing business. These opportunities include:

- *Gene-Based and Other Esoteric Tests:* We intend to remain a leading innovator in the clinical laboratory industry by continuing to introduce new tests, technology and services. We estimate that the current United States market in esoteric testing, including gene-based testing, is $3 billion to $4 billion per year. We believe that we have the largest gene-based testing business in the United States, with greater than $500 million in net revenues during 2003, and that this business has been growing by more than 20% per year. We believe that the unveiling of the human genome, the discovery of new genes and the linkages of these genes with disease will result in more complex and thorough predictive, diagnostic and therapeutic testing. We believe that we are well positioned to realize this growth. We intend to focus on commercializing diagnostic applications of discoveries in the areas of functional genomics (the analysis

9

**495**

LX-0650-0026

of genes and their functions) and proteomics (the discovery of new proteins made possible by the human genome project).

• **Anatomic Pathology:** While we are one of the leading providers of anatomic pathology services in the United States, we have traditionally been strongest in cytology, and specifically in the analysis of Pap tests to detect cervical cancer. During the last several years, we have led the industry in converting over 80% of our Pap smear business to the use of liquid-based technology for cervical cancer screening, a higher quality and more profitable product offering. We intend to continue to expand our anatomic pathology business into higher growth segments, including histology (tissue pathology), and actively participate in the emerging use of molecular testing as a screening tool in conjunction with Pap tests. We estimate that the current United States market for anatomic pathology services is approximately $6 billion per year. We estimate that cytology represents about $1 billion per year of this market, and that tissue pathology represents about $5 billion per year of this market. We generated approximately $500 million in net revenues from such services during 2003.

• **Information Technology:** We continue to invest in the development and improvement of information technology products for customers and providers by developing differentiated products that will provide friendlier, easier access to ordering and resulting of laboratory tests and patient-centric information. In February 2003, we launched our proprietary eMaxx® Internet portal to physicians nationwide. The eMaxx® Internet portal enables doctors to order diagnostic tests and review laboratory results online, as well as check patients' insurance eligibility in real time and view clinical information from many sources. In pilot markets, physicians are also able to use eMaxx® to prescribe pharmaceuticals. This service allows us to replace older technology desktop products that we currently provide to many physicians and thereby streamline our support structure. Demand has been growing for our information technology solutions as physician offices have expanded their usage of the Internet. By the end of 2003, we were receiving approximately 25% of all test orders and delivering about 35% of all test results via the Internet.

The eMaxx® Internet portal was developed by MedPlus Inc., or MedPlus, which we acquired in November 2001. MedPlus' ChartMaxx® and eMaxx® patient record systems are designed to support the creation and management of electronic patient records, by bringing together in one patient-centric view information from various sources, including the physician's records and laboratory and hospital data. We intend to expand the services offered through our portal over time as other strategic arrangements are realized, which will enhance our ability to introduce a broad range of electronic services to healthcare providers.

• **Selective Regional Acquisitions:** The clinical laboratory industry remains highly fragmented. We expect to continue to acquire other regional clinical laboratories that can be integrated with our existing laboratories, thereby enabling us to reduce costs and improve efficiencies through the elimination of redundant facilities and equipment, and reductions in personnel (see "Recent Acquisitions" for a discussion of our recent acquisitions). We may also consider acquisitions of ancillary businesses as part of our overall growth strategy, such as our November 2001 acquisition of MedPlus, which develops clinical connectivity products designed to enhance patient care (see "Information Technology").

## Information Systems

Information systems are used extensively in virtually all aspects of our business, including laboratory testing, billing, customer service, logistics, and management of medical data. Our success depends, in part, on the continued and uninterrupted performance of our information technology, or IT systems. Computer systems are vulnerable to damage from a variety of sources, including telecommunications or network failures, malicious human acts and natural disasters. Moreover, despite network security measures, some of our servers are potentially vulnerable to physical or electronic break-ins, computer viruses and similar disruptive problems. Despite the precautionary measures that we have taken to prevent unanticipated problems that could affect our IT systems, sustained or repeated system failures that interrupt our ability to process test orders, deliver test results or perform tests in a timely manner could adversely affect our reputation and result in a loss of customers and net revenues.

During the 1980s and early 1990s when we acquired many of our laboratory facilities, our regional laboratories were operated as local, decentralized units, and we did not standardize their billing, laboratory and some of their other information systems. As a result, by the end of 1995 we had many different information

10

LX-0650-0027

systems for billing, test results reporting, and other transactions. Over time, the growth in the size and network of our customers and the increasing complexity of billing demonstrated a greater need for standardized systems.

During 2002, we began implementation of a standard laboratory information system and a standard billing system. We expect that deployment of the standardized systems will take several more years to complete and will result in significantly more centralized systems than we have today. We expect the integration of these systems will improve operating efficiency and provide management with more timely and comprehensive information with which to make management decisions. However, failure to properly implement this standardization process could materially adversely impact us. During system conversions of this type, workflow may be re-engineered to take advantage of enhanced system capabilities, which may cause temporary disruptions in service. In addition, the implementation process, including the transfer of databases and master files to new data centers, presents significant conversion risks that need to be managed carefully.

## Billing

Billing for laboratory services is complicated. Depending on the billing arrangement and applicable law, we must bill various payers, such as patients, insurance companies, Medicare, Medicaid, doctors and employer groups, all of which have different requirements. Additionally, auditing for compliance with applicable laws and regulations as well as internal compliance policies and procedures adds further complexity to the billing process. Among many other factors complicating billing are:

- pricing differences between our fee schedules and the reimbursement rates of the payers;
- disputes with payers as to which party is responsible for payment; and
- disparity in coverage and information requirements among various payers.

We incur significant additional costs as a result of our participation in Medicare and Medicaid programs, as billing and reimbursement for clinical laboratory testing is subject to considerable and complex federal and state regulations. These additional costs include those related to: (1) complexity added to our billing processes; (2) training and education of our employees and customers; (3) compliance and legal costs; and (4) costs related to, among other factors, medical necessity denials and advance beneficiary notices. Compliance with applicable laws and regulations, as well as internal compliance policies and procedures, adds further complexity and costs to the billing process. Changes in laws and regulations could negatively impact our ability to bill our clients. The Centers for Medicare & Medicaid Services, or CMS (formerly the Health Care Financing Administration), establishes procedures and continuously evaluates and implements changes in the reimbursement process.

We believe that most of our bad debt expense, which was 4.8% of our net revenues in 2003, is primarily the result of missing or incorrect billing information on requisitions received from healthcare providers rather than credit related issues. In general, we perform the requested tests and report test results regardless of whether the billing information is incorrect or missing. We subsequently attempt to contact the provider to obtain any missing information and rectify incorrect billing information. Missing or incorrect information on requisitions adds complexity to and slows the billing process, creates backlogs of unbilled requisitions, and generally increases the aging of accounts receivable. When all issues relating to the missing or incorrect information are not resolved in a timely manner, the related receivables are written off to the allowance for doubtful accounts.

We have implemented "best practices" for billing that have significantly reduced the percentage of requisitions with missing billing information from approximately 16% at the beginning of 1996 to approximately 4% in 2003. These initiatives, together with our Six Sigma and standardization initiatives and progress in dealing with Medicare medical necessity documentation requirements, have significantly reduced bad debt expense as a percentage of net revenues from about 7% during 1996 to 4.8% during 2003. We believe that in the longer term, with a continuing focus on process discipline and the increased use of electronic ordering by our customers, bad debt as a percentage of net revenues can be reduced to 4% or less (see "Regulation of Reimbursement for Clinical Laboratory Services").

## Competition

While there has been significant consolidation in the clinical laboratory testing business in recent years, our industry remains fragmented and highly competitive. We compete with three types of laboratory providers: hospital-affiliated laboratories, other commercial clinical laboratories and physician-office laboratories. We are the leading clinical laboratory provider in the United States, with net revenues of $4.7 billion during 2003, and facilities in substantially all of the country's major metropolitan areas. Our largest competitor is LabCorp. In

11

**497**

LX-0650-0028

addition, we compete with, and service, many smaller regional and local commercial clinical laboratories, as well as laboratories owned by physicians and hospitals (see "Payers and Customers—Customers").

We believe that healthcare providers consider a number of factors when selecting a laboratory, including:

- service capability and quality;
- accuracy, timeliness and consistency in reporting test results;
- number and type of tests performed by the laboratory;
- number, convenience and geographic coverage of patient service centers;
- reputation in the medical community; and
- pricing.

We believe that we compete favorably in each of these areas.

We believe that large commercial clinical laboratories may be able to increase their share of the overall clinical laboratory testing market due to their large service networks and lower cost structures. These advantages should enable larger clinical laboratories to more effectively serve large customers, including managed care organizations. In addition, we believe that consolidation in the clinical laboratory testing business will continue. However, a majority of the clinical laboratory testing is likely to continue to be performed by hospitals, which generally have affiliations with community physicians that refer testing to us (see "Payers and Customers—Customers—Hospitals"). As a result of these affiliations, we compete against hospital-affiliated laboratories primarily on the basis of service capability and quality as well as other non-pricing factors. Our failure to provide service superior to hospital-affiliated laboratories and other laboratories could negatively impact our net revenues.

The diagnostic testing industry is faced with changing technology and new product introductions. Advances in technology may lead to the development of more cost-effective tests that can be performed outside of a commercial clinical laboratory such as (1) point-of-care tests that can be performed by physicians in their offices and (2) home testing that can be performed by patients or by physicians in their offices. Development of such technology and its use by our customers would reduce the demand for our laboratory testing services and negatively impact our net revenues (see "Regulation of Clinical Laboratory Operations").

## Quality Assurance

Our goal is to continually improve the processes for collection, storage and transportation of patient specimens, as well as the precision and accuracy of analysis and result reporting. Our quality assurance efforts focus on proficiency testing, process audits, statistical process control and personnel training for all of our laboratories and patient service centers. We continue to implement our Six Sigma and standardization initiatives to help achieve our goal of becoming recognized as the undisputed quality leader in the healthcare services industry. Our Nichols Institute facility in San Juan Capistrano was the first clinical laboratory in North America to achieve ISO-9001 certification. Two of our clinical trials laboratories, our diagnostic kits facility and one of our routine laboratories have also achieved ISO-9001 certification. These certifications are international standards for quality management systems.

**Internal Proficiency Testing, Quality Control and Audits.** Quality control samples are processed in parallel with the analysis of patient specimens. The results of tests on quality control samples are monitored to identify trends, biases or imprecision in the analytical processes. We also perform internal process audits as part of our comprehensive Quality Assurance program.

**External Proficiency Testing and Accreditation.** All of our laboratories participate in various external quality surveillance programs. They include proficiency testing programs administered by the College of American Pathologists, or CAP, as well as some state agencies.

CAP is an independent, non-governmental organization of board certified pathologists. CAP is approved by CMS to inspect clinical laboratories to determine compliance with the standards required by the Clinical Laboratory Improvement Amendments of 1988, or CLIA. CAP offers an accreditation program to which laboratories may voluntarily subscribe. All of our major regional laboratories are accredited by CAP. Accreditation includes on-site inspections and participation in the CAP (or equivalent) proficiency testing program.

LX-0650-0029

**Regulation of Clinical Laboratory Operations**

The clinical laboratory industry is subject to significant federal and state regulation, including inspections and audits by governmental agencies. Governmental authorities may impose fines or criminal penalties or take other actions to enforce laws and regulations, including revoking a clinical laboratory's federal certification to operate a clinical laboratory operation. Changes in regulation may increase the costs of performing clinical laboratory tests, increase the administrative requirements of claims or decrease the amount of reimbursement.

**CLIA and State Regulation.** All of our laboratories and (where applicable) patient service centers are licensed and accredited by the appropriate federal and state agencies. CLIA regulates virtually all clinical laboratories by requiring they be certified by the federal government and comply with various operational, personnel and quality requirements intended to ensure that their clinical laboratory testing services are accurate, reliable and timely. CLIA does not preempt state laws that are more stringent than federal law. For example, state laws may require additional personnel qualifications, quality control, record maintenance and/or proficiency testing. The cost of compliance with CLIA makes it cost prohibitive for many physicians to operate clinical laboratories in their offices. However, manufacturers of laboratory equipment and test kits could seek to increase their sales by marketing point-of-care laboratory equipment to physicians and by selling test kits approved for home use to both physicians and patients. Diagnostic tests approved or cleared by the FDA for home use are automatically deemed to be "waived" tests under CLIA and may be performed in physician office laboratories with minimal regulatory oversight as well as by patients in their homes.

**Drug Testing.** The Substance Abuse and Mental Health Services Administration, or SAMHSA, regulates drug testing for public sector employees and employees of certain federally regulated businesses. SAMHSA has established detailed performance and quality standards that laboratories must meet to perform drug testing on these employees. All laboratories that perform such testing must be certified as meeting SAMHSA standards.

**Controlled Substances.** The federal Drug Enforcement Administration, or DEA, regulates access to controlled substances used to perform drugs of abuse testing. Laboratories that use controlled substances are licensed by the DEA.

**Medical Waste, Hazardous Waste and Radioactive Materials.** Clinical laboratories are also subject to federal, state and local regulations relating to the handling and disposal of regulated medical waste, hazardous waste and radioactive materials. We generally use outside vendors to dispose of such waste.

**FDA.** The FDA has regulatory responsibility over instruments, test kits, reagents and other devices used to perform diagnostic testing by clinical laboratories. In the past, the FDA has claimed regulatory authority over laboratory-developed tests, but has exercised enforcement discretion in not regulating most laboratory-developed tests performed by high complexity CLIA-certified laboratories. In December 2000, the Department of Health and Human Services, or HHS, Secretary's Advisory Committee on Genetic Testing recommended that the FDA be the lead federal agency to regulate genetic testing. In late 2002, a new HHS Secretary's Advisory Committee on Genetics, Health and Society was appointed to replace the prior Advisory Committee, but it has not yet made any final recommendations. In the meantime, the FDA is considering revising its regulations on analyte specific reagents, which are used in laboratory-developed tests, including laboratory developed genetic testing. Representatives of clinical laboratories (including Quest Diagnostics) and the American Clinical Laboratory Association (our industry trade association) have met with representatives of the FDA to address industry issues pertaining to potential FDA regulation of genetic testing in general and issues with regard to the impact of potential increased oversight over analyte specific reagents. We expect those discussions to continue. Increased FDA regulation of the reagents used in laboratory-developed testing could lead to increased costs and delays in introducing new tests, including genetic tests.

**Occupational Safety.** The federal Occupational Safety and Health Administration, or OSHA, has established extensive requirements relating specifically to workplace safety for healthcare employers. This includes developing and implementing multi-faceted programs to protect workers from exposure to blood-borne pathogens, such as HIV and hepatitis B and C, including preventing or minimizing any exposure through sharps or needle stick injuries.

**Specimen Transportation.** Transportation of most clinical laboratory specimens and hazardous materials is subject to regulation by the Department of Transportation, the Public Health Service, the United States Postal Service and the International Civil Aviation Organization.

**Corporate Practice of Medicine.** Many states, including some in which our principal laboratories are located, prohibit corporations from engaging in the practice of medicine. The corporate practice of medicine doctrine has been interpreted in certain states to prohibit corporations from employing licensed healthcare professionals to provide services on the corporation's behalf. The scope of the doctrine, and how it applies,

13

LX-0650-0030

varies from state to state. In certain states these restrictions affect our ability to directly provide anatomic pathology services and/or to provide clinical laboratory services directly to consumers.

**Privacy and Security of Health Information; Standard Transactions**

Pursuant to the Health Insurance Portability and Accountability Act of 1996, or HIPAA, the Secretary of HHS has issued final regulations designed to improve the efficiency and effectiveness of the health care system by facilitating the electronic exchange of information in certain financial and administrative transactions while protecting the privacy and security of the information exchanged. Three principal regulations have been issued in final form: privacy regulations, security regulations, and standards for electronic transactions.

The HIPAA privacy regulations, which fully came into effect in April 2003, establish comprehensive federal standards with respect to the uses and disclosures of protected health information by health plans, healthcare providers and healthcare clearinghouses. The regulations establish a complex regulatory framework on a variety of subjects, including:

- the circumstances under which uses and disclosures of protected health information are permitted or required without a specific authorization by the patient, including but not limited to treatment purposes, activities to obtain payment for our services, and our health care operations activities;

- a patient's rights to access, amend and receive an accounting of certain disclosures of protected health information;

- the content of notices of privacy practices for protected health information; and

- administrative, technical and physical safeguards required of entities that use or receive protected health information.

We have implemented the HIPAA privacy regulations, as required by law. The HIPAA privacy regulations establish a "floor" and do not supersede state laws that are more stringent. Therefore, we are required to comply with both federal privacy standards and varying state privacy laws. In addition, for healthcare data transfers relating to citizens of other countries, we need to comply with the laws of other countries. The federal privacy regulations restrict our ability to use or disclose patient-identifiable laboratory data, without patient authorization, for purposes other than payment, treatment or healthcare operations (as defined by HIPAA) except for disclosures for various public policy purposes and other permitted purposes outlined in the final privacy regulations. The privacy regulations provide for significant fines and other penalties for wrongful use or disclosure of protected health information, including potential loss of licensure and civil and criminal fines and penalties. Although the HIPAA statute and regulations do not expressly provide for a private right of damages, we also could incur damages under state laws to private parties for the wrongful use or disclosure of confidential health information or other private personal information.

The final HIPAA security regulations, which establish requirements for safeguarding electronic patient information, were published on February 20, 2003 and became effective on April 21, 2003, although healthcare providers have until April 20, 2005 to comply. We are conducting an analysis to determine the proper security measures to reasonably and appropriately comply with the standards and implementation specifications by the compliance deadline of April 20, 2005.

The final HIPAA regulations for electronic transactions, which we refer to as the transaction standards, establish uniform standards for electronic transactions and code sets, including the electronic transactions and code sets used for claims, remittance advices, enrollment and eligibility. The transaction standards became effective in October 2002, although covered entities were eligible to obtain a one-year extension if approved through an application to the Secretary of HHS. We received this one-year extension through October 16, 2003 from HHS.

HHS issued guidance on July 24, 2003 stating that it would not penalize a covered entity for post-implementation date transactions that are not fully compliant with the transactions standards, if the covered entity could demonstrate its good faith efforts to comply with the standards. HHS' stated purpose for this flexible enforcement position was to "permit health plans to mitigate unintended adverse effects on covered entities' cash flow and business operations during the transition to the standards, as well as on the availability and quality of patient care." We continue to work in good faith to complete the implementation of these standards with those payers who either were not ready to exchange files in the standard formats as of the compliance date, or who have varying interpretations of the requirements. Working with these payers requires that we continue to trade electronic claims files and payments in legacy formats, even after the compliance deadline of October 16, 2003.

14

**500**

LX-0650-0031

On September 23, 2003, CMS announced that it would implement a contingency plan for the Medicare program to accept electronic transactions that are not fully compliant with the transaction standards after the October 16, 2003 compliance deadline. The CMS contingency plan, as announced, allows Medicare carriers to continue to accept and process Medicare claims in the pre-October 16 electronic formats to give healthcare providers additional time to complete the testing process, provided that they continue to make a good faith effort to comply with the new standards. Almost all other payers have followed the lead of CMS, accepting legacy formats until both parties to the transactions are ready to implement the new electronic transaction standards.

As part of its plan, CMS is expected to regularly reassess the readiness of its healthcare providers to determine how long the contingency plan will remain in effect. Many of our payers were not ready to implement the transaction standards by the October 2003 compliance deadline or were not ready to test or trouble-shoot claims submissions. We are working in good faith with payers that have not converted to the new standards to reach agreement on each payer's data requirements and to test claims submissions.

The HIPAA transaction standards are complex, and subject to differences in interpretation by payers. For instance, some payers may interpret the standards to require us to provide certain types of information, including demographic information not usually provided to us by physicians. As a result of inconsistent interpretations of transaction standards by payers or our inability to obtain certain billing information not usually provided to us by physicians, we could face increased costs and complexity, a temporary disruption in receipts and ongoing reductions in reimbursements and net revenues. We are working closely with our payers to establish acceptable protocols for claims submissions and with our trade association and an industry coalition to present issues and problems as they arise to the appropriate regulators and standards setting organizations.

Compliance with all of the HIPAA requirements requires significant capital and personnel resources from all healthcare organizations, not just Quest Diagnostics. While we believe that our total costs to comply with HIPAA will not be material to our results of operations or cash flows, the potential need for additional customer contact to obtain data for billing as a result of different interpretations of the current regulations could impose significant additional costs on us.

## Regulation of Reimbursement for Clinical Laboratory Services

**Overview.** The healthcare industry has experienced significant changes in reimbursement practices during the past several years. Government payers, such as Medicare (which principally serves patients 65 years and older) and Medicaid (which principally serves indigent patients), as well as private payers and large employers, have taken steps and may continue to take steps to control the cost, utilization and delivery of healthcare services, including clinical laboratory services. If we experience additional reductions in the payments we receive for our services by reducing costs, increasing test volume and/or introducing new procedures, it could have a material adverse impact on our net revenues and profitability. On the other hand, we believe that laboratory tests are an effective means to detect certain medical conditions at an earlier point in time, leading to potential reduction in other healthcare costs such as the cost of hospitalization.

Principally as a result of government reimbursement reductions and measures adopted by CMS to reduce utilization described below, the percentage of our net revenues derived from Medicare and Medicaid programs declined from approximately 20% in 1995 to approximately 15% in 2002. This percentage increased to approximately 17% in 2003 principally as a result of our acquisition of Unilab, which had a higher percentage of its net revenues derived from Medicare and Medicaid programs. While the cost to comply with Medicare administrative requirements is disproportionately higher than our cost to bill other payers, average Medicare reimbursement rates approximate the Company's overall average reimbursement rate from all sources, making the Medicare business generally less profitable. However, we believe that our other business may significantly depend on continued participation in the Medicare and Medicaid programs, because many customers want a single laboratory to perform all of their clinical laboratory testing services, regardless of whether reimbursements are ultimately made by themselves, Medicare, Medicaid or other payers.

Billing and reimbursement for clinical laboratory testing is subject to significant and complex federal and state regulation. Penalties for violations of laws relating to billing federal healthcare programs and for violations of federal fraud and abuse laws include: (1) exclusion from participation in Medicare/Medicaid programs; (2) asset forfeitures; (3) civil and criminal fines and penalties; and (4) the loss of various licenses, certificates and authorizations necessary to operate some or all of a clinical laboratory's business. Civil monetary penalties for a wide range of violations are not more than $10,000 per violation plus three times the amount claimed and, in the case of kickback violations, not more than $50,000 per violation plus up to three times the amount

15

LX-0650-0032

of remuneration involved. A parallel civil remedy under the federal False Claims Act provides for damages not more than $11,000 per violation plus up to three times the amount claimed.

**Reduced Reimbursements.** In 1984, Congress established a Medicare fee schedule payment methodology for clinical laboratory services performed for patients covered under Part B of the Medicare program. Congress then imposed a national ceiling on the amount that carriers could pay under their local Medicare fee schedules. Since then, Congress has periodically reduced the national ceilings. The Medicare national fee schedule limitations were reduced in 1996 to 76% of the 1984 national median of the local fee schedules and in 1998 to 74% of the 1984 national median. The national ceiling applies to tests for which limitation amounts were established before January 1, 2001. For more recent tests (tests for which a limitation amount is first established on or after January 1, 2001), the limitation amount is set at 100% of the median of all the local fee schedules established for that test in accordance with the Social Security Act. The Balanced Budget Act of 1997 eliminated the provision for annual increases to the Medicare national fee schedule based on the consumer price index from 1998 through 2002. A 1.1% increase based on the consumer price index became effective on January 1, 2003. The Prescription Drug, Improvement, and Modernization Act of 2003 eliminated for five years (beginning January 1, 2004) the provision for annual increases to the Medicare national fee schedule based on the consumer price index, including the adjustment (which would have been 2.6%) that had been scheduled for January 1, 2004. Thus, by law an adjustment to the national fee schedule for clinical laboratory services based on the consumer price index cannot occur before January 1, 2009.

Pathology services are reimbursed by Medicare based on a resource-based relative value scale, or RBRVS that is periodically updated by CMS. Less than 1% of our net revenues are derived from pathology services reimbursed by Medicare based on RBRVS.

With regard to the rest of our laboratory services performed on behalf of Medicare beneficiaries, we must bill the Medicare program directly and must accept the carrier's fee schedule amount as payment in full. In addition, state Medicaid programs are prohibited from paying more (and in most instances, pay significantly less) than Medicare. Major clinical laboratories, including Quest Diagnostics, typically use two fee schedules for tests billed on a fee-for-service basis:

- "Client" fees charged to physicians, hospitals, and institutions for which a clinical laboratory performs testing services on a wholesale basis and which are billed on a monthly basis. These fees are generally subject to negotiation or discount.

- "Patient" fees charged to individual patients and third-party payers, like Medicare and Medicaid. These fees generally require separate bills for each requisition.

The fee schedule amounts established by Medicare are typically substantially lower than patient fees otherwise charged by us, but are sometimes higher than our fees actually charged to certain other clients. During 1992, the Office of the Inspector General, or OIG, of the HHS issued final regulations that prohibited charging Medicare fees substantially in excess of a provider's usual charges. The OIG, however, declined to provide any guidance concerning interpretation of these rules, including whether or not discounts to non-governmental clients and payers or the dual-fee structure might be inconsistent with these rules.

A proposed rule released in September 1997 would have authorized the OIG to exclude providers from participation in the Medicare program, including clinical laboratories, that charge Medicare and other programs fees that are "substantially in excess of . . . usual charges . . . to any of [their] customers, clients or patients." This proposal was withdrawn by the OIG in 1998. In November 1999, the OIG issued an advisory opinion which indicated that a clinical laboratory offering discounts on client bills may violate the "usual charges" regulation if the "charge to Medicare substantially exceeds the amount the laboratory most frequently charges or has contractually agreed to accept from non-Federal payers." The OIG subsequently issued a letter clarifying that the usual charges regulation is not a blanket prohibition on discounts to private pay customers.

In September 2003, the OIG published a Notice of Proposed Rulemaking that would amend the OIG's exclusion regulations addressing excessive claims. Under the proposed exclusion rule, the OIG would have the authority to exclude a provider for submitting claims to Medicare that contain charges that are substantially in excess of the provider's usual charges. The proposal would define "usual charges" as the average payment from non-government entities, on a test by test basis, excluding capitated payments; and would define "substantially in excess" to be an amount that is more than 20% greater than the usual charge. We believe that the rule is unnecessary because Congress has already established fee schedules for the services that the rule proposes to regulate. We also believe that the rule is unworkable and overly burdensome. Through our industry trade association, we filed comments opposing the proposed rule and we are working with our trade association and a coalition of other healthcare providers who also oppose this proposed regulation as drafted. If this regulation is

16

LX-0650-0033

adopted as proposed, it could potentially reduce the amounts reimbursed to us by Medicare and other federal payers or affect the fees we charge to other payers and could also be costly for us to administer.

The 1997 Balanced Budget Act permits CMS to adjust statutorily prescribed fees for some medical services, including clinical laboratory services, if the fees are "grossly excessive." In December 2002, CMS issued an interim final rule setting forth a process and factors for establishing a "realistic and equitable" payment amount for all Medicare Part B services (except physician services and services paid under a prospective payment system) when the existing payment amounts are determined to be inherently unreasonable. Payment amounts may be considered unreasonable because they are either grossly excessive or deficient. We cannot provide any assurances to investors that fees payable by Medicare could not be reduced as a result of the application of this rule or that the government might not assert claims for reimbursement by purporting to retroactively apply this rule or the OIG interpretation concerning "usual charges."

Currently, Medicare does not require the beneficiary to pay a co-payment for clinical laboratory testing. When co-payments were last in effect before adoption of the clinical laboratory services fee schedules in 1984, clinical laboratories received from Medicare carriers only 80% of the Medicare allowed amount and were required to bill Medicare beneficiaries for the unpaid balance of the Medicare allowed amount. If re-enacted, a co-payment requirement could adversely affect the revenues of the clinical laboratory industry, including us, by exposing the testing laboratory to the credit of individuals and by increasing the number of bills. In addition, a laboratory could be subject to potential fraud and abuse violations if adequate procedures to bill and collect the co-payments are not established and followed. The Medicare reform bill approved by the United State Senate in June 2003 included a co-payment provision, under which clinical laboratories would receive from Medicare carriers only 80% of the Medicare allowed amount for clinical laboratory tests and would be required to bill Medicare beneficiaries for the 20% balance of the Medicare allowed amount. The co-payment provision was dropped from the bill as passed (known as Prescription Drug, Improvement, and Modernization Act of 2003), although the final legislation did include (as discussed above) a five year freeze on adjustments to the Medicare national fee schedule based on the consumer price index. Certain Medicaid programs do provide co-payments for clinical laboratory testing.

**Reduced Utilization of Clinical Laboratory Testing.** In recent years, CMS has taken several steps to reduce utilization of clinical laboratory testing. Since 1995, Medicare carriers have adopted policies under which they do not pay for many commonly ordered clinical tests unless the ordering physician has provided an appropriate diagnosis code supporting the medical necessity of the test. Physicians are required by law to provide diagnostic information when they order clinical tests for Medicare and Medicaid patients. However, CMS has not prescribed any penalty for physicians who fail to provide diagnostic information to laboratories. Moreover, regulations adopted in accordance with HIPAA require submission of diagnosis codes as part of the standard claims transaction.

We are generally permitted to bill patients directly for some statutorily excluded clinical laboratory services. If a patient signs an advance beneficiary notice, or ABN, we are also generally permitted to bill patients for clinical laboratory tests that Medicare does not cover due to "medical necessity" limitations (these tests include limited coverage tests for which the ordering physician did not provide an appropriate diagnosis code and certain tests ordered on a patient at a frequency greater than covered by Medicare). An ABN is a notice signed by the beneficiary which documents the patient's informed decision to personally assume financial liability for laboratory tests which are likely to be not covered by Medicare because they are deemed to be not medically necessary. We do not have any direct contact with most of these patients and, in such cases, cannot control the proper use of the ABN by the physician or the physician's office staff. If the ABN is not timely provided to the beneficiary or is not completed properly, we end up performing tests that we cannot subsequently bill to the patient if they are not reimbursable by Medicare due to coverage limitations.

**Inconsistent Practices.** Currently, many different local carriers administer Medicare. They have inconsistent policies on matters such as: (1) test coverage; (2) automated chemistry panels; (3) diagnosis coding; (4) claims documentation; and (5) fee schedules (subject to the national fee schedule limitations). Inconsistent carrier rules and policies have increased the complexity of the billing process for clinical laboratories. As part of the 1997 Balanced Budget Act, HHS was required to adopt uniform policies on the above matters by January 1, 1999, and replace the current local carriers with no more than five regional carriers. Although HHS has finalized a number of uniform test coverage/diagnosis coding policies, it has not taken any final action to replace the local carriers with five regional carriers. However, in November 2000, CMS published a solicitation in the Commerce Business Daily seeking two contractors to process Part B clinical laboratory claims. In the solicitation, CMS stated that the Secretary has decided to limit the number of carriers processing clinical diagnostic laboratory test claims to two contractors. The solicitation indicated that the request for proposals, or RFP, would be released

17

LX-0650-0034

on or before December 31, 2000 but as of February 2004, the RFP had not been issued; the solicitation did not indicate the effective date for a final transition to the regional carrier model. CMS plans to achieve standardization in part through implementing a single claims processing system for all carriers. This initiative, however, was suspended due to CMS's Year 2000 compliance priorities.

**Carrier Jurisdiction Changes for Lab-to-lab Referrals.** On October 31, 2003, CMS announced its intention to change the manner in which Medicare contractors currently process claims for lab-to-lab referrals. While laboratories are, under certain criteria, permitted to directly bill Medicare for tests they refer to other laboratories, they must be reimbursed at the correct fee schedule amount based on the Medicare fee schedule in effect in the Medicare carrier region in which the test was actually performed. Historically, laboratories needed to enroll with and file claims to multiple carriers in order to bill for such out-of-area test referrals, to ensure receipt of the appropriate payment amount. This has proven to be an administratively difficult process, with many obstacles to obtaining accurate claims payment, including applying the correct fee schedule. The announced change will enable the laboratory's "home" carrier to maintain and apply the clinical laboratory fee schedule applicable to the carrier region where the test was performed. This will streamline the claims filing process by allowing a laboratory to file all of its claims to its "home" carrier. As of January 2004, CMS has indicated a July 1, 2004 effective date for this change.

**Competitive Bidding.** The Prescription Drug, Improvement and Modernization Act of 2003 requires CMS to conduct and complete by December 31, 2005, a demonstration project on the application of competitive acquisition to clinical laboratory tests. The details of how this federal demonstration project will be implemented are unknown at this time. Florida has issued a proposal for competitive bidding for its Medicaid program. If competitive bidding were implemented on a regional or national basis for clinical laboratory testing, it could materially adversely affect the clinical laboratory industry and us.

**Future Legislation.** Future changes in federal, state and local regulations (or in the interpretation of current regulations) affecting governmental reimbursement for clinical laboratory testing could adversely affect us. We cannot predict, however, whether and what type of legislative proposals will be enacted into law or what regulations will be adopted by regulatory authorities.

**Fraud and Abuse Regulations.** Medicare and Medicaid anti-kickback laws prohibit clinical laboratories from making payments or furnishing other benefits to influence the referral of tests billed to Medicare, Medicaid or other federal programs. As noted above, the penalties for violation of these laws may include criminal and civil fines and penalties and/or suspension or exclusion from participation in federal programs. Many of the anti-fraud statutes and regulations, including those relating to joint ventures and alliances, are vague or indefinite and have not been interpreted by the courts. We cannot predict if some of the fraud and abuse rules will be interpreted contrary to our practices.

In November 1999, the OIG issued an advisory opinion concluding that the industry practice of discounting client bills may constitute a kickback if the discounted price is below a laboratory's overall cost (including overhead) and below the amounts reimbursed by Medicare. Advisory opinions are not binding but may be indicative of the position that prosecutors may take in enforcement actions. The OIG's opinion, if enforced, could result in fines and possible exclusion and could require us to eliminate offering discounts to clients below the rates reimbursed by Medicare. The OIG subsequently issued a letter clarifying that it did not intend to imply that discounts are a per se violation of the federal anti-kickback statute, but may merit further investigation depending on the facts and circumstances presented.

In addition, since 1992, a federal anti-"self-referral" law, commonly known as the "Stark" law, prohibits, with certain exceptions, Medicare payments for laboratory tests referred by physicians who have, personally or through a family member, an investment interest in, or a compensation arrangement with, the testing laboratory. Since January 1995, these restrictions have also applied to Medicaid-covered services. Many states have similar anti-"self-referral" and other laws that are not limited to Medicare and Medicaid referrals and could also affect investment and compensation arrangements with physicians. We cannot predict if some of the state laws will be interpreted contrary to our practices. In April 2003, the OIG issued a Special Advisory Bulletin addressing what it described as "questionable contractual arrangements" in contractual joint ventures. The OIG Bulletin focused on arrangements where a health care provider, or Owner, expands into a related health care business by contracting with a health care provider, or Manager, that already is engaged in that line of business for the Manager to provide related health care items or services to the patients of the Owner in return for a share of the profits of the new line of business. While we believe that the Bulletin is directed at "sham" arrangements intended to induce referrals, we cannot predict whether the OIG might choose to investigate all contractual joint ventures, including our joint ventures with various hospitals or hospital systems.

18

LX-0650-0035

## Government Investigations and Related Claims

We are subject to extensive and frequently changing federal, state and local laws and regulations. We believe that, based on our experience with government settlements and public announcements by various government officials, the federal government continues to strengthen its position on healthcare fraud. In addition, legislative provisions relating to healthcare fraud and abuse give federal enforcement personnel substantially increased funding, powers and remedies to pursue suspected cases of fraud and abuse. Many of the regulations applicable to us, including those relating to billing and reimbursement of tests and those relating to relationships with physicians and hospitals, are vague or indefinite and have not been interpreted by the courts. They may be interpreted or applied by a prosecutorial, regulatory or judicial authority in a manner that could require us to make changes in our operations, including our billing practices. If we fail to comply with applicable laws and regulations, we could suffer civil and criminal penalties, including the loss of licenses or our ability to participate in Medicare, Medicaid and other federal and state healthcare programs.

During the mid-1990s, Quest Diagnostics and SBCL settled government claims that primarily involved industry-wide billing and marketing practices that both companies believed to be lawful. The aggregate amount of the settlements for these claims exceeded $500 million. The federal or state governments may bring additional claims based on new theories as to our practices that we believe to be in compliance with law. The federal government has substantial leverage in negotiating settlements since the amount of potential fines far exceeds the rates at which we are reimbursed, and the government has the remedy of excluding a non-compliant provider from participation in the Medicare and Medicaid programs, which represented approximately 17% of our net revenues during 2003.

Although management believes that established reserves for claims are sufficient, including qui tam cases, of which management is aware, it is possible that additional information may become available that may cause the final resolution of these matters to exceed established reserves by an amount which could be material to our results of operations and cash flows in the period in which such claims are settled. We do not believe that these issues will have a material adverse effect on our overall financial condition. However, we understand that there may be pending qui tam claims brought by former employees or other "whistle blowers" as to which we have not been provided with a copy of the complaint and accordingly cannot determine the extent of any potential liability.

As an integral part of our compliance program discussed below, we investigate all reported or suspected failures to comply with federal healthcare reimbursement requirements. Any non-compliance that results in Medicare or Medicaid overpayments is reported to the government and reimbursed by us. As a result of these efforts, we have periodically identified and reported overpayments. While we have reimbursed these overpayments and have taken corrective action where appropriate, we cannot assure investors that in each instance the government will necessarily accept these actions as sufficient.

## Compliance Program

Compliance with all government rules and regulations has become a significant concern throughout the clinical laboratory industry because of evolving interpretations of regulations and the national debate over healthcare. We established a compliance program early in 1993.

We emphasize the development of training programs intended to ensure the strict implementation and observance of all applicable laws, regulations and Company policies. Further, we conduct in-depth reviews of procedures, personnel and facilities to assure regulatory compliance throughout our operations. The Quality, Safety and Compliance Committee of the Board of Directors requires periodic reporting of compliance operations from management.

We seek to conduct our business in compliance with all statutes and regulations applicable to our operations. Many of these statutes and regulations have not been interpreted by the courts. We cannot assure investors that applicable statutes or regulations will not be interpreted or applied by a prosecutorial, regulatory or judicial authority in a manner that would adversely affect us. Potential sanctions for violation of these statutes include significant damages, penalties, and fines, exclusion from participation in governmental healthcare programs and the loss of various licenses, certificates and authorization necessary to operate some or all of our business, which could have a material adverse effect on our business.

19

LX-0650-0036

## Intellectual Property Rights

Other companies or individuals, including our competitors, may obtain patents or other property rights that would prevent, limit or interfere with our ability to develop, perform or sell our tests or operate our business. As a result, we may be involved in intellectual property litigation and we may be found to infringe on the proprietary rights of others, which could force us to do one or more of the following:

- cease developing, performing or selling products or services that incorporate the challenged intellectual property;

- obtain and pay for licenses from the holder of the infringed intellectual property right;

- redesign or reengineer our tests;

- change our business processes; or

- pay substantial damages, court costs and attorneys' fees, including potentially increased damages for any infringement held to be willful.

Patents generally are not issued until several years after an application is filed. The possibility that, before a patent is issued to a third party, we may be performing a test or other activity covered by the patent is not a defense to an infringement claim. Thus, even tests that we develop could become the subject of infringement claims if a third party obtains a patent covering those tests.

Infringement and other intellectual property claims, regardless of their merit, can be expensive and time-consuming to litigate. In addition, any requirement to reengineer our tests or change our business processes could substantially increase our costs, force us to interrupt product sales or delay new test releases. In the past, we have settled several disputes regarding our alleged infringement of intellectual property rights of third parties. We are currently involved in settling several additional disputes. We do not believe that resolution of these disputes will have a material adverse effect on our results of operations, cash flows or financial condition. However, infringement claims could arise in the future as patents could be issued on tests or processes that we may be performing, particularly in such emerging areas as gene-based testing and other specialty testing.

## Insurance

As a general matter, providers of clinical laboratory testing services may be subject to lawsuits alleging negligence or other similar legal claims. These suits could involve claims for substantial damages. Any professional liability litigation could also have an adverse impact on our client base and reputation. We maintain various liability insurance programs for claims that could result from providing or failing to provide clinical laboratory testing services, including inaccurate testing results and other exposures. Our insurance coverage limits our maximum exposure on individual claims; however, we are essentially self-insured for a significant portion of these claims. The basis for claims reserves incorporates actuarially determined losses based upon our historical and projected loss experience. Management believes that present insurance coverage and reserves are sufficient to cover currently estimated exposures. Although management cannot predict the outcome of any claims made against the Company, management does not anticipate that the ultimate outcome of any such proceedings or claims will have a material adverse effect on our financial position but may be material to our results of operations and cash flows in the period in which such claims are resolved. Similarly, although we believe that we will be able to obtain adequate insurance coverage in the future at acceptable costs, we cannot assure you that we will be able to do so.

## Employees

At December 31, 2003 and 2002, we employed approximately 37,200 and 33,400 people, respectively. These totals exclude employees of the joint ventures where we do not have a majority interest. We have no collective bargaining agreements with any unions covering any employees in the United States, and we believe that our overall relations with our employees are good.

20

LX-0650-0037

## CAUTIONARY STATEMENT FOR PURPOSES OF THE "SAFE HARBOR" PROVISIONS OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995

Some statements and disclosures in this document are forward-looking statements. Forward-looking statements include all statements that do not relate solely to historical or current facts and can be identified by the use of words such as "may", "believe", "will", "expect", "project", "estimate", "anticipate", "plan" or "continue". These forward-looking statements are based on our current plans and expectations and are subject to a number of risks and uncertainties that could significantly cause our plans and expectations, including actual results, to differ materially from the forward-looking statements. The Private Securities Litigation Reform Act of 1995, or the Litigation Reform Act, provides a "safe harbor" for forward-looking statements to encourage companies to provide prospective information about their companies without fear of litigation.

We would like to take advantage of the "safe harbor" provisions of the Litigation Reform Act in connection with the forward-looking statements included in this document. Investors are cautioned not to unduly rely on such forward-looking statements when evaluating the information presented in this document. The following important factors could cause our actual financial results to differ materially from those projected, forecasted or estimated by us in forward-looking statements:

   (a) Heightened competition, including increased pricing pressure, competition from hospitals for testing for non-patients and competition from physicians. See "Business—Competition".

   (b) Impact of changes in payer mix, including any shift from fee-for-service to capitated fee arrangements. See "Business—Payers and Customers—Customers—Managed Care Organizations and Other Insurance Providers".

   (c) Adverse actions by government or other third-party payers, including unilateral reduction of fee schedules payable to us, competitive bidding, or an increase in the practice of negotiating for exclusive contracts that involve aggressively priced capitated payments by managed care organizations. See "Business—Regulation of Reimbursement for Clinical Laboratory Services" and "Business—Payers and Customers—Customers—Managed Care Organizations and Other Insurance Providers".

   (d) The impact upon our testing volume and collected revenue or general or administrative expenses resulting from our compliance with Medicare and Medicaid administrative policies and requirements of third party payers. These include:

     (1) the requirements of Medicare carriers to provide diagnosis codes for many commonly ordered tests and the possibility that third party payers will increasingly adopt similar requirements;

     (2) the policy of CMS to limit Medicare reimbursement for tests contained in automated chemistry panels to the amount that would have been paid if only the covered tests, determined on the basis of demonstrable "medical necessity", had been ordered;

     (3) continued inconsistent practices among the different local carriers administering Medicare;

     (4) inability to obtain from patients an advance beneficiary notice form for tests that cannot be billed without prior receipt of the form; and

     (5) the potential need to monitor charges and lower certain fees to Medicare to comply with the OIG's proposed rule pertaining to exclusion of providers for submitting claims to Medicare containing charges that are substantially in excess of the provider's usual charges.

    See "Business—Regulation of Reimbursement for Clinical Laboratory Services" and "Business—Billing".

   (e) Adverse results from pending or future government investigations, lawsuits or private actions. These include, in particular significant monetary damages, loss or suspension of licenses, and/or suspension or exclusion from the Medicare and Medicaid programs and/or other significant litigation matters. See "Business—Government Investigations and Related Claims".

   (f) Failure to obtain new customers at profitable pricing or failure to retain existing customers, and a reduction in tests ordered or specimens submitted by existing customers.

   (g) Failure to efficiently integrate acquired clinical laboratory businesses, including Unilab, or to efficiently integrate clinical laboratory businesses from joint ventures and alliances with hospitals, and to manage the costs related to any such integration, or to retain key technical and management personnel. See "Business—Recent Acquisitions".

21

LX-0650-0038

(h) Inability to obtain professional liability or other insurance coverage or a material increase in premiums for such coverage or reserves for self-insurance. See "Business—Insurance".

(i) Denial of CLIA certification or other licenses for any of our clinical laboratories under the CLIA standards, revocation or suspension of the right to bill the Medicare and Medicaid programs or other adverse regulatory actions by federal, state and local agencies. See "Business—Regulation of Clinical Laboratory Operations".

(j) Changes in federal, state or local laws or regulations, including changes that result in new or increased federal or state regulation of commercial clinical laboratories, including regulation by the FDA.

(k) Inability to achieve expected synergies from our acquisitions of other business, including Unilab. See "Business—Recent Acquisitions".

(l) Inability to achieve additional benefits from our Six Sigma and standardization initiatives.

(m) Adverse publicity and news coverage about the clinical laboratory industry or us.

(n) Computer or other system failures that affect our ability to perform tests, report test results or properly bill customers, including potential failures resulting from the standardization of our IT systems and other system conversions, telecommunications failures, malicious human acts (such as electronic break-ins or computer viruses) or natural disasters. See "Business—Information Systems" and "Business—Billing".

(o) Development of technologies that substantially alter the practice of laboratory medicine, including technology changes that lead to the development of more cost-effective tests such as (1) point-of-care tests that can be performed by physicians in their offices and (2) home testing that can be carried out without requiring the services of clinical laboratories. See "Business—Competition" and "Business—Regulation of Clinical Laboratory Operations".

(p) Issuance of patents or other property rights to our competitors or others that could prevent, limit or interfere with our ability to develop, perform or sell our tests or operate our business.

(q) Development of tests by our competitors or others which we may not be able to license, or usage of our technology or similar technologies or our trade secrets by competitors, any of which could negatively affect our competitive position.

(r) Inability to commercialize newly licensed tests or technologies or to obtain appropriate reimbursements for such tests.

(s) Inability to obtain or maintain adequate patent and other proprietary rights protections of our products and services or to successfully enforce our proprietary rights.

(t) Development of an Internet-based electronic commerce business model that does not require an extensive logistics and laboratory network.

(u) The impact of the privacy regulations, security regulations and standards for electronic transactions regulations issued under HIPAA on our operations as well as the cost to comply with the regulations, including the failure of third party payers to complete testing with us, failure to agree on data content for claims, failure to accept default diagnosis codes in the absence of physician-supplied codes, or inability of payers to accept or remit transactions in HIPAA-required standard transaction and code set format. See "Business—Privacy and Security of Health Information; Standard Transactions".

(v) Inability to promptly or properly bill for our services or to obtain appropriate payments for services that we do bill. See "Business—Billing".

(w) Changes in interest rates and changes in our credit ratings from Standard & Poor's and Moody's Investor Services causing an unfavorable impact on our cost of and access to capital.

(x) Inability to hire and retain qualified personnel or the loss of the services of one or more of our key senior management personnel.

(y) Terrorist and other criminal activities, which could affect our customers, transportation or power systems, or our facilities, and for which insurance may not adequately reimburse us for.

22

LX-0650-0039

## Item 2. Properties

Our principal laboratories (listed alphabetically by state) are located in or near the following metropolitan areas. In certain areas (indicated by the number (2)), we have two principal laboratories as a result of recent acquisitions.

| Location | Leased or Owned |
|---|---|
| Phoenix, Arizona | Leased by Joint Venture |
| Los Angeles, California(2) | One owned, one leased |
| Sacramento, California | Leased |
| San Diego, California | Leased |
| San Jose, California | Leased |
| San Juan Capistrano, California | Owned |
| Denver, Colorado | Leased |
| New Haven, Connecticut | Owned |
| Washington, D.C. (Chantilly, Virginia) | Leased |
| Miami, Florida(2) | One owned, one leased |
| Tampa, Florida | Owned |
| Atlanta, Georgia | Owned |
| Chicago, Illinois(2) | One owned, one leased |
| Indianapolis, Indiana | Leased by Joint Venture |
| Lexington, Kentucky | Owned |
| New Orleans, Louisiana | Owned |
| Baltimore, Maryland | Owned |
| Boston, Massachusetts | Leased |
| Detroit, Michigan | Leased |
| St. Louis, Missouri | Owned |
| Las Vegas, Nevada | Owned |
| New York, New York (Teterboro, New Jersey) | Owned |
| Long Island, New York | Leased |
| Dayton, Ohio | Leased by Joint Venture |
| Oklahoma City, Oklahoma | Leased by Joint Venture |
| Portland, Oregon | Leased |
| Erie, Pennsylvania | Leased by Joint Venture |
| Philadelphia, Pennsylvania | Leased |
| Pittsburgh, Pennsylvania | Leased |
| Nashville, Tennessee | Leased |
| Dallas, Texas | Leased |
| Houston, Texas | Leased |
| Seattle, Washington | Leased |

Our executive offices are located at an owned facility in Teterboro, New Jersey and at leased facilities in Lyndhurst, New Jersey. We also lease a site in Norristown, Pennsylvania, that serves as a billing center; a site in San Clemente, California, that serves as the main facility for Nichols Institute Diagnostics; a site in Cincinnati that serves as the main office for MedPlus; and an additional site in West Hills, California, that will serve as our regional laboratory in the Los Angeles metropolitan area after we complete the integration of Unilab. We also own an administrative office in Collegeville, Pennsylvania, and a site in Norriton, Pennsylvania that serves as our national data center. We own our laboratory facility in Mexico City and lease laboratory facilities in San Juan, Puerto Rico and near London, England. We believe that, in general, our laboratory facilities are suitable and adequate for our current and anticipated future levels of operation. We believe that if we were unable to renew a lease on any of our testing facilities, we could find alternative space at competitive market rates and relocate our operations to such new location.

LX-0650-0040

## Item 3. Legal Proceedings

In addition to the investigations described in "Business—Government Investigations and Related Claims", we are involved in various legal proceedings arising in the ordinary course of business. Some of the proceedings against us involve claims that are substantial in amount. Although we cannot predict the outcome of such proceedings or any claims made against us, we do not anticipate that the ultimate outcome of the various proceedings or claims will have a material adverse effect on our financial position, but may be material to our results of operations and cash flows in the period in which such proceedings or claims are resolved.

## Item 4. Submission of Matters to a Vote of Security Holders

None.

24

LX-0650-0041

## PART II

<u>Item 5. Market for Registrant's Common Stock, Related Stockholder Matters and Issuer Purchases of Equity Securities</u>

Our common stock is listed and traded on the New York Stock Exchange under the symbol "DGX." The following table sets forth, for the periods indicated, the high and low sales price per share as reported on the New York Stock Exchange Consolidated Tape:

|  | High | Low |
|---|---|---|
| **2002** | | |
| First Quarter | $84.10 | $66.00 |
| Second Quarter | 96.14 | 79.25 |
| Third Quarter | 85.31 | 51.29 |
| Fourth Quarter | 66.99 | 49.09 |
| **2003** | | |
| First Quarter | $60.90 | $47.36 |
| Second Quarter | 66.24 | 55.14 |
| Third Quarter | 69.25 | 56.42 |
| Fourth Quarter | 74.99 | 59.47 |

As of February 23, 2004, we had approximately 5,900 record holders of our common stock.

On October 21, 2003, we declared a quarterly cash dividend of $.15 per common share, payable on January 23, 2004 to holders of record on January 8, 2004. On February 19, 2004, we declared a quarterly cash dividend of $.15 per common share, payable on April 21, 2004 to holders of record on April 7, 2004. Prior to October 2003, we had not previously declared or paid cash dividends on our common stock. We expect to fund future dividend payments with cash flows from operations, and do not expect the dividend to have a material impact on our ability to finance future growth.

In May 2003, our Board of Directors authorized a share repurchase program, which permits us to purchase up to $300 million of our common stock. In October 2003, our Board of Directors increased the share repurchase authorization by an additional $300 million. Through December 31, 2003, we repurchased approximately 4 million shares of our common stock at an average price of $64.54 per share for a total of $258 million.

<u>Item 6. Selected Financial Data</u>

See page 34.

<u>Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations</u>

See page 37.

<u>Item 7A. Quantitative and Qualitative Disclosures About Market Risk</u>

See Management's Discussion and Analysis of Financial Condition and Results of Operations.

<u>Item 8. Financial Statements and Supplementary Data</u>

See Item 15 (a) 1 and 2.

<u>Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure</u>

None.

LX-0650-0042

## Item 9A. Controls and Procedures

(a)   Our Chief Executive Officer and Chief Financial Officer have evaluated the effectiveness of the design and operation of our disclosure controls and procedures (as defined under Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended) as of the end of the period covered by this report. Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures are adequate and effective.

(b)   During the quarter ended December 31, 2003, there were no changes in our internal control over financial reporting that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

LX-0650-0043

## PART III

### Item 10. Directors and Executive Officers of the Registrant

Information concerning the directors of the Company is incorporated by reference to the information in the Company's Proxy Statement to be filed on or before April 29, 2004, or the Proxy Statement, appearing under the caption "Election of Directors".

### Executive Officers of the Registrant

Officers of the Company are elected annually by the Board of Directors and hold office at the discretion of the Board of Directors. The following persons serve as executive officers of the Company:

*Kenneth W. Freeman* (53) is Chairman of the Board and Chief Executive Officer of the Company. Mr. Freeman joined the Company in May 1995 as President and Chief Executive Officer, was elected a Director in July 1995 and was elected Chairman of the Board in December 1996. Prior to 1995, he served in a variety of financial and managerial positions at Corning, which he joined in 1972. He was elected Controller and a Vice President of Corning in 1985, Senior Vice President in 1987, General Manager of the Science Products Division in 1989 and Executive Vice President in 1993. He was appointed President and Chief Executive Officer of Corning Asahi Video Products Company in 1990.

*Surya N. Mohapatra, Ph.D.* (54) is President and Chief Operating Officer and a Director of the Company. Prior to joining the Company in February 1999 as Senior Vice President and Chief Operating Officer, he was Senior Vice President of Picker International, a worldwide leader in advanced medical imaging technologies, where he served in various executive positions during his 18-year tenure. Dr. Mohapatra was appointed President and Chief Operating Officer in June 1999.

The Company is implementing an orderly succession plan under which Dr. Mohapatra will succeed Mr. Freeman as Chief Executive Officer by the date of the 2004 annual meeting of stockholders, scheduled to be held on May 4, 2004. At that time Mr. Freeman will continue as Chairman of the Board.

*Robert A. Hagemann* (47) is Senior Vice President and Chief Financial Officer. He joined Corning Life Sciences, Inc., in 1992, where he held a variety of senior financial positions before being named Vice President and Corporate Controller of the Company in 1996. Prior to joining the Company, Mr. Hagemann was employed by Prime Hospitality, Inc. and Crompton & Knowles, Inc. in senior financial positions. He was also previously associated with Ernst & Young. Mr. Hagemann assumed his present responsibilities in August 1998.

*Gerald C. Marrone* (61) is Senior Vice President, Administration. Mr. Marrone joined the Company in November 1997 as Chief Information Officer, after 12 years with Citibank, N.A. He assumed his current position in October 2002. While at Citibank, he served as Vice President, Division Executive for Citibank's Global Production Support Division, and was also the Chief Information Officer of Citibank's Global Cash Management business. Prior to joining Citibank, he served for five years as the Chief Information Officer for Memorial Sloan-Kettering Cancer Center in New York.

*Michael E. Prevoznik* (42) is Senior Vice President and General Counsel. Prior to joining SBCL in 1994 as its Chief Legal Compliance Officer, Mr. Prevoznik was with Dechert Price & Rhodes. In 1996, he became Vice President and Chief Legal Compliance Officer for SmithKline Beecham Healthcare Services. In 1998, he was appointed Vice President, Compliance for SmithKline Beecham, assuming additional responsibilities for coordinating all compliance activities within SmithKline Beecham worldwide. Mr. Prevoznik joined the Company as Vice President and General Counsel in August 1999. In 2003 he assumed additional responsibilities for corporate communication and governmental affairs.

*David M. Zewe* (52) is Senior Vice President, Diagnostics Testing Services. Mr. Zewe oversees diagnostic testing operations company-wide, including physician, clinical trials, international and drugs of abuse testing, as well as the diagnostic instruments business. Mr. Zewe joined the Company in 1994 as General Manager of the Philadelphia regional laboratory, became Regional Vice President Sales and Marketing for the mid-Atlantic region in August 1996, became Vice President, Revenue Services in August 1999, leading the billing function company-wide, and became Senior Vice President, U.S. Operations in January 2001, responsible for all core business operations and revenue services. Mr. Zewe assumed his current position in May 2002. Prior to joining the Company, Mr. Zewe was with the Squibb Diagnostics Division of Bristol Myers Squibb, most recently serving as Vice President of Sales.

27

**513**

## Item 11. Executive Compensation

The information called for by this Item is incorporated by reference to the information under the caption "Executive Compensation" appearing in the Proxy Statement. The information contained in the Proxy Statement under the captions "Compensation Committee Report on Executive Compensation" and "Performance Graph" is not incorporated herein by reference.

## Item 12. Security Ownership of Certain Beneficial Owners and Management

Except for the Equity Compensation Plan information set forth below, the information called for by this Item is incorporated by reference to the information under the caption "Security Ownership of Certain Beneficial Owners and Management" appearing in the Proxy Statement.

### Equity Compensation Plan Information

The following table provides information as of December 31, 2003 about our common stock that may be issued upon the exercise of options, warrants and rights under our existing equity compensation plans:

| Plan category | Number of securities to be issued upon exercise of outstanding options, warrants and rights (a) | Weighted-average exercise price of outstanding options, warrants and rights (b) | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) (c) |
|---|---|---|---|
| Equity compensation plans approved by security holders | 10,239,921 | $44.85 | 4,790,768 |
| Equity compensation plans not approved by security holders | - | not applicable | 1,419,381 |
| Total | 10,239,921 | $44.85 | 6,210,149 |

The only equity compensation plan that has not been approved by the Company's stockholders is the Company's Employee Stock Purchase Plan, or ESPP. The ESPP permits employees to purchase the Company's common stock each calendar quarter through payroll deductions. The purchase price is 85% of the closing market price on the last business day of the calendar quarter (or, if lower, the closing market price on the first business day of the calendar quarter). The ESPP authorizes the issuance of 4 million shares of the Company's common stock. The number of securities reflected in the table above for the ESPP includes the share allocation for the fourth quarter of 2003, which were issued in January 2004. The ESPP was adopted prior to the spinoff of the Company in 1996 and, as a result of action taken by the Board in 2001, has a term ending on December 31, 2006.

## Item 13. Certain Relationships and Related Transactions

The information called for by this Item is incorporated by reference to the information under the caption "Certain Relationships and Related Transactions" appearing in the Proxy Statement.

## Item 14. Principal Accountant Fees and Services

The information called for by this Item is incorporated by reference to the information under the caption "Ratification of Appointment of PricewaterhouseCoopers LLP" appearing in the Proxy Statement.

**514**

LX-0650-0045

## Item 15. Exhibits, Financial Statement Schedules and Reports on Form 8-K

(a)   Documents filed as part of this report:

1.   Index to financial statements and supplementary data filed as part of this report:

| Item | Page |
|---|---|
| Report of Independent Auditors | F-1 |
| Consolidated Balance Sheets | F-2 |
| Consolidated Statements of Operations | F-3 |
| Consolidated Statements of Cash Flows | F-4 |
| Consolidated Statements of Stockholders' Equity | F-5 |
| Notes to Consolidated Financial Statements | F-6 |
| Supplementary Data: Quarterly Operating Results (unaudited) | F-36 |

2.   Financial Statement Schedule:

| Item | Page |
|---|---|
| Schedule II—Valuation Accounts and Reserves | F-37 |

3.   Exhibits filed as part of this report:

See (c) below.

(b)   Report on Form 8-K filed during the fourth quarter of 2003:

On October 21, 2003, the Company furnished a current report on Form 8-K reporting under Item 7 its press release of October 31, 2003 announcing, among other things, its results for the quarter and nine months ended September 30, 2003 and its press release announcing a quarterly cash dividend and the expansion of the Company's share repurchase program.

On October 31, 2003, the Company filed a current report on Form 8-K reporting under Item 5 operating income for the quarters ended March 31, 2003, June 30, 2003 and September 30, 2003 and the nine months ended September 30, 2003 and for the quarters ended March 31, 2002, June 30, 2002, September 30, 2002 and December 31, 2002 and the year ended December 31, 2002 on a basis consistent with the preparation of the Quarterly Report on Form 10-Q for the quarter ended September 30, 2003.

On November 20, 2003, the Company filed an amended current report on Form 8-K (Date of Report: February 26, 2003) reporting under Item 2 on the acquisition of the outstanding capital stock of Unilab Corporation.

(c)   Exhibits filed as part of this report:

| Exhibit Number | Description |
|---|---|
| 3.1 | Restated Certificate of Incorporation (filed as an Exhibit to the Company's current report on Form 8-K (Date of Report: May 31, 2001) and incorporated herein by reference) |
| 3.2 | Amended and Restated By-Laws of the Registrant (filed as an Exhibit to the Company's 2000 annual report on Form 10-K and incorporated herein by reference) |
| 4.1 | Form of Rights Agreement dated December 31, 1996 (the "Rights Agreement") between Corning Clinical Laboratories Inc. and Harris Trust and Savings Bank as Rights Agent (filed as an Exhibit to the Company's Registration Statement on Form 10 (File No. 1-12215) and incorporated herein by reference) |
| 4.2 | Form of Amendment No. 1 effective as of July 1, 1999 to the Rights Agreement (filed as an Exhibit to the Company's current report on Form 8-K (Date of Report: August 16, 1999) and incorporated herein by reference) |
| 4.3 | Form of Amendment No. 2 to the Rights Agreement (filed as an Exhibit to the Company's 1999 annual report on Form 10-K and incorporated herein by reference) |
| 4.4 | Form of Amendment No. 3 to the Rights Agreement (filed as an Exhibit to the Company's 2000 annual report on Form 10-K and incorporated herein by reference) |
| 4.5 | Form of Acceptance by National City Bank as successor Rights Agent under the Rights Agreement |

29

**515**

LX-0650-0046

10.1 Form of 6¾% Senior Notes due 2006, including the form of guarantee endorsed thereon (filed as an Exhibit to the Company's current report on Form 8-K (Date of Report: June 27, 2001) and incorporated herein by reference)

10.2 Form of 7½% Senior Notes due 2011, including the form of guarantee endorsed thereon (filed as an Exhibit to the Company's current report on Form 8-K (Date of Report: June 27, 2001) and incorporated herein by reference)

10.3 Form of 1.75% Contingent Convertible Debentures due 2021, including the form of guarantee endorsed thereon (filed as an Exhibit to the Company's current report on Form 8-K (Date of Report: November 26, 2001) and incorporated herein by reference)

10.4 Indenture dated as of June 27, 2001, among the Company, the Subsidiary Guarantors, and the Trustee (filed as an Exhibit to the Company's current report on Form 8-K (Date of Report: June 27, 2001) and incorporated herein by reference)

10.5 First Supplemental Indenture, dated as of June 27, 2001, among the Company, the Subsidiary Guarantors, and the Trustee to the Indenture referred to in Exhibit 10.4 (filed as an Exhibit to the Company's current report on Form 8-K (Date of Report: June 27, 2001) and incorporated herein by reference)

10.6 Second Supplemental Indenture, dated as of November 26, 2001, among the Company, the Subsidiary Guarantors, and the Trustee to the Indenture referred to in Exhibit 10.4 (filed as an Exhibit to the Company's current report on Form 8-K (Date of Report: November 26, 2001) and incorporated herein by reference)

10.7 Third Supplemental Indenture, dated as of April 4, 2002, among Quest Diagnostics, the Additional Subsidiary Guarantors, and the Trustee to the Indenture referred to in Exhibit 10.4 (filed as an Exhibit to the Company's current report on Form 8-K (Date of Report: April 1, 2002) and incorporated herein by reference)

10.8 Fourth Supplemental Indenture dated as of March 19, 2003, among Unilab Corporation (f/k/a Quest Diagnostics Newco Incorporated), Quest Diagnostics Incorporated, The Bank Of New York, and the Subsidiary Guarantors (filed as an Exhibit to the Company's quarterly report on Form 10-Q for the quarter ended March 31, 2003 and incorporated herein by reference)

10.9 Credit Agreement, dated as of June 27, 2001, among the Company, the Subsidiary Guarantors and the Banks (filed as an Exhibit to the Company's current report on Form 8-K (Date of Report: June 27, 2001) and incorporated herein by reference)

10.10 Second Amended and Restated Credit and Security Agreement dated as of September 30, 2003 among Quest Diagnostics Receivables Inc., as Borrower, Quest Diagnostics Incorporated, as Servicer, each of the lenders party thereto and Wachovia Bank, National Association, as Administrative Agent (filed as an Exhibit to the Company's quarterly report on Form 10-Q for the quarter ended September 30, 2003 and incorporated herein by reference)

10.11 Amended and Restated Receivables Sale Agreement dated as of September 30, 2003 among Quest Diagnostics Incorporated and each of its direct or indirect wholly owned subsidiaries who is or hereafter becomes a seller hereunder, as the Sellers, and Quest Diagnostics Receivables Inc., as the Buyer (filed as an Exhibit to the Company's quarterly report on Form 10-Q for the quarter ended September 30, 2003 and incorporated herein by reference)

10.12 Term Loan Credit Agreement dated as of June 21, 2002 among Quest Diagnostics Incorporated, certain subsidiary guarantors of the Company, the lenders party thereto, and Bank of America, N.A., as Administrative Agent (filed as an Exhibit to the Company's Registration Statement on Form S-4 (No. 333-88330) and incorporated herein by reference)

10.13 First Amendment to Credit Agreement dated as of September 20, 2002 among Quest Diagnostics Incorporated, certain subsidiary guarantors of the Company, the lenders party thereto, and Bank of America, N.A., as Administrative Agent (filed as an Exhibit to the Company's quarterly report on Form 10-Q for the quarter ended September 30, 2002 and incorporated herein by reference)

10.14 Second Amendment to Credit Agreement dated as of December 19, 2002 among Quest Diagnostics Incorporated, certain subsidiary guarantors of the Company, the lenders party thereto, and Bank of America, N.A., as Administrative Agent (filed as an Exhibit to post effective Amendment No. 1 to the Company's Registration Statement on Form S-4 (No. 333-88330) and incorporated herein by reference)

30

LX-0650-0047

| 10.15 | Term Loan Credit Agreement dated as of December 19, 2003 among Quest Diagnostics Incorporated, certain subsidiary guarantors of the Company, the lenders party thereto, and Sumitomo Mitsui Banking Corporation |
|---|---|
| 10.16 | Stock and Asset Purchase Agreement dated as of February 9, 1999 among SmithKline Beecham plc, SmithKline Beecham Corporation and the Company (the "Stock and Asset Purchase Agreement") (filed as Appendix A of the Company's Definitive Proxy Statement dated May 11, 1999 and incorporated herein by reference) |
| 10.17 | Amendment No. 1 dated August 6, 1999 to the Stock and Asset Purchase Agreement (filed as an Exhibit to the Company's current report on Form 8-K (Date of Report: August 16, 1999) and incorporated herein by reference) |
| 10.18 | Non-Competition Agreement dated as of August 16, 1999 between SmithKline Beecham plc and the Company (filed as an Exhibit to the Company's current report on Form 8-K (Date of Report: August 16, 1999) and incorporated herein by reference) |
| 10.19 | Stockholders Agreement dated as of August 16, 1999 between SmithKline Beecham plc and the Company (filed as an Exhibit to the Company's current report on Form 8-K (Date of Report: August 16, 1999) and incorporated herein by reference) |
| 10.20 | Amended and Restated Global Clinical Trials Agreement, dated as of December 19, 2002 between SmithKline Beecham plc dba GlaxoSmithKline and the Company (filed as an Exhibit to post effective amendment No. 1 to the Company's Registration Statement on Form S-4 (No. 333-88330) and incorporated herein by reference) |
| 10.21 | Agreement and Plan of Merger, dated as of April 2, 2002, as amended, among the Company, Quest Diagnostics Incorporated and Unilab Corporation (filed as an annex to the Company's final prospectus, dated August 6, 2002, and incorporated herein by reference) |
| 10.22 | Amendment to the Agreement and Plan of Merger, dated as of May 13, 2002, among the Company, Quest Diagnostics Newco Incorporated and Unilab Corporation (filed as an annex to the Company's final prospectus, dated August 6, 2002, and incorporated herein by reference) |
| 10.23 | Amendment No. 2 to the Agreement and Plan of Merger, dated as of June 20, 2002, among the Company, Quest Diagnostics Newco Incorporated and Unilab Corporation (filed as an annex to the Company's final prospectus, dated August 6, 2002, and incorporated herein by reference) |
| 10.24 | Amendment No. 3 to the Agreement and Plan of Merger, dated as of September 25, 2002, among the Company, Quest Diagnostics Newco Incorporated and Unilab Corporation (incorporated herein by reference to Exhibit (a)(11) of the Company's Schedule TO Amendment No. 12 filed with the Commission on September 26, 2002, file No. 001-12215) |
| 10.25 | Amendment No. 4 to the Agreement and Plan of Merger, dated as of January 4, 2003, among the Company, Quest Diagnostics Newco Incorporated and Unilab Corporation (incorporated herein by reference to Exhibit (a)(20) of Quest Diagnostics' Schedule TO Amendment No. 20 filed with the Commission on January 6, 2003, file No. 001-12215) |
| 10.26 | Form of Employees Stock Purchase Plan, as amended (filed as an Exhibit to the Company's annual report on Form 10-K for the year ended December 31, 2002 and incorporated herein by reference) |
| 10.27 | Form of 1996 Employee Equity Participation Program, as amended (filed as an Exhibit to the Company's quarterly report on Form 10-Q for the quarter ended September 30, 2002 and incorporated herein by reference) |
| 10.28 | Form of 1999 Employee Equity Participation Program, as amended as of July 31, 2003 (filed as an Exhibit to the Company's quarterly report on Form 10-Q for the quarter ended June 30, 2003 and incorporated herein by reference) |
| 10.29 | Procedures for the Exercise of Designated Options by Covered Employees (filed as an Exhibit to the Company's quarterly report on Form 10-Q for the quarter ended June 30, 2003 and incorporated herein by reference) |
| 10.30 | Form of Stock Option Plan for Non-Employee Directors (filed as an Exhibit to post effective amendment No. 1 to the Company's Registration Statement on Form S-4 (No. 333-88330) and incorporated herein by reference) |
| 10.31 | Form of Amended and Restated Deferred Compensation Plan For Directors (filed as an Exhibit to the Company's quarterly report on Form 10-Q for the quarter ended June 30, 2003 and incorporated herein by reference) |

31

**517**

LX-0650-0048

| 10.32 | Employment Agreement between the Company and Kenneth W. Freeman dated as of January 1, 2003 (filed as an Exhibit to the Company's annual report on Form 10-K for the year ended December 31, 2002 and incorporated herein by reference) |
| 10.33 | Employment Agreement between the Company and Surya N. Mohapatra dated as of November 9, 2003 |
| 10.34 | Form of Supplemental Deferred Compensation Plan (filed as an Exhibit to the Company's annual report on Form 10-K for the year ended December 31, 1998 and incorporated herein by reference) |
| 10.35 | Amendment No. 1 to the Supplemental Deferred Compensation Plan (filed as an Exhibit to post effective amendment No. 1 to the Company's Registration Statement on Form S-4 (No. 333-88330) and incorporated herein by reference) |
| 10.36 | Amendment No. 2 to the Supplemental Deferred Compensation Plan (filed as an Exhibit to post effective amendment No. 1 to the Company's Registration Statement on Form S-4 (No. 333-88330) and incorporated herein by reference) |
| 10.37 | Form of Executive Retirement Supplemental Plan (filed as an Exhibit to the Company's Registration Statement on Form 10 (File No. 1-12215) and incorporated herein by reference) |
| 10.38 | Form of Senior Management Incentive Plan (filed as Appendix A to the Company's proxy statement dated March 28, 2003 and incorporated herein by reference) |
| 14 | Code of Business Ethics |
| 21 | Subsidiaries of Quest Diagnostics Incorporated |
| 23.1 | Consent of PricewaterhouseCoopers LLP |
| 31.1 | Certification of Chief Executive Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 31.2 | Certification of Chief Financial Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 32.1 | Certification of Chief Executive Officer Pursuant to 18 U.S.C. § 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 32.2 | Certification of Chief Financial Officer Pursuant to 18 U.S.C. § 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |

LX-0650-0049

## Signatures

Pursuant to the requirements of Sections 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Quest Diagnostics Incorporated

| By | /s/ Kenneth W. Freeman | Chairman of the Board and Chief Executive Officer | February 26, 2004 |
|---|---|---|---|
| | Kenneth W. Freeman | | |
| By | /s/ Robert A. Hagemann | Senior Vice President and Chief Financial Officer | February 26, 2004 |
| | Robert A. Hagemann | | |
| By | /s/ Thomas F. Bongiorno | Vice President, Controller and Chief Accounting Officer | February 26, 2004 |
| | Thomas F. Bongiorno | | |

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and on the dates indicated.

| | Capacity | Date |
|---|---|---|
| /s/ Kenneth W. Freeman | Chairman of the Board and Chief Executive Officer | February 26, 2004 |
| Kenneth W. Freeman | | |
| /s/ Surya N. Mohapatra | Director, President and Chief Operating Officer | February 26, 2004 |
| Surya N. Mohapatra | | |
| /s/ Kenneth D. Brody | Director | February 26, 2004 |
| Kenneth D. Brody | | |
| /s/ William F. Buehler | Director | February 26, 2004 |
| William F. Buehler | | |
| /s/ Mary A. Cirillo | Director | February 26, 2004 |
| Mary A. Cirillo | | |
| /s/ James F. Flaherty III | Director | February 26, 2004 |
| James F. Flaherty III | | |
| /s/ William R. Grant | Director | February 26, 2004 |
| William R. Grant | | |
| /s/ Rosanne Haggerty | Director | February 26, 2004 |
| Rosanne Haggerty | | |
| /s/ Dan C. Stanzione | Director | February 26, 2004 |
| Dan C. Stanzione | | |
| /s/ Gail R. Wilensky | Director | February 26, 2004 |
| Gail R. Wilensky | | |
| /s/ John B. Ziegler | Director | February 26, 2004 |
| John B. Ziegler | | |

33

LX-0650-0050

## SELECTED HISTORICAL FINANCIAL DATA OF OUR COMPANY

The following table summarizes selected historical financial data of our Company and our subsidiaries at the dates and for each of the periods presented. We derived the selected historical financial data for the years 1999 through 2003 from the audited consolidated financial statements of our Company. As discussed in Note 2 to the Consolidated Financial Statements, all per share data has been restated to reflect our two-for-one stock split effected on May 31, 2001. In April 2002, the Financial Accounting Standards Board, or FASB, issued Statement of Financial Accounting Standards, or SFAS, No. 145, "Rescission of FASB Statements No. 4, 44 and 64, Amendment of FASB Statement No. 13, and Technical Corrections", or SFAS 145. Pursuant to SFAS 145, extraordinary losses associated with the extinguishment of debt in 1999, 2000 and 2001, previously presented net of applicable taxes, were reclassified to other non-operating expenses. The selected historical financial data is only a summary and should be read together with the audited consolidated financial statements and related notes of our Company and management's discussion and analysis of financial condition and results of operations included elsewhere in this Annual Report on Form 10-K.

| | 2003(a) | 2002(b) | 2001 | 2000 | 1999(c) |
|---|---|---|---|---|---|
| | Year Ended December 31, | | | | |
| | (in thousands, except per share data) | | | | |
| **Operations Data:** | | | | | |
| Net revenues ..................... | $4,737,958 | $4,108,051 | $3,627,771 | $3,421,162 | $ 2,205,243 |
| Amortization of goodwill(d) ....... | - | - | 38,392 | 37,862 | 23,530 |
| Provisions for restructuring and other special charges ........... | - | - | - | 2,100 (e) | 73,385 (f) |
| Operating income .............. | 796,454 | 592,142 | 411,550 | 317,527 (e) | 78,980 (f) |
| Loss on debt extinguishment ...... | - | - | 42,012 (g) | 4,826 (h) | 3,566 (i) |
| Net income (loss) .............. | 436,717 | 322,154 | 162,303 (g) | 102,052 (e),(h) | (3,413)(f),(i) |
| **Basic net income (loss) per common share:** | | | | | |
| Net income (loss) .............. | $ 4.22 | $ 3.34 | $ 1.74 | $ 1.14 | $ (0.05) |
| **Diluted net income (loss) per common share:(j)** | | | | | |
| Net income (loss) .............. | $ 4.12 | $ 3.23 | $ 1.66 | $ 1.08 | $ (0.05) |
| Dividends per common share ...... | $ 0.15 | $ - | $ - | $ - | $ - |
| **Balance Sheet Data (at end of year):** | | | | | |
| Accounts receivable, net ......... | $ 609,187 | $ 522,131 | $ 508,340 | $ 485,573 | $ 539,256 |
| Total assets ..................... | 4,301,418 | 3,324,197 | 2,930,555 | 2,864,536 | 2,878,481 |
| Long-term debt .................. | 1,028,707 | 796,507 | 820,337 | 760,705 | 1,171,442 |
| Preferred stock ................. | - | - | - (k) | 1,000 | 1,000 |
| Common stockholders' equity ..... | 2,394,694 | 1,768,863 | 1,335,987 | 1,030,795 | 862,062 |
| **Other Data:** | | | | | |
| Net cash provided by operating activities...................... | $ 662,799 | $ 596,371 | $ 465,803 | $ 369,455 | $ 249,535 |
| Net cash used in investing activities..................... | (417,050) | (477,212) | (296,616) | (48,015) | (1,107,990) |
| Net cash (used in) provided by financing activities ............ | (187,568) | (144,714) | (218,332) | (177,247) | 682,831 |
| Provision for doubtful accounts .... | 228,222 | 217,360 | 218,271 | 234,694 | 142,333 |
| Rent expense .................... | 120,748 | 96,547 | 82,769 | 76,515 | 59,073 |
| Capital expenditures ............. | 174,641 | 155,196 | 148,986 | 116,450 | 76,029 |

(a) On February 28, 2003, we completed the acquisition of Unilab Corporation, or Unilab. Consolidated operating results for 2003 include the results of operations of Unilab subsequent to the closing of the acquisition. See Note 3 to the Consolidated Financial Statements.

(b) On April 1, 2002, we completed the acquisition of American Medical Laboratories, Incorporated, or AML. Consolidated operating results for 2002 include the results of operations of AML subsequent to the closing of the acquisition. See Note 3 to the Consolidated Financial Statements.

34

LX-0650-0051

(c) On August 16, 1999, we completed the acquisition of SmithKline Beecham Clinical Laboratories, Inc., or SBCL. Consolidated operating results for 1999 include the results of operations of SBCL subsequent to the closing of the acquisition.

(d) In July 2001, the FASB issued SFAS No. 142, "Goodwill and Other Intangibles", or SFAS 142, which the Company adopted on January 1, 2002. The following table presents net income and basic and diluted earnings per common share data adjusted to exclude the amortization of goodwill, assuming that SFAS 142 had been in effect for the periods presented:

| | Year Ended December 31, | | |
| | 2001 | 2000 | 1999 |
|---|---|---|---|
| | (In thousands, except per share data) | | |
| Net income: | | | |
| Reported net income (loss) | $162,303 | $102,052 | $(3,413) |
| Add back: Amortization of goodwill, net of taxes | 35,964 | 36,023 | 22,013 |
| Adjusted net income | $198,267 | $138,075 | $18,600 |
| Basic earnings per common share: | | | |
| Reported net income (loss) | $ 1.74 | $ 1.14 | $ (0.05) |
| Amortization of goodwill, net of taxes | 0.39 | 0.40 | 0.31 |
| Adjusted net income | $ 2.13 | $ 1.54 | $ 0.26 |
| Diluted earnings per common share: | | | |
| Reported net income (loss) | $ 1.66 | $ 1.08 | $ (0.05) |
| Amortization of goodwill, net of taxes | 0.37 | 0.38 | 0.31 |
| Adjusted net income | $ 2.03 | $ 1.46 | $ 0.26 |

(e) During the second quarter of 2000, we recorded a net special charge of $2.1 million. This net charge resulted from a $13.4 million charge related to the costs to cancel certain contracts that we believed were not economically viable as a result of the SBCL acquisition, and which were principally associated with the cancellation of a co-marketing agreement for clinical trials testing services, which charges were in large part offset by a reduction in reserves attributable to a favorable resolution of outstanding claims for reimbursements associated with billings of certain tests.

(f) During 1999, we recorded provisions for restructuring and other special charges of $73 million in conjunction with the acquisition and planned integration of SBCL. Of the $73 million charge, $19.8 million represented stock-based employee compensation related to special one-time grants to certain employees of the combined company and accelerated vesting, $12.7 million represented professional and consulting fees related to planned integration activities and $3.5 million represented special recognition awards granted to certain employees involved in the transaction and integration planning processes of the SBCL acquisition. The remaining $36 million represented a charge to earnings in the fourth quarter of 1999 representing the costs associated with planned integration activities affecting Quest Diagnostics' operations and employees. See Note 4 to the Consolidated Financial Statements for further details.

(g) In conjunction with our debt refinancing in 2001, we recorded a loss on debt extinguishment of $42 million. The loss represented the write-off of deferred financing costs of $23 million, associated with the debt which was refinanced, and $13 million of payments related primarily to the tender premium incurred in connection with our cash tender offer of our 10¾% senior subordinated notes due 2006. The remaining $6 million of losses represented amounts incurred in conjunction with the cancellation of certain interest rate swap agreements which were terminated in connection with the debt that was refinanced. See Note 7 to the Consolidated Financial Statements for further details.

(h) During the fourth quarter of 2000, we recorded a $4.8 million loss on the extinguishment of debt representing the write-off of deferred financing costs resulting from the prepayment of $155 million of term loans under our then existing senior secured credit facility.

(i) In conjunction with the acquisition of SBCL, we repaid the entire amount outstanding under our then existing credit agreement. The loss on the extinguishment of debt recorded in the third quarter of 1999

35

LX-0650-0052

represented $3.6 million of deferred financing costs, which were written-off in connection with the extinguishment of the then existing credit agreement.

(j) Potentially dilutive common shares primarily include stock options and restricted common shares granted under our Employee Equity Participation Program. During the period in which net income available for common stockholders is a loss, diluted weighted average common shares outstanding equals basic weighted average common shares outstanding, since under this circumstance, the incremental shares would have an anti-dilutive effect.

(k) On December 31, 2001, the Company repurchased all of its then outstanding preferred stock for its par value of $1 million plus accrued dividends.

36

LX-0650-0053

## QUEST DIAGNOSTICS INCORPORATED AND SUBSIDIARIES
## MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION
## AND RESULTS OF OPERATIONS

**Overview**

The underlying fundamentals of the diagnostic testing industry have improved since the early to mid-1990s, which was a period of declining reimbursement and reduced test utilization. During the early 1990s, the industry was negatively impacted by significant government regulation and investigations into various billing practices. In addition, the rapid growth of managed care, as a result of the need to reduce overall healthcare costs, and excess laboratory testing capacity, led to revenue and profit declines across the diagnostic testing industry, which in turn led to industry consolidation, particularly among commercial laboratories. As a result of these dynamics, fewer but larger commercial laboratories have emerged, which have greater economies of scale, rigorous programs designed to assure compliance with government billing regulations and other laws, and a more disciplined approach to pricing services. These changes have resulted in improved profitability and a reduced risk of non-compliance with complex government regulations. At the same time, a slowdown in the growth of managed care and decreasing influence by managed care organizations on the ordering of clinical laboratory testing by physicians has contributed to renewed growth in testing and further improvements in profitability since 1999. Partially offsetting these favorable trends have been changes in the United States economy during the last several years, which has resulted in an increase in the number of unemployed and uninsured. In addition, in an attempt to slow the rapidly rising costs of healthcare, employers and healthcare insurers have made design changes to healthcare plans, which shift a larger portion of healthcare costs to consumers. We believe that these factors have reduced the utilization of healthcare services in general. Orders for laboratory testing are generated from physician offices, hospitals and employers. As such, factors such as the number of unemployed and uninsured and design changes in healthcare plans, which impact the level of employment or the number of physicians office and hospital visits, will impact the utilization of laboratory testing.

We believe the diagnostic testing industry has continued to grow during the last several years despite the slowdown in the United States economy and the changes in healthcare plan design, and that growth will accelerate as the economy improves. In addition, over the longer term, growth is expected to accelerate as a result of the following factors:

- general expansion and aging of the United States population;

- continuing research and development in the area of genomics and proteomics, which is expected to yield new, more sophisticated and specialized diagnostics tests;

- increasing recognition by consumers and payers of the value of early detection and prevention which can be provided through laboratory testing as a means to improve health and reduce the overall cost of healthcare; and

- increasing affordability of tests due to advances in technology and cost efficiencies.

Quest Diagnostics, as the largest clinical laboratory testing company with a leading position in most of its geographic markets and service offerings, is well positioned to benefit from the growth expected in the industry.

Payments for clinical laboratory testing services are made by the government, health insurers, physicians, hospitals, employers and patients. Physicians, hospitals and employers are typically billed on a fee-for-service basis based on fee schedules, which are typically negotiated. Fees billed to patients and health insurers are based on the laboratory's patient fee schedule, subject to any limitations on fees negotiated with the health insurers or with physicians on behalf of their patients. Medicare and Medicaid reimbursements are based on fee schedules set by governmental authorities.

We incur significant additional costs as a result of our participation in Medicare and Medicaid programs, as billing and reimbursement for clinical laboratory testing is subject to considerable and complex federal and state regulations. These additional costs include those related to: (1) complexity added to our billing processes; (2) training and education of our employees and customers; (3) compliance and legal costs; and (4) costs related to, among other factors, medical necessity denials and advance beneficiary notices. Compliance with applicable laws and regulations, as well as internal compliance policies and procedures, adds further complexity and costs to the billing process. We have implemented "best practices" that have significantly improved our billing and collection processes. These efforts, together with our Six Sigma and standardization initiatives, have significantly reduced bad debt expense as a percentage of net revenues over the last several years. While the

37

**523**

LX-0650-0054

total cost to comply with Medicare administrative requirements is disproportionate to our cost to bill other payers, average Medicare reimbursement rates approximate the Company's overall average reimbursement rate from all payers, making this business generally less profitable. Government payers, such as Medicare and Medicaid, as well as insurers and larger employers have taken steps and may continue to take steps to control the cost, utilization and delivery of healthcare services, including clinical laboratory services. Principally as a result of reimbursement reductions and measures adopted by the Centers for Medicare & Medicaid Services, or CMS (formerly the Health Care Financing Administration) which establishes procedures and continuously evaluates and implements changes in the reimbursement process to control utilization, the percentage of our aggregate net revenues derived from Medicare and Medicaid programs declined from approximately 20% in 1995 to approximately 17% in 2003. Despite the added cost and complexity of participating in the Medicare and Medicaid programs, we continue to participate in such programs because we believe that our other business may significantly depend on continued participation in the Medicare and Medicaid programs, because many customers want a single laboratory to perform all of their clinical laboratory testing services, regardless of who pays for such services.

Health insurers, which typically contract with a limited number of clinical laboratories for their members, represent approximately one-half of our total testing volumes and one-half of our net revenues. Larger health insurers typically prefer to use large commercial clinical laboratories because they can provide services on a national or regional basis and can manage networks of local or regional laboratories to provide even broader access to their members and physicians. In certain markets, such as California, health insurers delegate their covered members to independent physician associations, or IPA, which in turn contract with laboratories for clinical laboratory services.

Over the last decade, health insurers have been consolidating, resulting in fewer but larger insurers with significant bargaining power to negotiate fee arrangements with healthcare providers, including clinical laboratories. These health insurers demand that clinical laboratory service providers accept discounted fee structures or assume all or a portion of the financial risk associated with providing testing services to their members through capitated payment contracts. Under these capitated payment contracts, the Company and health insurers agree to a predetermined monthly contractual rate for each member of the health insurer's plan regardless of the number or cost of services provided by the Company. Capitated agreements have historically been priced aggressively, particularly for exclusive or semi-exclusive arrangements. In 2003, we derived approximately 14% of our testing volume and 8% of our net revenues from capitated payment contracts. In recent years, there has been a shift in the way major insurers contract with clinical laboratories. Health insurers have begun to offer more freedom of choice to their affiliated physicians, including greater freedom to determine which laboratory to use and which tests to order. Accordingly, most of our agreements with major health insurers are non-exclusive arrangements. As a result, under these non-exclusive arrangements, physicians have more freedom of choice in selecting laboratories, and laboratories are likely to compete more on the basis of service and quality rather than price alone. Also, health insurers have been giving insurers greater freedom of choice and patients have increasingly been selecting plans (such as preferred provider organizations and consumer driven plans) that offer a greater choice of providers. Pricing for these preferred provider organizations is typically negotiated on a fee-for-service basis, which generally results in higher revenue per requisition than under a capitated fee arrangement. Despite these trends, health insurers continue to aggressively seek cost reductions in order to keep their premiums to their customers competitive.

We expect that the overall reimbursement dynamics for all payers on a combined basis are neutral for the diagnostic testing industry. Today, many federal and state governments face serious budget deficits and healthcare spending is a prime target for reductions. For example, the Prescription Drug, Improvement, and Modernization Act of 2003 eliminated for five years (beginning January 1, 2004) the provision for annual increases to the Medicare national fee schedule based on the consumer price index. Efforts to impose reduced reimbursements and more stringent cost controls by government and other payers for existing tests may continue. However, we believe that as new tests are developed which either improve on the effectiveness of existing tests or provide new diagnostic capabilities, government and other payers will add these tests as covered services, because of the importance of laboratory testing in assessing and managing the health of patients. We continue to emphasize the importance and the high value of laboratory testing with insurers and government payers at the federal and state level.

The diagnostic testing industry is subject to seasonal fluctuations in operating results and cash flows. Typically, testing volume declines during the summer months, year-end holiday periods and other major holidays, reducing net revenues and operating cash flows below annual averages. Testing volume is also subject to declines in winter months due to inclement weather, which varies in severity from year to year.

38

LX-0650-0055

The diagnostic testing industry is labor intensive. Employee compensation and benefits constitute approximately one-half of our total costs and expenses. Cost of services consists principally of costs for obtaining, transporting and testing specimens. Selling, general and administrative expenses consist principally of the costs associated with our sales force, billing operations (including bad debt expense), and general management and administrative support.

Information systems are used extensively in virtually all aspects of our business, including laboratory testing, billing, customer service, logistics, and management of medical data. Our success depends, in part, on the continued and uninterrupted performance of our information technology systems. In 2002, we began implementation of a standard laboratory information system and a standard billing system, which we expect will take several more years to complete. Through proper planning and execution, we expect to reduce the risks associated with systems conversions of this type, and minimize any disruptions in our operations.

## Critical Accounting Policies

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires us to make estimates and assumptions and select accounting policies that affect the reported amounts of assets and liabilities, the disclosure of contingent assets and liabilities and the reported amounts of revenues and expenses in our financial statements. Actual results could differ from those estimates.

While many operational aspects of our business are subject to complex federal, state and local regulations, the accounting for our business is generally straightforward with net revenues primarily recognized upon completion of the testing process. Our revenues are primarily comprised of a high volume of relatively low dollar transactions, and about one-half of our total costs and expenses consist of employee compensation and benefits. Due to the nature of our business, several of our accounting policies involve significant estimates and judgments:

- revenues and accounts receivable;
- reserves for general and professional liability claims;
- billing-related settlement reserves; and
- accounting for and recoverability of goodwill.

### Revenues and accounts receivable

The process for estimating the ultimate collection of receivables involves significant assumptions and judgments. Billings for services under third-party payer programs, including Medicare and Medicaid, are recorded as revenues net of allowances for differences between amounts billed and the estimated receipts under such programs. Adjustments to the estimated receipts, based on final settlement with the third-party payers, are recorded upon settlement as an adjustment to net revenues.

We have implemented a monthly standardized approach to estimate and review the collectibility of our receivables based on the period they have been outstanding. Historical collection and payer reimbursement experience is an integral part of the estimation process related to reserves for doubtful accounts. In addition, we assess the current state of our billing functions in order to identify any known collection or reimbursement issues in order to assess the impact, if any, on our reserve estimates, which involves judgment. We believe that the collectibility of our receivables is directly linked to the quality of our billing processes, most notably those related to obtaining the correct information in order to bill effectively for the services we provide. As such, we have implemented "best practices" to reduce the number of requisitions that we receive from healthcare providers with missing or incorrect billing information. Revisions in reserve for doubtful accounts estimates are recorded as an adjustment to bad debt expense within selling, general and administrative expenses. We believe that our collection and reserves processes, along with our close monitoring of our billing processes, helps to reduce the risk associated with material revisions to reserve estimates resulting from adverse changes in collection and reimbursement experience and billing operations.

### Reserves for general and professional liability claims

As a general matter, providers of clinical laboratory testing services may be subject to lawsuits alleging negligence or other similar legal claims. These suits could involve claims for substantial damages. Any professional liability litigation could also have an adverse impact on our client base and reputation. We maintain

39

LX-0650-0056

various liability insurance programs for claims that could result from providing or failing to provide clinical laboratory testing services, including inaccurate testing results and other exposures. Our insurance coverage limits our maximum exposure on individual claims; however, we are essentially self-insured for a significant portion of these claims. While the basis for claims reserves incorporates actuarially determined losses based upon our historical and projected loss experience, the process of analyzing, assessing and establishing reserve estimates relative to these types of claims involves a high degree of judgment. Changes in the facts and circumstances associated with a claim could have a material impact on our results of operations, principally costs of services, and cash flows in the period that reserve estimates are revised. We believe that present insurance coverage and reserves are sufficient to cover currently estimated exposures, but we cannot assure investors that we will not incur liabilities in excess of recorded reserves. Similarly, although we believe that we will be able to obtain adequate insurance coverage in the future at acceptable costs, we cannot assure investors that we will be able to do so.

### Billing-related settlement reserves

Our business is subject to extensive and frequently changing federal, state and local laws and regulations. We have entered into several settlement agreements with various government and private payers during recent years relating to industry-wide billing and marketing practices that had been substantially discontinued by early 1993. In addition, we are aware of several pending lawsuits filed under the qui tam provisions of the civil False Claims Act and have received notices of private claims relating to billing issues similar to those that were the subject of prior settlements with various government payers. We have a comprehensive compliance program that is intended to ensure the strict implementation and observance of all applicable laws, regulations and Company policies. The Quality, Safety and Compliance Committee of the Board of Directors requires periodic reporting of compliance operations from management. As an integral part of our compliance program, we investigate all reported or suspected failures to comply with federal healthcare reimbursement requirements. Any non-compliance that results in Medicare or Medicaid overpayments is reported to the government and reimbursed by us. As a result of these efforts, we have periodically identified and reported overpayments. While we have reimbursed these overpayments and have taken corrective action where appropriate, we cannot assure investors that in each instance the government will necessarily accept these actions as sufficient.

While we believe that we are in material compliance with all applicable laws, many of the regulations applicable to us, including those relating to billing and reimbursement of tests and those relating to relationships with physicians and hospitals, are vague or indefinite and have not been interpreted by the courts. They may be interpreted or applied by a prosecutorial, regulatory or judicial authority in a manner that could require us to make changes in our operations, including our billing practices. If we fail to comply with applicable laws and regulations, we could suffer civil and criminal penalties, including the loss of licenses or our ability to participate in Medicare, Medicaid and other federal and state healthcare programs.

Although management believes that established reserves for billing-related claims are sufficient, it is possible that additional information (such as the indication by the government of criminal activity, additional tests being questioned or other changes in the government's or private claimants' theories of wrongdoing) may become available which may cause the final resolution of these matters to exceed established reserves by an amount which could be material to our results of operations and cash flows in the period in which such claims are settled. We do not believe that these issues will have a material adverse effect on our overall financial condition.

### Accounting for and recoverability of goodwill

In July 2001, the Financial Accounting Standards Board, or FASB, issued Statement of Financial Accounting Standards, or SFAS, No. 142, "Goodwill and Other Intangible Assets", or SFAS 142. The impact of adopting SFAS 142 is summarized in Note 2 to the Consolidated Financial Statements.

Effective January 1, 2002, we evaluate the recoverability and measure the potential impairment of our goodwill under SFAS 142. The annual impairment test is a two-step process that begins with the estimation of the fair value of the reporting unit. The first step screens for potential impairment and the second step measures the amount of the impairment, if any. Our estimate of fair value considers publicly available information regarding the market capitalization of our Company, as well as (i) publicly available information regarding comparable publicly-traded companies in the clinical laboratory testing industry, (ii) the financial projections and future prospects of our business, including its growth opportunities and likely operational improvements, and (iii) comparable sales prices, if available. As part of the first step to assess potential impairment, we compare

40

LX-0650-0057

our estimate of fair value for the Company to the book value of our consolidated net assets. If the book value of our consolidated net assets is greater than our estimate of fair value, we would then proceed to the second step to measure the impairment, if any. The second step compares the implied fair value of goodwill with its carrying value. The implied fair value is determined by allocating the fair value of the reporting unit to all of the assets and liabilities of that unit as if the reporting unit had been acquired in a business combination and the fair value of the reporting unit was the purchase price paid to acquire the reporting unit. The excess of the fair value of the reporting unit over the amounts assigned to its assets and liabilities is the implied fair value of goodwill. If the carrying amount of the reporting unit's goodwill is greater than its implied fair value, an impairment loss will be recognized in the amount of the excess. We believe our estimation methods are reasonable and reflective of common valuation practices.

On a quarterly basis, we perform a review of our business to determine if events or changes in circumstances have occurred which could have a material adverse effect on the fair value of the Company and its goodwill. If such events or changes in circumstances were deemed to have occurred, we would perform an impairment test of goodwill as of the end of the quarter, consistent with the annual impairment test, and record any noted impairment loss.

## Acquisition of Unilab Corporation

On February 28, 2003, we completed the acquisition of Unilab Corporation, or Unilab, the leading commercial clinical laboratory in California. In connection with the acquisition, we paid $297 million in cash and issued 7.1 million shares of Quest Diagnostics common stock to acquire all of the outstanding capital stock of Unilab. In addition, we reserved approximately 0.3 million shares of Quest Diagnostics common stock for outstanding stock options of Unilab which were converted upon the completion of the acquisition into options to acquire shares of Quest Diagnostics common stock. In connection with the acquisition of Unilab, as part of a settlement agreement with the United States Federal Trade Commission, we entered into an agreement to sell to Laboratory Corporation of America Holdings, Inc., or LabCorp, certain assets in northern California for $4.5 million, including the assignment of agreements with four IPA's and leases for 46 patient service centers (five of which also serve as rapid response laboratories), or the Divestiture. We completed the transfer of assets and assignment of the IPA agreements to LabCorp and recorded a $1.5 million gain in the third quarter of 2003 in connection with the Divestiture, which is included in "other operating (income) expense, net" in the consolidated statements of operations. See Note 3 to the Consolidated Financial Statements for a full discussion of the Unilab acquisition and the Divestiture.

## Integration of Acquired Businesses

In July 2002, the FASB issued SFAS No. 146, "Accounting for Costs Associated with Exit or Disposal Activities", or SFAS 146. SFAS 146, which we adopted effective January 1, 2003, requires that a liability for a cost associated with an exit activity, including those related to employee termination benefits and contractual obligations, be recognized when the liability is incurred, and not necessarily the date of an entity's commitment to an exit plan, as under previous accounting guidance. The provisions of SFAS 146 apply to integration costs associated with actions that impact the employees and operations of Quest Diagnostics. Costs associated with actions that impact the employees and operations of an acquired company, such as Unilab, are accounted for as a cost of the acquisition and included in goodwill in accordance with Emerging Issues Task Force No. 95-3, "Recognition of Liabilities in Connection with a Purchase Business Combination".

### Unilab Corporation

As part of the Unilab acquisition, we acquired all of Unilab's operations, including its primary testing facilities in Los Angeles, San Jose and Sacramento, California, and approximately 365 patient service centers and 35 rapid response laboratories and approximately 4,100 employees. During the fourth quarter of 2003, we finalized our plan related to the integration of Unilab into our laboratory network. As part of the plan, following the sale of certain assets to LabCorp as part of the Divestiture, we closed our previously owned clinical laboratory in the San Francisco Bay area and completed the integration of remaining customers in the northern California area to Unilab's laboratories in San Jose and Sacramento. We continue to have two laboratories in the Los Angeles metropolitan area (our facilities in Van Nuys and Tarzana). We plan to open a new regional laboratory in the Los Angeles metropolitan area and then integrate our business in the Los Angeles metropolitan area into the new facility.

41

LX-0650-0058

We expect to incur up to $20 million of costs through 2005 to integrate Unilab and our existing California operations. During 2003, we recorded $9 million of such costs associated with executing the plan. The majority of these integration costs related to employee severance and contractual obligations associated with leased facilities and equipment. Employee groups affected as a result of this plan include those involved in the collection and testing of specimens, as well as administrative and other support functions. Of the $9 million in costs, $7.9 million was recorded in the fourth quarter and related to actions that impact the employees and operations of Unilab, was accounted for as a cost of the Unilab acquisition and included in goodwill. Of the $7.9 million, $6.8 million related to employee severance benefits for approximately 150 employees, with the remainder primarily related to contractual obligations. In addition, $1.1 million of integration costs, related to actions that impact Quest Diagnostics' employees and operations and comprised principally of employee severance benefits for approximately 30 employees, were accounted for as a charge to earnings in the third quarter of 2003 and included in "other operating (income) expense, net" within the consolidated statements of operations. As of December 31, 2003, accruals related to the Unilab integration plan totaled approximately $7 million. While the majority of the accrued costs at December 31, 2003 are expected to be paid in 2004, there are certain severance costs that have payment terms extending into 2005. The remaining estimated costs associated with executing the Unilab integration plan relate to actions which are expected to take place through 2005. Such costs will be accounted for as a charge to earnings in the periods that the related actions are taken.

Upon completion of the Unilab integration, we expect to realize approximately $25 million to $30 million of annual synergies and we expect to achieve this annual rate of synergies by the end of 2005.

### American Medical Laboratories, Incorporated and Clinical Diagnostics Services, Incorporated

On April 1, 2002, we completed our acquisition of all of the outstanding voting stock of American Medical Laboratories, Incorporated, or AML. In addition, during the fourth quarter of 2001, we acquired all of the voting stock of Clinical Diagnostic Services, Inc.

See Notes 3 and 4 to the Consolidated Financial Statements for a full discussion of these transactions.

## Six Sigma and Standardization Initiatives

We intend to become recognized as the quality leader in the healthcare services industry. We continue to implement our Six Sigma and standardization initiatives throughout all aspects of our organization. Six Sigma is a management approach that requires a thorough understanding of customer needs and requirements, root cause analysis, process improvements and rigorous tracking and measuring of services. We have integrated our Six Sigma initiative with our initiative to standardize operations and processes across all of our Company by adopting identified Company best practices. We plan to continue these initiatives during the next several years and expect that their successful implementation will result in measurable improvements in customer satisfaction and operating results.

## Results of Operations

### Year Ended December 31, 2003 Compared with Year Ended December 31, 2002

Net income for the year ended December 31, 2003 increased to $437 million from $322 million for the prior year period. This increase in earnings was primarily attributable to revenue growth and improved efficiencies generated from our Six Sigma and standardization initiatives.

### Net Revenues

Net revenues for the year ended December 31, 2003 grew by 15.3% over the prior year level and include the results of Unilab, which was acquired on February 28, 2003, for ten months. Net revenues for 2003 also included twelve months of results for AML, which was acquired on April 1, 2002. Pro forma revenue growth, assuming that the Unilab and AML acquisitions and the related Divestiture had been completed on January 1, 2002, was 4.3% for the year ended December 31, 2003.

For the year ended December 31, 2003, clinical testing volume, measured by the number of requisitions, increased 11.3% compared to 2002. On a pro forma basis, assuming that the Unilab and AML acquisitions and the Divestiture had been completed on January 1, 2002, testing volume declined 1.2%. The combined effect of the severe winter storms and the New Jersey physicians' strike during the first quarter of 2003 and Hurricane

42

LX-0650-0059

Isabel and the blackout in the third quarter of 2003 reduced testing volume by approximately 0.5% for the year ended December 31, 2003. In addition, our drugs-of-abuse testing business, which is most directly impacted by economic conditions and accounts for approximately 3% of our net revenues and 6% of our testing volume, declined during 2003, reducing Company-wide testing volume growth by approximately 0.5%. Both reported and pro forma testing volume have been impacted by general economic conditions, which have increased the number of uninsured and unemployed and, we believe, have reduced utilization of healthcare services in 2003.

For the year ended December 31, 2003, average revenue per requisition improved 3.6%, or 5.1% on a pro forma basis, assuming that the Unilab and AML acquisitions and the Divestiture had been completed on January 1, 2002. These improvements in average revenue per requisition were primarily attributable to a continuing shift in test mix to higher value testing, including gene-based and esoteric testing. Gene-based testing net revenues exceeded $500 million for 2003, and grew over 20% compared to the prior year. In addition, a shift in payer mix to higher priced fee-for-service reimbursement contributed a portion of the increase in average revenue per requisition. The inclusion of Unilab's results subsequent to February 28, 2003 served to reduce average revenue per requisition, reflecting Unilab's lower revenue per requisition.

Our businesses, other than clinical laboratory testing, which represent approximately 4% of our consolidated net revenues, grew approximately 16% during the year and contributed about 0.5% to the reported growth in net revenues.

*Operating Costs and Expenses*

Total operating costs and expenses for 2003 increased $426 million from 2002 primarily due to increases in our clinical testing volume (largely as a result of the Unilab acquisition), employee compensation and benefits, testing supply costs and depreciation expense. While our cost structure has been favorably impacted by the improved efficiencies generated from our Six Sigma and standardization initiatives, we continue to make investments to enhance our infrastructure to pursue our overall business strategy. These investments include:

- Skills training for all employees, which together with our competitive pay and benefits, helps to increase employee satisfaction and performance, which we believe will result in better service to our customers;
- Our information technology strategy, which is designed to improve our efficiency and provide better service to our customers; and
- Our strategic growth opportunities.

Cost of services, which includes the costs of obtaining, transporting and testing specimens, was 58.4% of net revenues for 2003, compared to 59.2% in the prior year. This improvement was primarily the result of efficiency gains resulting from our Six Sigma and standardization initiatives and the increase in average revenue per requisition. This improvement was partially offset by initial installation costs of deploying our Internet-based orders and results systems in physicians' offices and our patient service centers. The increase in the number of orders and test results reported via our Internet-based systems is improving the initial collection of billing information which is reducing the cost of billing and bad debt expense, both of which are components of selling, general and administrative expenses. At December 31, 2003, approximately 25% of our orders and approximately 35% of our test results were being transmitted via the Internet. Additionally, we are seeing an increase in the number of physicians who no longer draw blood in their office, which is resulting in an increase in the number of blood draws in our patient service centers or by our phlebotomists placed in physicians' offices. This shift has increased our operating costs associated with our blood draws, but is reducing costs in accessioning and other parts of our operations due to improved billing information and a reduction in the number of inadequate patient samples obtained by our trained phlebotomists compared to samples collected by physician employed phlebotomists.

Selling, general and administrative expenses, which include the costs of the sales force, billing operations, bad debt expense and general management and administrative support, decreased during 2003, as a percentage of net revenues, to 24.6% from 26.2% in the prior year. This improvement was primarily due to efficiencies from our Six Sigma and standardization initiatives and the improvement in average revenue per requisition. During 2003, bad debt expense improved to 4.8% of net revenues, compared to 5.3% in 2002. The reduction in bad debt expense as a percentage of net revenues occurred despite the addition of Unilab, which has higher levels of bad debt than the rest of Quest Diagnostics. This improvement primarily relates to the collection of diagnosis, patient and insurance information necessary to more effectively bill for services performed. We believe that our Six Sigma and standardization initiatives and the increased use of electronic ordering by our customers will provide additional opportunities to further improve our overall collection experience and cost structure.

43

LX-0650-0060

Other operating (income) expense, net represents miscellaneous income and expense items related to operating activities, and includes gains and losses associated with the disposal of operating assets.

*Operating Income*

Operating income for the year ended December 31, 2003 improved to $796 million, or 16.8% of net revenues, from $592 million, or 14.4% of net revenues, in 2002. The increase in operating income was primarily due to revenue growth and improved efficiencies generated from our Six Sigma and standardization initiatives.

*Other Income (Expense)*

Net interest expense for the year ended December 31, 2003 increased from 2002 by $6 million and was primarily attributable to the amounts borrowed to finance the acquisition of Unilab and to repay substantially all of Unilab's outstanding debt, partially offset by decreased amounts borrowed under our secured receivables credit facility.

Other income (expense), net represents miscellaneous income and expense items related to non-operating activities such as gains and losses associated with investments and other non-operating assets.

### Year Ended December 31, 2002 Compared with Year Ended December 31, 2001

Net income for the year ended December 31, 2002 increased to $322 million from $162 million for the year ended December 31, 2001. Assuming that the provisions of SFAS 142 related to accounting for goodwill amortization had been in effect in 2001, net income for the year ended December 31, 2001 would have been $198 million. The increase in earnings was primarily attributable to revenue growth, improved efficiencies generated from our Six Sigma and standardization initiatives, and a reduction in net interest expense, partially offset by increases in employee compensation and supply costs, depreciation expense and investments in our information technology strategy and strategic growth opportunities. In addition, results for the year ended December 31, 2001 included a loss on debt extinguishment of $42 million, which was incurred in conjunction with our debt refinancing in the second quarter of 2001.

*Net Revenues*

Net revenues for the year ended December 31, 2002 grew by 13.2% compared with the prior year. The acquisition of AML, which was completed on April 1, 2002, contributed approximately one-half of the increase in net revenues. For the year ended December 31, 2002, clinical testing volume, measured by the number of requisitions, increased 9.7% compared with the prior year. Assuming AML had been part of Quest Diagnostics in 2001, clinical testing volume would have increased above the prior year level by 3.4% on a pro forma basis. Other smaller acquisitions completed in 2001 contributed approximately 1.5% to testing volume growth in 2002. Partially offsetting these increases was a decline in testing volumes associated with our drugs of abuse testing business, which reduced total Company testing volume for the year ended December 31, 2002 by about one-half of a percent. Drugs of abuse testing, which accounted for approximately 7% of our testing volume and 4% of our net revenues, was impacted by a general slowing of the economy and a corresponding slowdown in hiring. Average revenue per requisition increased 3.2% for the year ended December 31, 2002, compared with the prior year. The improvement in average revenue per requisition was primarily attributable to a continuing shift in test mix to higher value testing, including gene-based testing, which contributed over one-half of the improvement, and a shift in payer mix to higher priced fee-for-service reimbursement. We continued to see strong growth in our gene-based and esoteric testing with gene-based testing net revenues, which approached $400 million for the year, growing at more than 20% compared with the prior year. Our businesses, other than clinical laboratory testing, which accounted for approximately 4% of our total net revenues in 2002, grew about 15% over the prior year and accounted for 0.6% of the 13.2% increase in net revenues, or approximately $20 million. Most of this increase was from our MedPlus subsidiary, which we acquired in November 2001, which develops clinical connectivity products designed to enhance patient care.

*Operating Costs and Expenses*

Total operating costs for the year ended December 31, 2002 increased $300 million from the prior year primarily due to increases in our clinical testing volume, largely as a result of the AML acquisition, employee compensation and supply costs and depreciation expense; partially offset by reductions in amortization of

44

LX-0650-0061

goodwill and bad debt expense. While our cost structure has been favorably impacted by the synergies realized as a result of the integration of SBCL and the improved efficiencies generated from our Six Sigma and standardization initiatives, we continue to make investments to enhance our infrastructure to pursue our overall business strategy. These investments include those related to:

- Skills training for all employees, which together with our competitive pay and benefits, helps to increase employee satisfaction and performance, which we believe will result in better service to our customers;

- Our information technology strategy, which is designed to improve our efficiency and provide better service to our customers; and

- Our strategic growth opportunities.

Cost of services, which includes the costs of obtaining, transporting and testing specimens, was 59.2% of net revenues for the year ended December 31, 2002, decreasing slightly from 59.3% in the prior year. The positive impact of our Six Sigma and standardization initiatives and the increase in average revenue per requisition, which reduced cost of services as a percentage of net revenues, was partially offset by the addition of AML's higher cost of services as of April 1, 2002. Cost of services has also increased due to a greater percentage of patients having their blood drawn in our patient service centers or by our phlebotomists placed in physicians' offices. During 2002, in an effort to reduce their costs, many physicians took action to simplify activities in their offices by ceasing blood draws by physician staff. Additionally, reflected in the cost of services are the one-time installation costs of deploying our Internet-based orders and results systems in physicians' offices. As of December 31, 2002, approximately 10% of all orders and 15% of all test results were being transmitted via the Internet. Both the reduction of blood draws in the physicians' offices and the increased use of the Internet for ordering and resulting are improving the initial collection of billing information and generating savings in the cost of billing and bad debt expense, both of which are components of selling, general and administrative expense. Increased blood draws by Company-trained employee phlebotomists also improve the overall preparation of the blood sample, which can improve efficiency of the testing process.

Selling, general and administrative expenses, which include the costs of the sales force, billing operations, bad debt expense and general management and administrative support, decreased during the year ended December 31, 2002 as a percentage of net revenues to 26.2% from 28.1% in the prior year. This decrease was primarily due to efficiencies from our Six Sigma and standardization initiatives, in particular bad debt expense, the improvement in average revenue per requisition and the impact of AML's cost structure as of April 1, 2002. During 2002, bad debt expense improved to 5.3% of net revenues, compared to 6.0% of net revenues in 2001. The improvements in bad debt expense were principally attributable to the continued progress that we have made in our overall collection experience through process improvements, driven by our Six Sigma and standardization initiatives. These improvements primarily relate to the collection of diagnosis, patient and insurance information necessary to effectively bill for services performed. We believe that our Six Sigma and standardization initiatives will provide additional opportunities to further improve our overall collection experience.

Amortization of goodwill for the year ended December 31, 2002 decreased from the prior year by $38 million as the result of adopting SFAS 142, effective January 1, 2002. See Note 2 to the Consolidated Financial Statements for further details regarding the impact of SFAS 142.

Other operating (income) expense, net represents miscellaneous income and expense items related to operating activities, such as gains and losses associated with the disposal of operating assets.

### Operating Income

Operating income for the year ended December 31, 2002 improved to $592 million, or 14.4% of net revenues, from $412 million, or 11.3% of net revenues, in 2001. The increase in operating income was primarily due to revenue growth, improved efficiencies generated from our Six Sigma and standardization initiatives and a reduction in amortization of goodwill, partially offset by increases in employee compensation and supply costs, depreciation expense and investments in our information technology strategy and strategic growth opportunities.

### Other Income (Expense)

Net interest expense for the year ended December 31, 2002 decreased from the prior year by $17 million. The reduction was primarily due to the favorable impact of our debt refinancings in 2001 and a favorable interest rate environment.

45

**531**

LX-0650-0062

In 2001, we refinanced a majority of our long-term debt on a senior unsecured basis. Specifically, we completed a $550 million senior notes offering, or the Senior Notes, and entered into a new $500 million senior unsecured credit facility, or the Credit Agreement, which included a five-year $325 million revolving credit agreement and a $175 million term loan. We used the net proceeds from the senior notes offering and the term loan, together with cash on hand, to repay all of the $584 million which was outstanding under our then existing senior secured credit agreement, including the costs to settle existing interest rate swap agreements, and to consummate a cash tender offer of our 10¾% senior subordinated notes due 2006, or the Subordinated Notes. In conjunction with our debt refinancing, we recorded a loss on debt extinguishment of $42 million, $36 million of which represented the write-off of $23 million of deferred financing costs, associated with the debt which was refinanced, and $13 million of payments related primarily to the tender premium incurred in connection with our cash tender offer for our Subordinated Notes. The remaining $6 million of losses represented amounts incurred in conjunction with the cancellation of certain interest rate swap agreements, which were terminated in connection with the debt that was refinanced. Prior to our debt refinancing, our secured credit agreement required us to maintain interest rate swap agreements to mitigate the risk of changes in interest rates associated with a portion of our variable interest rate indebtedness.

Other income (expense), net, represents miscellaneous income and expense items related to non-operating activities, such as gains and losses associated with investments and other non-operating assets. For the year ended December 31, 2002, other income (expense), net includes a $4.9 million pretax gain on the sale of certain assets, partially offset by losses on miscellaneous non-operating assets. For the year ended December 31, 2001, other income (expense), net includes the net impact of writing-off $9.6 million of certain impaired assets, partially offset by a $6.3 million gain on the sale of an investment.

### Income Taxes

During 2001, our effective tax rate was significantly impacted by goodwill amortization, the majority of which was not deductible for tax purposes, and had the effect of increasing the overall tax rate. The reduction in the effective tax rate for the year ended December 31, 2002 was primarily due to the elimination of amortization of goodwill (as a result of adopting SFAS 142, effective January 1, 2002) the majority of which was not deductible for tax purposes.

### Impact of Contingent Convertible Debentures on Diluted Earnings per Common Share

On November 26, 2001, we completed our $250 million offering of 1¼% contingent convertible debentures due 2021, or the Debentures. Each one thousand dollar principal amount of Debentures is convertible into 11.429 shares of our common stock, which represents an initial conversion price of $87.50 per share. Holders may surrender the Debentures for conversion into shares of our common stock under any of the following circumstances: (i) if the sales price of our common stock is above 120% of the conversion price (or $105 per share) for specified periods; (ii) if we call the Debentures; or (iii) if specified corporate transactions have occurred. See Note 11 to the Consolidated Financial Statements for a further discussion of the Debentures.

The if-converted method is used in determining the dilutive effect of the Debentures in periods when the holders of such securities are permitted to exercise their conversion rights. As of and for each of the years ended December 31, 2003 and 2002, the holders of our Debentures did not have the ability to exercise their conversion rights. Had the requirements to allow the holders to exercise their conversion rights been met and the Debentures remained outstanding for the entire period, diluted earnings per common share would have been reduced by approximately 2% during each of the years ended December 31, 2003 and 2002.

### Quantitative and Qualitative Disclosures About Market Risk

We address our exposure to market risks, principally the market risk of changes in interest rates, through a controlled program of risk management that may include the use of derivative financial instruments. We do not hold or issue derivative financial instruments for trading purposes. We do not believe that our foreign exchange exposure is material to our financial position or results of operations. See Note 2 to the Consolidated Financial Statements for additional discussion of our financial instruments and hedging activities.

At December 31, 2003 and 2002, the fair value of our debt was estimated at $1.2 billion and $899 million, respectively, using quoted market prices and yields for the same or similar types of borrowings, taking into account the underlying terms of the debt instruments. At December 31, 2003 and 2002, the estimated fair value exceeded the carrying value of the debt by approximately $86 million and $77 million, respectively. An

46

LX-0650-0063

assumed 10% increase in interest rates (representing approximately 50 and 60 basis points at December 31, 2003 and 2002, respectively) would potentially reduce the estimated fair value of our debt by approximately $17 million and $21 million, respectively, at December 31, 2003 and 2002.

The Debentures have a contingent interest component that will require us to pay contingent interest based on certain thresholds, as outlined in the indenture governing the Debentures. The contingent interest component, which is more fully described in Note 11 to the Consolidated Financial Statements, is considered to be a derivative instrument subject to SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities", as amended. As such, the derivative was recorded at its fair value in the consolidated balance sheets and was not material at December 31, 2003 and 2002.

Borrowings under our unsecured revolving credit facility under our Credit Agreement, our term loan facilities and our secured receivables credit facility are subject to variable interest rates, unless fixed through interest rate swaps or other agreements. Interest rates on our unsecured revolving credit facility and term loans are subject to a pricing schedule that can fluctuate based on changes in our credit rating. As such, our borrowing cost under these credit arrangements will be subject to both fluctuations in interest rates and changes in our credit rating. As of December 31, 2003, our borrowing rate for LIBOR-based loans was principally LIBOR plus 1.1875%. At December 31, 2003, there was $305 million outstanding under our term loan due June 2007 and there were no borrowings outstanding under our unsecured revolving credit facility or secured receivables credit facility.

Based on our net exposure to interest rate changes, an assumed 10% change in interest rates on our variable rate indebtedness (representing approximately 12 basis points) would impact annual net interest expense by approximately $0.4 million, assuming no changes to the debt outstanding at December 31, 2003.

## Liquidity and Capital Resources

### Cash and Cash Equivalents

Cash and cash equivalents at December 31, 2003 totaled $155 million, compared to $97 million at December 31, 2002. Cash flows from operating activities in 2003 provided cash of $663 million, which together with cash on-hand were used to fund investing and financing activities, which required cash of $417 million and $188 million, respectively. Cash and cash equivalents at December 31, 2002 totaled $97 million, a decrease of $26 million from December 31, 2001. Cash flows from operating activities in 2002 provided cash of $596 million, which together with cash on-hand were used to fund investing and financing activities, which required cash of $477 million and $145 million, respectively.

### Cash Flows from Operating Activities

Net cash provided by operating activities for 2003 was $663 million compared to $596 million in the prior year period. This increase was primarily due to improved operating performance, partially offset by an increase in accounts receivable associated with growth in net revenues. Days sales outstanding, a measure of billing and collection efficiency, improved to 48 days at December 31, 2003 from 49 days at December 31, 2002. Net cash provided by operating activities for 2002 benefited from our ability to accelerate the tax deduction for certain operating expenses resulting from Internal Revenue Service rule changes.

Net cash from operating activities for 2002 was $131 million higher than the 2001 level. This increase was primarily due to improved operating performance, our ability to accelerate the tax deductions resulting from Internal Revenue Service rule changes, efficiencies in our billing and collection processes and a reduction in SBCL integration costs paid. The increase was partially offset by settlement payments, primarily related to contractual disputes previously reserved for, and a decrease in the tax benefits realized associated with the exercise of employee stock options. The year-over-year comparisons were also impacted by the payment of indemnifiable tax matters to GlaxoSmithKline in 2002 and cash received from Corning Incorporated in 2001 related to an indemnified billing-related claim. Days sales outstanding decreased to 49 days at December 31, 2002 from 54 days at December 31, 2001.

### Cash Flows from Investing Activities

Net cash used in investing activities in 2003 was $417 million, consisting primarily of acquisition and related transaction costs of $238 million to acquire the outstanding capital stock of Unilab and capital expenditures of $175 million. The acquisition and related transaction costs included the cash portion of the

LX-0650-0064

Unilab purchase price of $297 million and approximately $12 million of transaction costs paid in 2003, partially offset by $72 million of cash acquired from Unilab.

Net cash used in investing activities in 2002 was $477 million, consisting primarily of acquisition and related costs of $334 million, primarily to acquire the outstanding voting stock of AML, and capital expenditures of $155 million.

### Cash Flows from Financing Activities

Net cash used in financing activities in 2003 was $188 million, consisting primarily of debt repayments totaling $392 million and purchases of treasury stock totaling $258 million, partially offset by $450 million of borrowings under our term loan due June 2007. Borrowings under our term loan due June 2007 were used to finance the cash portion of the purchase price and related transaction costs associated with the acquisition of Unilab, and to repay $220 million of debt, representing substantially all of Unilab's then existing outstanding debt, and related accrued interest. Of the $220 million, $124 million represented payments related to our cash tender offer, which was completed on March 7, 2003, for all of the outstanding $101 million principal amount of Unilab's 12¾% Senior Subordinated Notes due 2009 and $23 million of related tender premium and associated tender offer costs. The remaining debt repayments in 2003 consisted primarily of $145 million of repayments under our term loan due June 2007 and $24 million of capital lease repayments. The $258 million in treasury stock purchases represents 4.0 million shares of our common stock repurchased at an average price of $64.54 per share.

Net cash used in financing activities in 2002 was $145 million, consisting primarily of the net cash activity associated with the financing of the AML acquisition. We financed AML's all-cash purchase price of approximately $335 million and related transaction costs, together with the repayment of approximately $150 million of acquired AML debt and accrued interest with cash on-hand, $300 million of borrowings under our secured receivables credit facility and $175 million of borrowings under our unsecured revolving credit facility. During the last three quarters of 2002, we repaid all of the $475 million in borrowings related to the acquisition of AML.

### Dividend Policy

Through October 20, 2003, we had never declared or paid cash dividends on our common stock. On October 21, 2003, our Board of Directors declared the payment of a quarterly dividend of $0.15 per common share. The initial quarterly dividend was paid on January 23, 2004 to shareholders of record on January 8, 2004 and totaled $15.4 million. We expect to fund future dividend payments with cash flows from operations, and do not expect the dividend to have a material impact on our ability to finance future growth.

### Share Repurchase Plan

In May 2003, our Board of Directors authorized a share repurchase program, which permits us to purchase up to $300 million of our common stock. In October 2003, our Board of Directors increased our share repurchase authorization by an additional $300 million. Through December 31, 2003, we have repurchased 4.0 million shares of our common stock at an average price of $64.54 per share for a total of $258 million under the program. We expect to fund the share repurchase program with cash flows from operations and do not expect the share repurchase program to have a material impact on our ability to finance future growth.

### Contingent Convertible Debentures

On November 30, 2004, 2005, 2008, 2012 and 2016 each holder of the Debentures may require us to repurchase the holder's Debentures for the principal amount of the Debentures plus any accrued and unpaid interest. We may repurchase the $250 million Debentures for cash, common stock, or a combination of both. We expect to settle any repurchases from any put on the Debentures with a cash payment, funding such payment with a combination of cash on-hand and borrowings under our credit facilities.

48

534

LX-0650-0065

*Contractual Obligations and Commitments*

The following table summarizes certain of our contractual obligations as of December 31, 2003. See Notes 11 and 15 to the Consolidated Financial Statements for further details.

| Contractual Obligations | Total | Payments due by period (In thousands) | | | |
|---|---|---|---|---|---|
| | | Less than 1 year | 1–3 years | 4–5 years | After 5 years |
| Long-term debt | $1,101,071 | $ 72,817 | $424,404 | $ 81,919 | $521,931 |
| Capital lease obligations | 1,586 | 1,133 | 421 | 32 | - |
| Operating leases | 529,781 | 122,596 | 170,236 | 100,799 | 136,150 |
| Purchase obligations | 75,046 | 39,269 | 35,420 | 202 | 155 |
| Total contractual obligations | $1,707,484 | $235,815 | $630,481 | $182,952 | $658,236 |

See Note 11 to the Consolidated Financial Statements for a full description of the terms of our indebtedness and related debt service requirements. A full discussion and analysis regarding our minimum rental commitments under noncancelable operating leases, noncancelable commitments to purchase products or services, and reserves with respect to insurance and billing-related claims is contained in Note 15 to the Consolidated Financial Statements.

In December 2003, we entered into two lines of credit with two financial institutions totaling $68 million for the issuance of letters of credit, which mature in December 2004. Standby letters of credit are obtained, principally in support of our risk management program, to ensure our performance or payment to third parties and amounted to $57 million at December 31, 2003, of which $44 million was issued against the $68 million letter of credit lines with the remaining $13 million issued against our $325 million unsecured revolving credit facility. The letters of credit, which are renewed annually, primarily represent collateral for automobile liability and workers' compensation loss payments.

Our credit agreements relating to our unsecured revolving credit facility and our term loan facilities contain various covenants and conditions, including the maintenance of certain financial ratios, that could impact our ability to, among other things, incur additional indebtedness, repurchase shares of our outstanding common stock, make additional investments and consummate acquisitions. We do not expect these covenants to adversely impact our ability to execute our growth strategy or conduct normal business operations.

*Unconsolidated Joint Ventures*

We have investments in unconsolidated joint ventures in Phoenix, Arizona; Indianapolis, Indiana; and Dayton, Ohio, which are accounted for under the equity method of accounting. We believe that our transactions with our joint ventures are conducted at arm's length, reflecting current market conditions and pricing. Total net revenues of our unconsolidated joint ventures, on a combined basis, are less than 6% of our consolidated net revenues. Total assets associated with our unconsolidated joint ventures are less than 3% of our consolidated total assets. We have no material unconditional obligations or guarantees to, or in support of, our unconsolidated joint ventures and their operations.

*Requirements and Capital Resources*

We estimate that we will invest approximately $180 million to $190 million during 2004 for capital expenditures to support and expand our existing operations, principally related to investments in information technology, equipment, and facility upgrades. During January 2004, $13 million in letters of credit issued against our $325 million unsecured revolving credit facility were cancelled and $17 million of letters of credit were issued under the letter of credit lines. As of February 26, 2004, all of the $325 million unsecured revolving credit facility and all of the $250 million secured receivables credit facility remained available to us for future borrowing. Our secured receivables credit facility is set to expire on April 21, 2004. We are currently in discussions with our lenders regarding a replacement for the facility and expect to have a replacement in place during the second quarter of 2004. If in the unexpected instance the facility is not renewed, we expect that other sources of liquidity could be readily obtained.

We believe that cash from operations and our borrowing capacity under our credit facilities and any replacement facilities will provide sufficient financial flexibility to meet seasonal working capital requirements and to fund capital expenditures, debt service requirements, cash dividends on common shares, share repurchases

49

**535**

LX-0650-0066

and additional growth opportunities for the foreseeable future, exclusive of any potential temporary impact of the Health Insurance Portability and Accountability Act of 1996, as discussed below. Our investment grade credit ratings have had a favorable impact on our cost of and access to capital, and we believe that our improved financial performance should provide us with access to additional financing, if necessary, to fund growth opportunities that cannot be funded from existing sources.

## Health Insurance Portability and Accountability Act of 1996

The Secretary of the Department of Human Health and Services, or HHS, has issued final regulations under the Health Insurance Portability and Accountability Act of 1996, or HIPAA, designed to improve the efficiency and effectiveness of the healthcare system by facilitating the electronic exchange of information in certain financial and administrative transactions while protecting the privacy and security of the information exchanged. Three principal regulations have been issued: privacy regulations, security regulations, and standards for electronic transactions.

We implemented the HIPAA privacy regulations by April 2003, as required, and are conducting an analysis to determine the proper security measures to reasonably and appropriately comply with the standards and implementation specifications by the compliance deadline of April 20, 2005.

The HIPAA regulations on electronic transactions, which we refer to as the transaction standards, establish uniform standards for electronic transactions and code sets, including the electronic transactions and code sets used for claims, remittance advices, enrollment and eligibility.

On September 23, 2003, CMS announced that it would implement a contingency plan for the Medicare program to accept electronic transactions that are not fully compliant with the transaction standards after the October 16, 2003 compliance deadline. The CMS contingency plan, as announced, allows Medicare carriers to continue to accept and process Medicare claims in the pre-October 16 electronic formats to give healthcare providers additional time to complete the testing process, provided that they continue to make a good faith effort to comply with the new standards. Almost all other payers have followed the lead of CMS, accepting legacy formats until both parties to the transactions are ready to implement the new electronic transaction standards.

As part of its plan, CMS is expected to regularly reassess the readiness of its healthcare providers to determine how long the contingency plan will remain in effect. Many of our payers were not ready to implement the transaction standards by the October 2003 compliance deadline or were not ready to test or trouble-shoot claims submissions. We are working in good faith with payers that have not converted to the new standards to reach agreement on each payer's data requirements and to test claims submissions.

The HIPAA transaction standards are complex, and subject to differences in interpretation by payers. For instance, some payers may interpret the standards to require us to provide certain types of information, including demographic information not usually provided to us by physicians. As a result of inconsistent interpretation of transaction standards by payers or our inability to obtain certain billing information not usually provided to us by physicians, we could face increased costs and complexity, a temporary disruption in receipts and ongoing reductions in reimbursements and net revenues. We are working closely with our payers to establish acceptable protocols for claims submissions and with our trade association and an industry coalition to present issues and problems as they arise to the appropriate regulators and standards setting organizations. Compliance with the HIPAA requirements requires significant capital and personnel resources from all healthcare organizations. While we believe that our total costs to comply with HIPAA will not be material to our results of operations or cash flows, additional customer contact to obtain data for billing as a result of different interpretations of the current regulations could impose significant additional costs on us.

## Outlook

As discussed in the Overview, we believe that the underlying fundamentals of the diagnostic testing industry will continue to improve and that the growth in the market for laboratory testing will accelerate over the long term. We believe that in the short term, the market will continue to expand, despite the negative impact which the current levels of unemployed and uninsured, and healthcare plan design changes are having on our business. As the leading national provider of diagnostic testing, information and related services with the most extensive network of laboratories and patient service centers throughout the United States, we expect to further enhance patient access and customer service. We provide a broad range of benefits for customers

50

LX-0650-0067

including: continued improvements in quality; convenience and accessibility; a broad test menu; and a broad range of information technology products to help providers and insurers better manage their patients' health.

We continue to invest in areas that are differentiating us from our competitors, including: Six Sigma quality, which is benefiting margins by improving efficiencies and is beginning to attract new business by improving service quality; state-of-the-art electronic client connectivity options that enhance customer loyalty; and new tests and testing techniques including gene-based testing. We also pursue selective acquisitions when they make strategic and economic sense. While there are fewer large acquisition opportunities available as a result of industry consolidation, there remain numerous regional and local acquisition opportunities. Additionally, we see an opportunity to use our strong customer service capabilities to expand our current position in many markets around the country.

Our credit profile continues to improve. Our strong cash generation and balance sheet position us well to take advantage of growth opportunities.

**Inflation**

We believe that inflation generally does not have a material adverse effect on our results of operations or financial condition because the majority of our contracts are short term.

**Impact of New Accounting Standards**

In January 2003, the FASB issued Interpretation No. 46, "Consolidation of Variable Interest Entities", as revised in December 2003. The impact of this accounting standard is discussed in Note 2 to the Consolidated Financial Statements.

LX-0650-0068

## STATEMENT OF MANAGEMENT RESPONSIBILITY FOR FINANCIAL STATEMENTS

The management of Quest Diagnostics Incorporated is responsible for the preparation, presentation and integrity of the consolidated financial statements and other information included in this annual report. The financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America and include certain amounts based on management's best estimates and judgments.

Quest Diagnostics maintains a comprehensive system of internal controls designed to provide reasonable assurance as to the reliability of the financial statements as well as to safeguard assets from unauthorized use or disposition. The system is reinforced by written policies, selection and training of highly competent financial personnel, appropriate division of responsibilities and a program of internal audits.

The Audit and Finance Committee of the Board of Directors is responsible for reviewing and monitoring Quest Diagnostics' financial reporting and accounting practices and the annual appointment of the independent auditors. The Audit and Finance Committee meets periodically with management, the internal auditors and the independent auditors to review and assess the activities of each. Both the independent auditors and the internal auditors meet with the Audit and Finance Committee, without management present, to review the results of their audits.

The consolidated financial statements have been audited by our independent auditors, PricewaterhouseCoopers LLP. Their responsibility is to express an opinion with respect to the consolidated financial statements on the basis of an audit conducted in accordance with auditing standards generally accepted in the United States of America.

| By | /s/ Kenneth W. Freeman | Chairman of the Board and | February 26, 2004 |
|---|---|---|---|
| | Kenneth W. Freeman | Chief Executive Officer | |
| By | /s/ Surya N. Mohapatra | President and | February 26, 2004 |
| | Surya N. Mohapatra | Chief Operating Officer | |
| By | /s/ Robert A. Hagemann | Senior Vice President and | February 26, 2004 |
| | Robert A. Hagemann | Chief Financial Officer | |

52

**538**

LX-0650-0069

**Report of Independent Auditors**

To the Board of Directors and Stockholders
of Quest Diagnostics Incorporated

In our opinion, the accompanying consolidated financial statements listed in the index appearing under Item 15(a)(1) present fairly, in all material respects, the financial position of Quest Diagnostics Incorporated and its subsidiaries (the "Company") at December 31, 2003 and 2002, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2003 in conformity with accounting principles generally accepted in the United States of America. In addition, in our opinion, the financial statement schedule listed in the index appearing under Item 15(a)(2) presents fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements. These financial statements and financial statement schedule are the responsibility of the Company's management; our responsibility is to express an opinion on these financial statements and financial statement schedule based on our audits. We conducted our audits of these statements in accordance with auditing standards generally accepted in the United States of America, which require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

As discussed in Note 2 to the financial statements, the Company adopted SFAS No. 142, "Goodwill and Other Intangible Assets" ("SFAS 142"), which changed the method of accounting for goodwill and other intangible assets effective January 1, 2002.

/s/ PricewaterhouseCoopers LLP

PricewaterhouseCoopers LLP
Stamford, Connecticut
January 23, 2004

F-1

**539**

LX-0650-0070

QUEST DIAGNOSTICS INCORPORATED AND SUBSIDIARIES
CONSOLIDATED BALANCE SHEETS
DECEMBER 31, 2003 AND 2002
(in thousands, except per share data)

|  | 2003 | 2002 |
|---|---|---|
| **Assets** | | |
| **Current assets:** | | |
| Cash and cash equivalents | $ 154,958 | $ 96,777 |
| Accounts receivable, net of allowance of $211,739 and $193,456 at December 31, 2003 and 2002, respectively | 609,187 | 522,131 |
| Inventories | 72,484 | 60,899 |
| Deferred income taxes | 108,975 | 102,700 |
| Prepaid expenses and other current assets | 50,182 | 41,936 |
| Total current assets | 995,786 | 824,443 |
| Property, plant and equipment, net | 607,305 | 570,149 |
| Goodwill, net | 2,518,875 | 1,788,850 |
| Intangible assets, net | 16,978 | 22,083 |
| Deferred income taxes | 49,635 | 29,756 |
| Other assets | 112,839 | 88,916 |
| Total assets | $4,301,418 | $3,324,197 |
| **Liabilities and Stockholders' Equity** | | |
| **Current liabilities:** | | |
| Accounts payable and accrued expenses | $ 649,850 | $ 609,945 |
| Current portion of long-term debt | 73,950 | 26,032 |
| Total current liabilities | 723,800 | 635,977 |
| Long-term debt | 1,028,707 | 796,507 |
| Other liabilities | 154,217 | 122,850 |
| **Commitments and contingencies** | | |
| **Common stockholders' equity:** | | |
| Common stock, par value $0.01 per share; 300,000 shares authorized; 106,804 and 97,963 shares issued at December 31, 2003 and 2002, respectively | 1,068 | 980 |
| Additional paid-in capital | 2,267,014 | 1,817,511 |
| Retained earnings (accumulated deficit) | 380,559 | (40,772) |
| Unearned compensation | (2,346) | (3,332) |
| Accumulated other comprehensive income (loss) | 5,947 | (5,524) |
| Treasury stock, at cost; 3,990 shares at December 31, 2003 | (257,548) | — |
| Total common stockholders' equity | 2,394,694 | 1,768,863 |
| Total liabilities and stockholders' equity | $4,301,418 | $3,324,197 |

The accompanying notes are an integral part of these statements.

F-2

LX-0650-0071

**QUEST DIAGNOSTICS INCORPORATED AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
**FOR THE YEARS ENDED DECEMBER 31, 2003, 2002 AND 2001**
**(in thousands, except per share data)**

|  | 2003 | 2002 | 2001 |
|---|---|---|---|
| Net revenues | $4,737,958 | $4,108,051 | $3,627,771 |
| **Operating costs and expenses:** | | | |
| Cost of services | 2,768,623 | 2,432,388 | 2,151,594 |
| Selling, general and administrative | 1,165,700 | 1,074,841 | 1,018,680 |
| Amortization of goodwill | - | - | 38,392 |
| Amortization of intangible assets | 8,201 | 8,373 | 7,715 |
| Other operating (income) expense, net | (1,020) | 307 | (160) |
| Total operating costs and expenses | 3,941,504 | 3,515,909 | 3,216,221 |
| Operating income | 796,454 | 592,142 | 411,550 |
| **Other income (expense):** | | | |
| Interest expense, net | (59,789) | (53,673) | (70,523) |
| Minority share of income | (17,630) | (14,874) | (9,953) |
| Equity earnings in unconsolidated joint ventures | 17,439 | 16,714 | 10,763 |
| Loss on debt extinguishment | - | - | (42,012) |
| Other income (expense), net | 1,324 | 2,068 | (3,236) |
| Total non-operating expenses, net | (58,656) | (49,765) | (114,961) |
| Income before taxes | 737,798 | 542,377 | 296,589 |
| Income tax expense | 301,081 | 220,223 | 134,286 |
| Net income | $ 436,717 | $ 322,154 | $ 162,303 |
| **Basic earnings per common share:** | | | |
| Net income | $ 4.22 | $ 3.34 | $ 1.74 |
| Weighted average common shares outstanding—basic | 103,416 | 96,467 | 93,053 |
| **Diluted earnings per common share:** | | | |
| Net income | $ 4.12 | $ 3.23 | $ 1.66 |
| Weighted average common shares outstanding—diluted | 105,932 | 99,790 | 97,610 |

The accompanying notes are an integral part of these statements.

F-3

LX-0650-0072

**QUEST DIAGNOSTICS INCORPORATED AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**FOR THE YEARS ENDED DECEMBER 31, 2003, 2002 AND 2001**
**(in thousands)**

|  | 2003 | 2002 | 2001 |
|---|---|---|---|
| **Cash flows from operating activities:** | | | |
| Net income | $ 436,717 | $ 322,154 | $ 162,303 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Depreciation and amortization | 153,903 | 131,391 | 147,727 |
| Provision for doubtful accounts | 228,222 | 217,360 | 218,271 |
| Loss on debt extinguishment | - | - | 42,012 |
| Deferred income tax provision (benefit) | 33,853 | 90,401 | (560) |
| Minority share of income | 17,630 | 14,874 | 9,953 |
| Stock compensation expense | 5,297 | 9,028 | 20,672 |
| Tax benefits associated with stock-based compensation plans | 30,496 | 44,507 | 71,917 |
| Other, net | (1,583) | (813) | 1,034 |
| Changes in operating assets and liabilities: | | | |
| Accounts receivable | (254,865) | (168,185) | (230,131) |
| Accounts payable and accrued expenses | (6,795) | (12,658) | 12,788 |
| Integration, settlement and other special charges | (18,942) | (29,668) | (48,664) |
| Income taxes payable | 26,493 | (3,912) | 23,131 |
| Other assets and liabilities, net | 12,373 | (18,108) | 35,350 |
| **Net cash provided by operating activities** | 662,799 | 596,371 | 465,803 |
| **Cash flows from investing activities:** | | | |
| Business acquisitions, net of cash acquired | (237,610) | (333,512) | (152,864) |
| Capital expenditures | (174,641) | (155,196) | (148,986) |
| Increase in investments and other assets | (13,842) | (9,728) | (20,428) |
| Proceeds from disposition of assets | 9,043 | 10,564 | 22,673 |
| Collection of note receivable | - | 10,660 | 2,989 |
| **Net cash used in investing activities** | (417,050) | (477,212) | (296,616) |
| **Cash flows from financing activities:** | | | |
| Proceeds from borrowings | 450,000 | 475,237 | 969,939 |
| Repayments of debt | (391,718) | (634,278) | (1,175,489) |
| Purchases of treasury stock | (257,548) | - | - |
| Exercise of stock options | 29,887 | 27,034 | 25,631 |
| Distributions to minority partners | (14,253) | (12,192) | (8,718) |
| Financing costs paid | (4,227) | (129) | (28,459) |
| Redemption of preferred stock | - | - | (1,000) |
| Preferred dividends paid | - | - | (236) |
| Other | 291 | (386) | - |
| **Net cash used in financing activities** | (187,568) | (144,714) | (218,332) |
| **Net change in cash and cash equivalents** | 58,181 | (25,555) | (49,145) |
| **Cash and cash equivalents, beginning of year** | 96,777 | 122,332 | 171,477 |
| **Cash and cash equivalents, end of year** | $ 154,958 | $ 96,777 | $ 122,332 |

The accompanying notes are an integral part of these statements.

LX-0650-0073

**QUEST DIAGNOSTICS INCORPORATED AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY**
**FOR THE YEARS ENDED DECEMBER 31, 2003, 2002 AND 2001**
**(in thousands)**

| | Common Stock | Additional Paid-In Capital | Retained Earnings (Accumulated Deficit) | Unearned Compensation | Accumulated Other Comprehensive Income (Loss) | Treasury Stock | Comprehensive Income |
|---|---|---|---|---|---|---|---|
| *Balance, December 31, 2000* | $ 465 | $1,591,976 | $(525,111) | $(31,077) | $(5,458) | $ | |
| Net income | | | 162,303 | | | | $162,303 |
| Other comprehensive income | | | | | 1,988 | | 1,988 |
| Comprehensive income | | | | | | | $164,291 |
| Two-for-one stock split (47,149 common shares) | 472 | (472) | | | | | |
| Preferred dividends declared | | | (118) | | | | |
| Issuance of common stock under benefit plans (233 common shares) | 2 | 25,040 | | (3,540) | | | |
| Exercise of stock options (2,101 common shares) | 21 | 25,610 | | | | | |
| Tax benefits associated with stock-based compensation plans | | 71,917 | | | | | |
| Adjustment to Corning receivable | | 605 | | | | | |
| Amortization of unearned compensation | | | | 21,364 | | | |
| *Balance, December 31, 2001* | 960 | 1,714,676 | (362,926) | (13,253) | (3,470) | - | |
| Net income | | | 322,154 | | | | $322,154 |
| Other comprehensive loss | | | | | (2,054) | | (2,054) |
| Comprehensive income | | | | | | | $320,100 |
| Issuance of common stock under benefit plans (418 common shares) | 4 | 31,310 | | | | | |
| Exercise of stock options (1,521 common shares) | 16 | 27,018 | | | | | |
| Tax benefits associated with stock-based compensation plans | | 44,507 | | | | | |
| Amortization of unearned compensation | | | | 9,921 | | | |
| *Balance, December 31, 2002* | 980 | 1,817,511 | (40,772) | (3,332) | (5,524) | - | |
| Net income | | | 436,717 | | | | $436,717 |
| Other comprehensive income | | | | | 11,471 | | 11,471 |
| Comprehensive income | | | | | | | $448,188 |
| Dividend declared | | | (15,386) | | | | |
| Shares issued to acquire Unilab (7,055 common shares) | 71 | 372,393 | | | | | |
| Fair value of Unilab converted options | | 8,452 | | | | | |
| Issuance of common stock under benefit plans (400 common shares) | 4 | 18,081 | | (4,313) | | | |
| Exercise of stock options (1,567 common shares) | 15 | 29,872 | | | | | |
| Shares to cover employee payroll tax withholdings on stock issued under benefit plans (181 common shares) | (2) | (9,791) | | | | | |
| Tax benefits associated with stock-based compensation plans | | 30,496 | | | | | |
| Amortization of unearned compensation | | | | 5,299 | | | |
| Purchases of treasury stock (3,990 common shares) | | | | | | (257,548) | |
| *Balance, December 31, 2003* | $1,068 | $2,267,014 | $ 380,559 | $ (2,346) | $ 5,947 | $(257,548) | |

The accompanying notes are an integral part of these statements.

F-5

543

LX-0650-0074

QUEST DIAGNOSTICS INCORPORATED AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(dollars in thousands unless otherwise indicated)

## 1.  DESCRIPTION OF BUSINESS

Quest Diagnostics Incorporated and its subsidiaries ("Quest Diagnostics" or the "Company") is the largest clinical laboratory testing business in the United States. Prior to January 1, 1997, Quest Diagnostics was a wholly owned subsidiary of Corning Incorporated ("Corning"). On December 31, 1996, Corning distributed all of the outstanding shares of common stock of the Company to the stockholders of Corning as part of the "Spin-Off Distribution".

As the nation's leading provider of diagnostic testing and related services for the healthcare industry, Quest Diagnostics offers a broad range of clinical laboratory testing services to physicians, hospitals, managed care organizations, employers, governmental institutions and other commercial clinical laboratories. Quest Diagnostics is the leading provider of esoteric testing, including gene-based testing, and testing for drugs of abuse. The Company is also a leading provider of anatomic pathology services and testing to support clinical trials of new pharmaceuticals worldwide. Through the Company's national network of laboratories and patient service centers, and its esoteric testing laboratory and development facilities, Quest Diagnostics offers comprehensive and innovative diagnostic, information and related services used by physicians and other healthcare customers to diagnose, treat and monitor diseases and other medical conditions.

During 2003, Quest Diagnostics processed over 130 million requisitions through its extensive network of laboratories and patient service centers in virtually every major metropolitan area throughout the United States.

## 2.  SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### Principles of Consolidation

The consolidated financial statements include the accounts of all entities controlled by the Company. The equity method of accounting is used for investments in affiliates which are not Company controlled, in which the Company's ownership interest is between 20 and 49 percent and in which the Company has significant influence. The Company's share of equity earnings from investments in affiliates, accounted for under the equity method, totaled $17.4 million, $16.7 million and $10.8 million, respectively, for 2003, 2002 and 2001. All significant intercompany accounts and transactions are eliminated in consolidation.

### Use of Estimates

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

### Reclassifications

Certain amounts reported in the Company's consolidated statements of operations for the years ended December 31, 2002 and 2001 have been reclassified to conform to the December 31, 2003 presentation, which reports operating income on the face of the consolidated statements of operations. In April 2002, the Financial Accounting Standards Board ("FASB") issued Statement of Financial Accounting Standards ("SFAS") No. 145, "Rescission of FASB Statements No. 4, 44 and 64, Amendment of FASB Statement No. 13, and Technical Corrections" ("SFAS 145"). Pursuant to SFAS 145, the extraordinary loss associated with the extinguishment of debt in 2001, previously presented net of applicable taxes, was reclassified to other non-operating expenses. Certain amounts reported in the Company's consolidated statements of cash flows for the years ended December 31, 2002 and 2001 have been reclassified to conform to the December 31, 2003 presentation.

### Revenue Recognition

The Company primarily recognizes revenue for services rendered upon completion of the testing process. Billings for services under third-party payer programs, including Medicare and Medicaid, are recorded as revenues net of allowances for differences between amounts billed and the estimated receipts under such

F-6

LX-0650-0075

## QUEST DIAGNOSTICS INCORPORATED AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—CONTINUED
### (dollars in thousands unless otherwise indicated)

programs. Adjustments to the estimated receipts, based on final settlement with the third-party payers, are recorded upon settlement. In 2003, 2002 and 2001, approximately 17%, 15% and 14%, respectively, of net revenues were generated by Medicare and Medicaid programs. Under capitated agreements with health insurers, the Company recognizes revenue based on a predetermined monthly contractual rate for each member of the insurers' health plan regardless of the number or cost of services provided by the Company.

### Taxes on Income

The Company uses the asset and liability approach to account for income taxes. Under this method, deferred tax assets and liabilities are recognized for the expected future tax consequences of differences between the carrying amounts of assets and liabilities and their respective tax bases using tax rates in effect for the year in which the differences are expected to reverse. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period when the change is enacted.

### Earnings Per Share

On May 8, 2001, the stockholders approved an amendment to the Company's restated certificate of incorporation to increase the number of common shares authorized from 100 million shares to 300 million shares. On May 31, 2001, the Company effected a two-for-one stock split through the issuance of a stock dividend of one new share of common stock for each share of common stock held by stockholders of record on May 16, 2001. References to the number of common shares and per common share amounts in the accompanying consolidated statements of operations, including earnings per common share calculations and related disclosures, have been restated to give retroactive effect to the stock split for all periods presented.

Basic earnings per common share is calculated by dividing net income, less preferred stock dividends ($30 per quarter in 2001), by the weighted average common shares outstanding. Diluted earnings per common share is calculated by dividing net income, less preferred stock dividends, by the weighted average common shares outstanding after giving effect to all potentially dilutive common shares outstanding during the period. The if-converted method is used in determining the dilutive effect of the Company's 1¾% contingent convertible debentures in periods when the holders of such securities are permitted to exercise their conversion rights (see Note 11). Potentially dilutive common shares include outstanding stock options and restricted common shares granted under the Company's Employee Equity Participation Program. During the fourth quarter of 2001, the Company redeemed all of its then issued and outstanding shares of preferred stock.

The computation of basic and diluted earnings per common share was as follows (in thousands, except per share data):

|  | 2003 | 2002 | 2001 |
|---|---|---|---|
| Net income | $436,717 | $322,154 | $162,303 |
| Less: Preferred stock dividends | - | - | 118 |
| Net income available to common stockholders | $436,717 | $322,154 | $162,185 |
| | | | |
| Weighted average common shares outstanding—basic | 103,416 | 96,467 | 93,053 |
| Effect of dilutive securities: | | | |
| Stock options | 2,343 | 2,879 | 3,854 |
| Restricted common stock | 173 | 444 | 703 |
| Weighted average common shares outstanding—diluted | 105,932 | 99,790 | 97,610 |
| | | | |
| Basic earnings per common share: | | | |
| Net income | $ 4.22 | $ 3.34 | $ 1.74 |
| | | | |
| Diluted earnings per common share: | | | |
| Net income | $ 4.12 | $ 3.23 | $ 1.66 |

LX-0650-0076

QUEST DIAGNOSTICS INCORPORATED AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—CONTINUED
(dollars in thousands unless otherwise indicated)

The following securities were not included in the diluted earnings per share calculation due to their antidilutive effect (in thousands):

|  | 2003 | 2002 | 2001 |
|---|---|---|---|
| Stock options | 2,009 | 2,352 | 1,820 |
| Restricted common stock | - | - | 20 |

*Stock-Based Compensation*

SFAS No. 123, "Accounting for Stock-Based Compensation" ("SFAS 123"), as amended by SFAS No. 148, "Accounting for Stock-Based Compensation—Transition and Disclosure—an amendment of FASB Statement No. 123" ("SFAS 148") encourages, but does not require, companies to record compensation cost for stock-based compensation plans at fair value. In addition, SFAS 148 provides alternative methods of transition for a voluntary change to the fair value based method of accounting for stock-based employee compensation, and amends the disclosure requirements of SFAS 123 to require prominent disclosures in both annual and interim financial statements about the method of accounting for stock-based employee compensation and the effect of the method used on reported results.

The Company has chosen to adopt the disclosure only provisions of SFAS 148 and continue to account for stock-based compensation using the intrinsic value method prescribed in Accounting Principles Board ("APB") Opinion No. 25, "Accounting for Stock Issued to Employees" ("APB 25"), and related interpretations. Under this approach, the cost of restricted stock awards is expensed over their vesting period, while the imputed cost of stock option grants and discounts offered under the Company's Employee Stock Purchase Plan ("ESPP") is disclosed, based on the vesting provisions of the individual grants, but not charged to expense. Stock-based compensation expense recorded in accordance with APB 25, relating to restricted stock awards, was $5 million, $9 million and $21 million in 2003, 2002 and 2001, respectively.

The Company has several stock ownership and compensation plans, which are described more fully in Note 13. The following table presents net income and basic and diluted earnings per common share, had the Company elected to recognize compensation cost based on the fair value at the grant dates for stock option awards and discounts granted for stock purchases under the Company's ESPP, consistent with the method prescribed by SFAS 123, as amended by SFAS 148:

|  | 2003 | 2002 | 2001 |
|---|---|---|---|
| Net income, as reported | $436,717 | $322,154 | $162,303 |
| Add: Stock-based compensation under APB 25 | 5,297 | 9,028 | 20,672 |
| Deduct: Total stock-based compensation expense determined under fair value method for all awards, net of related tax effects | (52,351) | (47,393) | (45,079) |
| Pro forma net income | $389,663 | $283,789 | $137,896 |
| Earnings per common share: |  |  |  |
| Basic—as reported | $ 4.22 | $ 3.34 | $ 1.74 |
| Basic—pro forma | $ 3.77 | $ 2.94 | $ 1.48 |
| Diluted—as reported | $ 4.12 | $ 3.23 | $ 1.66 |
| Diluted—pro forma | $ 3.72 | $ 2.87 | $ 1.41 |

F-8

LX-0650-0077

QUEST DIAGNOSTICS INCORPORATED AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—CONTINUED
(dollars in thousands unless otherwise indicated)

The fair value of each option grant was estimated on the date of grant using the Black-Scholes option-pricing model with the following weighted average assumptions:

|  | 2003 | 2002 | 2001 |
|---|---|---|---|
| Dividend yield | 0.0% | 0.0% | 0.0% |
| Risk-free interest rate | 2.8% | 4.2% | 5.1% |
| Expected volatility | 48.1% | 45.2% | 47.7% |
| Expected holding period, in years | 5 | 5 | 5 |

The majority of options granted in 2003 were issued prior to the declaration of the Company's quarterly cash dividend in the fourth quarter of 2003 and as such carry a dividend yield of 0%, thereby reducing the weighted average dividend yield for 2003 to 0.0%.

*Foreign Currency*

Assets and liabilities of foreign subsidiaries are translated into U.S. dollars at year-end exchange rates. Income and expense items are translated at average exchange rates prevailing during the year. The translation adjustments are recorded as a component of accumulated other comprehensive income (loss) within stockholders' equity. Gains and losses from foreign currency transactions are included within "other operating (income) expense, net" in the consolidated statements of operations. Transaction gains and losses have not been material.

*Cash and Cash Equivalents*

Cash and cash equivalents include all highly-liquid investments with maturities, at the time acquired by the Company, of three months or less.

*Concentration of Credit Risk*

Financial instruments that potentially subject the Company to concentrations of credit risk are principally cash, cash equivalents, short-term investments and accounts receivable. The Company's policy is to place its cash, cash equivalents and short-term investments in highly rated financial instruments and institutions. Concentration of credit risk with respect to accounts receivable is mitigated by the diversity of the Company's clients and their dispersion across many different geographic regions, and is limited to certain customers who are large buyers of the Company's services. To reduce risk, the Company routinely assesses the financial strength of these customers and, consequently, believes that its accounts receivable credit risk exposure, with respect to these customers, is limited. While the Company has receivables due from federal and state governmental agencies, the Company does not believe that such receivables represent a credit risk since the related healthcare programs are funded by federal and state governments, and payment is primarily dependent on submitting appropriate documentation.

*Inventories*

Inventories, which consist principally of supplies, are valued at the lower of cost (first in, first out method) or market.

*Property, Plant and Equipment*

Property, plant and equipment is recorded at cost. Major renewals and improvements are capitalized, while maintenance and repairs are expensed as incurred. Costs incurred for computer software developed or obtained for internal use are capitalized for application development activities and expensed as incurred for preliminary project activities and post-implementation activities. Capitalized costs include external direct costs of materials and services consumed in developing or obtaining internal-use software, payroll and payroll-related costs for employees who are directly associated with and who devote time to the internal-use software project and interest costs incurred, when material, while developing internal-use software. Capitalization of such costs ceases when the project is substantially complete and ready for its intended purpose. Certain costs, such as

F-9

**547**

LX-0650-0078

**QUEST DIAGNOSTICS INCORPORATED AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—CONTINUED**
**(dollars in thousands unless otherwise indicated)**

maintenance and training, are expensed as incurred. The Company capitalizes interest on borrowings during the active construction period of major capital projects. Capitalized interest is added to the cost of the underlying assets and is amortized over the useful lives of the assets. Depreciation and amortization are provided on the straight-line method over expected useful asset lives as follows: buildings and improvements, ranging from ten to thirty years; laboratory equipment and furniture and fixtures, ranging from three to seven years; leasehold improvements, the lesser of the useful life of the improvement or the remaining life of the building or lease, as applicable; and computer software developed or obtained for internal use, ranging from three to five years.

*Goodwill*

Goodwill represents the cost of acquired businesses in excess of the fair value of assets acquired, including separately recognized intangible assets, less the fair value of liabilities assumed in a business combination. In June 2001, the FASB issued SFAS No. 142, "Goodwill and Other Intangible Assets" ("SFAS 142"), which broadens the criteria for recording intangible assets separate from goodwill and requires the use of a nonamortization approach to account for purchased goodwill and certain intangibles. Under a nonamortization approach, goodwill and certain intangibles are not amortized into results of operations, but instead are reviewed for impairment. Prior to July 1, 2001, goodwill was amortized on the straight-line method over periods not exceeding forty years. Pursuant to SFAS 142, goodwill recorded in connection with acquisitions consummated prior to July 1, 2001 continued to be amortized through December 31, 2001 and has not been amortized thereafter. In addition, goodwill recognized in connection with acquisitions consummated after June 30, 2001 has not been amortized.

The following table presents net income and basic and diluted earnings per common share, adjusted to reflect results as if the nonamortization provisions of SFAS 142 had been in effect for the periods presented:

|  | 2003 | 2002 | 2001 |
|---|---|---|---|
| Net income, as reported ................................ | $436,717 | $322,154 | $162,303 |
| Add back: Amortization of goodwill, net of taxes ......... | - | - | 35,964 |
| Adjusted net income .................................. | $436,717 | $322,154 | $198,267 |
| Basic earnings per common share: |  |  |  |
| Net income, as reported ............................... | $    4.22 | $    3.34 | $    1.74 |
| Amortization of goodwill, net of taxes .................. | - | - | 0.39 |
| Adjusted net income .................................. | $    4.22 | $    3.34 | $    2.13 |
| Diluted earnings per common share: |  |  |  |
| Net income, as reported ............................... | $    4.12 | $    3.23 | $    1.66 |
| Amortization of goodwill, net of taxes .................. | - | - | 0.37 |
| Adjusted net income .................................. | $    4.12 | $    3.23 | $    2.03 |

*Intangible Assets*

Intangible assets are recognized as an asset apart from goodwill if the asset arises from contractual or other legal rights, or if it is separable. Intangible assets, principally representing the cost of customer lists and non-competition agreements acquired, are capitalized and amortized on the straight-line method over their expected useful life, which generally ranges from five to fifteen years. The Company does not have any intangible assets that have an indefinite useful life.

*Recoverability and Impairment of Goodwill*

The new criteria for recording intangible assets separate from goodwill did not require the Company to reclassify any of its intangible assets. Under the nonamortization provisions of SFAS 142, goodwill and certain intangibles are not amortized into results of operations, but instead are reviewed for impairment and an impairment charge is recorded in the periods in which the recorded carrying value of goodwill and certain

F-10

**548**

LX-0650-0079

QUEST DIAGNOSTICS INCORPORATED AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—CONTINUED
(dollars in thousands unless otherwise indicated)

intangibles is more than its estimated fair value. The provisions of SFAS 142 require that a transitional impairment test be performed as of the beginning of the year the statement is adopted. The provisions of SFAS 142 also require that a goodwill impairment test be performed annually or in the case of other events that indicate a potential impairment. The Company's transitional impairment test indicated that there was no impairment of goodwill upon adoption of SFAS 142 effective January 1, 2002. The annual impairment test of goodwill was performed at the end of the Company's fiscal year on December 31st and indicated that there was no impairment of goodwill as of December 31, 2003.

Effective January 1, 2002, the Company evaluates the recoverability and measures the potential impairment of its goodwill under SFAS 142. The annual impairment test is a two-step process that begins with the estimation of the fair value of the reporting unit. The first step screens for potential impairment and the second step measures the amount of the impairment, if any. Management's estimate of fair value considers publicly available information regarding the market capitalization of the Company as well as (i) publicly available information regarding comparable publicly-traded companies in the clinical laboratory testing industry, (ii) the financial projections and future prospects of the Company's business, including its growth opportunities and likely operational improvements, and (iii) comparable sales prices, if available. As part of the first step to assess potential impairment, management compares the estimate of fair value for the Company to the book value of the Company's consolidated net assets. If the book value of the consolidated net assets is greater than the estimate of fair value, the Company would then proceed to the second step to measure the impairment, if any. The second step compares the implied fair value of goodwill with its carrying value. The implied fair value is determined by allocating the fair value of the reporting unit to all of the assets and liabilities of that unit as if the reporting unit had been acquired in a business combination and the fair value of the reporting unit was the purchase price paid to acquire the reporting unit. The excess of the fair value of the reporting unit over the amounts assigned to its assets and liabilities is the implied fair value of goodwill. If the carrying amount of the reporting unit's goodwill is greater than its implied fair value, an impairment loss will be recognized in the amount of the excess. Management believes its estimation methods are reasonable and reflective of common valuation practices.

On a quarterly basis, management performs a review of the Company's business to determine if events or changes in circumstances have occurred which could have a material adverse effect on the fair value of the Company and its goodwill. If such events or changes in circumstances were deemed to have occurred, the Company would perform an impairment test of goodwill as of the end of the quarter, consistent with the annual impairment test, and record any noted impairment loss.

Prior to 2002, the Company evaluated the recoverability and measured the possible impairment of goodwill under APB Opinion No. 17, "Intangible Assets" based on a fair value methodology. The fair value method was applied to each of the regional laboratories. Management's estimate of fair value was primarily based on multiples of forecasted revenue or multiples of forecasted earnings before interest, taxes, depreciation and amortization. The multiples were primarily determined based upon publicly available information regarding comparable publicly-traded companies in the industry, but also considered (i) the financial projections of each regional laboratory, (ii) the future prospects of each regional laboratory, including its growth opportunities, managed care concentration and likely operational improvements, and (iii) comparable sales prices, if available. During 2001, no impairments of goodwill were recorded.

*Recoverability and Impairment of Intangible Assets and Other Long-Lived Assets*

Effective January 1, 2002, the Company evaluates the possible impairment of its long-lived assets, including intangible assets which are amortized pursuant to the provisions of SFAS 142, under SFAS No. 144, "Accounting for Impairment or Disposal of Long-Lived Assets" ("SFAS 144"). The Company reviews the recoverability of its long-lived assets when events or changes in circumstances occur that indicate that the carrying value of the asset may not be recoverable. Evaluation of possible impairment is based on the Company's ability to recover the asset from the expected future pretax cash flows (undiscounted and without interest charges) of the related operations. If the expected undiscounted pretax cash flows are less than the carrying amount of such asset, an impairment loss is recognized for the difference between the estimated fair value and carrying amount of the asset. The Company's adoption of SFAS 144 did not result in any impairment loss being recorded.

F-11

549

LX-0650-0080

**QUEST DIAGNOSTICS INCORPORATED AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—CONTINUED**
**(dollars in thousands unless otherwise indicated)**

*Investments*

The Company accounts for investments in equity securities, which are included in "other assets" in conformity with SFAS No. 115, "Accounting for Certain Investments in Debt and Equity Securities", which requires the use of fair value accounting for trading or available-for-sale securities. Both realized and unrealized gains and losses for trading securities are recorded currently in earnings as a component of non-operating expenses within "other income (expense), net" in the consolidated statements of operations. Unrealized gains and losses for available-for-sale securities are recorded as a component of accumulated other comprehensive income (loss) within stockholders' equity. Gains and losses on securities sold are based on the average cost method.

Investments at December 31, 2003 and 2002 consisted of the following:

|  | 2003 | 2002 |
|---|---|---|
| Available-for-sale equity securities | $26,195 | $ 5,692 |
| Trading equity securities | 19,168 | 14,808 |
| Other investments | 12,598 | 9,744 |
| Total | $57,961 | $30,244 |

Investments in available-for-sale equity securities consist primarily of equity securities in public corporations. Investments in trading equity securities represent participant directed investments of deferred employee compensation and related Company matching contributions held in a trust pursuant to the Company's supplemental deferred compensation plan (see Note 13). Other investments do not have readily determinable fair values and consist primarily of investments in preferred and common shares of privately held companies.

As of December 31, 2003 and 2002, the Company had gross unrealized gains (losses) from available-for-sale equity securities of $15.5 million and $(6.6) million, respectively. "Other income (expense), net" for the year ended December 31, 2001 included a gain of $6.3 million associated with the sale of certain available-for-sale equity securities. For the years ended December 31, 2003, 2002 and 2001, gains (losses) from trading equity securities totaled $1.9 million, $(1.0) million and $(0.1) million, respectively, and are included in "other income (expense), net" within the consolidated statements of operations.

*Financial Instruments*

The Company's policy for managing exposure to market risks may include the use of financial instruments, including derivatives. The Company has established a control environment that includes policies and procedures for risk assessment and the approval, reporting and monitoring of derivative financial instrument activities. These policies prohibit holding or issuing derivative financial instruments for trading purposes.

SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities" ("SFAS 133"), as amended, requires that all derivative instruments be recorded on the balance sheet at their fair value. Changes in the fair value of derivatives are recorded each period in current earnings or other comprehensive income, depending on whether a derivative is designated as part of a hedge transaction and, if it is, the type of hedge transaction. Effective January 1, 2001, the Company adopted SFAS 133, as amended. The cumulative effect of the change in accounting for derivative financial instruments upon adoption on January 1, 2001 of SFAS 133, as amended, reduced comprehensive income by approximately $1 million.

*Fair Value of Financial Instruments*

The carrying amounts of cash and cash equivalents, accounts receivable and accounts payable and accrued expenses approximate fair value based on the short maturity of these instruments. At December 31, 2003 and 2002, the fair value of the Company's debt was estimated at $1.2 billion and $899 million, respectively, using quoted market prices and yields for the same or similar types of borrowings, taking into account the underlying terms of the debt instruments. At December 31, 2003 and 2002, the estimated fair value exceeded the carrying value of the debt by $86 million and $77 million, respectively.

LX-0650-0081

QUEST DIAGNOSTICS INCORPORATED AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—CONTINUED
(dollars in thousands unless otherwise indicated)

The Company's 1¾% contingent convertible notes due 2021 have a contingent interest component that will require the Company to pay contingent interest based on certain thresholds, as outlined in the indenture governing such notes. The contingent interest component, which is more fully described in Note 11, is considered to be a derivative instrument subject to SFAS 133, as amended. As such, the derivative was recorded at its fair value in the consolidated balance sheets and was not material at both December 31, 2003 and 2002.

*Comprehensive Income*

Comprehensive income encompasses all changes in stockholders' equity (except those arising from transactions with stockholders) and includes net income, net unrealized capital gains or losses on available-for-sale securities and foreign currency translation adjustments.

*Segment Reporting*

The Company currently operates in one reportable business segment. Substantially all of the Company's services are provided within the United States, and substantially all of the Company's assets are located within the United States. No one customer accounted for ten percent or more of net revenues in 2003, 2002, or 2001.

*New Accounting Standards*

In January 2003, the FASB issued Interpretation No. 46, "Consolidation of Variable Interest Entities", as revised in December 2003 ("FIN 46"). FIN 46 requires a variable interest entity to be consolidated by a company if that company is subject to a majority of the risk of loss from the variable interest entity's activities or entitled to receive a majority of the entity's residual returns or both. Historically, entities generally were not consolidated unless the entity was controlled through voting interests. FIN 46 also requires disclosures about variable interest entities that a company is not required to consolidate but in which it has a significant variable interest. The consolidation requirements of FIN 46 will apply to variable interest entities as of March 31, 2004 for the Company. Also, certain disclosure requirements apply to all financial statements issued after December 31, 2003, regardless of when the variable interest entity was established. The adoption of this standard is not expected to have a material impact on the Company's consolidated financial statements.

**3.  BUSINESS ACQUISITIONS**

*Acquisition of Unilab Corporation*

On February 28, 2003, the Company completed the acquisition of Unilab Corporation ("Unilab"), the leading commercial clinical laboratory in California. In connection with the acquisition, the Company paid $297 million in cash and issued 7.1 million shares of Quest Diagnostics common stock to acquire all of the outstanding capital stock of Unilab. In addition, the Company reserved approximately 0.3 million shares of Quest Diagnostics common stock for outstanding stock options of Unilab which were converted upon the completion of the acquisition into options to acquire shares of Quest Diagnostics common stock (the "converted options").

The aggregate purchase price of $698 million included the cash portion of the purchase price of $297 million and transaction costs of approximately $20 million, with the remaining portion of the purchase price paid through the issuance of 7.1 million shares of Quest Diagnostics common stock (valued at $372 million or $52.80 per share, based on the average closing stock price of Quest Diagnostics common stock for the five trading days ended March 4, 2003) and the issuance of approximately 0.3 million converted options (valued at approximately $9 million, based on the Black Scholes option-pricing model). Of the total transaction costs incurred, approximately $8 million was paid during fiscal 2002.

In conjunction with the acquisition of Unilab, the Company repaid $220 million of debt, representing substantially all of Unilab's then existing outstanding debt, and related accrued interest. Of the $220 million, $124 million represents payments related to the Company's cash tender offer, which was completed on March 7, 2003, for all of the outstanding $101 million principal amount and related accrued interest of Unilab's 12¾%

F-13

LX-0650-0082

QUEST DIAGNOSTICS INCORPORATED AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—CONTINUED
(dollars in thousands unless otherwise indicated)

Senior Subordinated Notes due 2009 and $23 million of related tender premium and associated tender offer costs.

The Company financed the cash portion of the purchase price and related transaction costs, and the repayment of substantially all of Unilab's outstanding debt and related accrued interest, with the proceeds from a new $450 million amortizing term loan due 2007 (see Note 11) and cash on-hand.

As part of the Unilab acquisition, Quest Diagnostics acquired all of Unilab's operations, including its primary testing facilities in Los Angeles, San Jose and Sacramento, California, and approximately 365 patient service centers and 35 rapid response laboratories and approximately 4,100 employees. The Company expects to realize significant benefits from the acquisition of Unilab. As the leading commercial clinical laboratory in California, the acquisition of Unilab positions the Company to capitalize on its leading position within the laboratory testing industry, further enhancing its national network and access to its comprehensive range of services. Customers and patients are expected to benefit from the acquisition by having greater access to diagnostic testing services through the Company's expanded network of patient service centers. In addition, customers will be provided with state-of-the-art electronic connectivity services, innovative technologies and an expanded esoteric testing menu from the Company's Nichols Institute based in San Juan Capistrano, California.

In connection with the acquisition of Unilab, as part of a settlement agreement with the United States Federal Trade Commission, the Company entered into an agreement to sell to Laboratory Corporation of America Holdings, Inc., ("LabCorp"), certain assets in northern California for $4.5 million, including the assignment of agreements with four independent physician associations ("IPA") and leases for 46 patient service centers (five of which also serve as rapid response laboratories) (the "Divestiture"). Approximately $27 million in annual net revenues were generated by capitated fees under the IPA contracts and associated fee-for-service testing for physicians whose patients use these patient service centers, as well as from specimens received directly from the IPA physicians. The Company completed the transfer of assets and assignment of the IPA agreements to LabCorp and recorded a $1.5 million gain in the third quarter of 2003 in connection with the Divestiture, which is included in "other operating (income) expense, net" within the consolidated statements of operations.

The acquisition of Unilab was accounted for under the purchase method of accounting. As such, the cost to acquire Unilab has been allocated to the assets and liabilities acquired based on estimated fair values as of the closing date. The consolidated financial statements include the results of operations of Unilab subsequent to the closing of the acquisition.

The following table summarizes the Company's purchase price allocation related to the acquisition of Unilab based on the estimated fair value of the assets acquired and liabilities assumed on the acquisition date.

|  | Fair Values as of February 28, 2003 |
|---|---|
| Current assets | $193,798 |
| Property, plant and equipment | 10,855 |
| Goodwill | 735,853 |
| Other assets | 47,777 |
| Total assets acquired | 988,283 |
| Current liabilities | 62,002 |
| Long-term liabilities | 7,369 |
| Long-term debt | 221,291 |
| Total liabilities assumed | 290,662 |
| Net assets acquired | $697,621 |

Based on management's review of the net assets acquired and consultations with third-party valuation specialists, no intangible assets meeting the criteria under SFAS No. 141, "Business Combinations", were

F-14

LX-0650-0083

QUEST DIAGNOSTICS INCORPORATED AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—CONTINUED
(dollars in thousands unless otherwise indicated)

identified. Of the $736 million allocated to goodwill, approximately $85 million is expected to be deductible for tax purposes.

*Acquisition of American Medical Laboratories, Incorporated*

On April 1, 2002, the Company completed its acquisition of all of the outstanding voting stock of American Medical Laboratories, Incorporated, ("AML") and an affiliated company of AML, LabPortal, Inc. ("LabPortal"), a provider of electronic connectivity products, in an all-cash transaction with a combined value of approximately $500 million, which included the assumption of approximately $160 million in debt.

Through the acquisition of AML, Quest Diagnostics acquired all of AML's operations, including two full-service laboratories, 51 patient service centers, and hospital sales, service and logistics capabilities. The all-cash purchase price of approximately $335 million and related transaction costs, together with the repayment of approximately $150 million of principal and related accrued interest, representing substantially all of AML's debt, was financed by Quest Diagnostics with cash on-hand, $300 million of borrowings under its secured receivables credit facility and $175 million of borrowings under its unsecured revolving credit facility. During 2002, Quest Diagnostics repaid all of the $475 million in borrowings related to the acquisition of AML.

The acquisition of AML was accounted for under the purchase method of accounting. As such, the cost to acquire AML has been allocated to the assets and liabilities acquired based on estimated fair values as of the closing date. The consolidated financial statements include the results of operations of AML subsequent to the closing of the acquisition.

The following table summarizes the Company's purchase price allocation related to the acquisition of AML based on the estimated fair value of the assets acquired and liabilities assumed on the acquisition date.

|  | Fair Values as of April 1, 2002 |
|---|---|
| Current assets | $ 83,403 |
| Property, plant and equipment | 31,475 |
| Goodwill | 426,314 |
| Other assets | 8,211 |
| Total assets acquired | 549,403 |
| Current portion of long-term debt | 11,834 |
| Other current liabilities | 51,403 |
| Long-term debt | 139,465 |
| Other liabilities | 4,925 |
| Total liabilities assumed | 207,627 |
| Net assets acquired | $341,776 |

Based on management's review of the net assets acquired and consultations with valuation specialists, no intangible assets meeting the criteria under SFAS No. 141, "Business Combinations", were identified. Of the $426 million allocated to goodwill, approximately $17 million is expected to be deductible for tax purposes.

*Acquisition of LabPortal*

The all-cash purchase price for LabPortal of approximately $4 million and related transaction costs, together with the repayment of all of LabPortal's outstanding debt of approximately $7 million and related accrued interest, was financed by Quest Diagnostics with cash on-hand. The acquisition of LabPortal was accounted for under the purchase method of accounting. As such, the cost to acquire LabPortal has been allocated to the assets and liabilities acquired based on estimated fair values as of the closing date, including approximately $8 million of goodwill. The consolidated financial statements include the results of operations of LabPortal subsequent to the closing of the acquisition.

F-15

**553**

LX-0650-0084

QUEST DIAGNOSTICS INCORPORATED AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—CONTINUED
(dollars in thousands unless otherwise indicated)

*Pro Forma Combined Financial Information*

The following unaudited pro forma combined financial information for the years ended December 31, 2003 and 2002 assumes that the Unilab and AML acquisitions and the Divestiture were completed on January 1, 2002. The unaudited pro forma combined financial information for the year ended December 31, 2001 assumes that the AML acquisition was completed on January 1, 2001 (in thousands, except per share data):

|  | 2003 | 2002 | 2001 |
|---|---|---|---|
| Net revenues | $4,803,875 | $4,607,242 | $3,925,418 |
| Net income | 444,944 | 365,448 | 171,346 |
| Basic earnings per common share: |  |  |  |
| Net income | $ 4.26 | $ 3.53 | $ 1.84 |
| Weighted average common shares outstanding—basic | 104,552 | 103,522 | 93,053 |
| Diluted earnings per common share: |  |  |  |
| Net income | $ 4.16 | $ 3.42 | $ 1.76 |
| Weighted average common shares outstanding—diluted | 107,079 | 106,926 | 97,610 |

The pro forma combined financial information presented above reflects certain reclassifications to the historical financial statements of Unilab and AML to conform the acquired companies' accounting policies and classification of certain costs and expenses to that of Quest Diagnostics. These adjustments had no impact on pro forma net income. Pro forma results for the year ended December 31, 2003 exclude $14.5 million of direct transaction costs, which were incurred and expensed by Unilab in conjunction with its acquisition by Quest Diagnostics. Pro forma results for the year ended December 31, 2002 exclude $14.5 million and $6.3 million, respectively, of direct transaction costs, which were incurred and expensed by AML and Unilab, respectively, in conjunction with their acquisitions by Quest Diagnostics.

*2001 Acquisitions*

During 2001, the Company acquired the assets of Clinical Laboratories of Colorado, LLC and the assets of Las Marias Reference Lab Corp. and Laboratorio Clinico Las Marias, Inc., a clinical laboratory based in San Juan, Puerto Rico. During 2001, the Company also acquired the outstanding voting shares that it did not already own of MedPlus, Inc., a leading developer and integrator of clinical connectivity and data management solutions for healthcare organizations and clinicians, and all of the voting stock of Clinical Diagnostic Services, Inc. ("CDS"), which operated a diagnostic testing laboratory and more than 50 patient service centers in New York and New Jersey. Additionally, during 2001, the Company acquired the minority ownership interest of a consolidated joint venture from its joint venture partner. The combined purchase price for these acquisitions was $155 million, which was paid primarily in cash.

The Company accounted for the above acquisitions under the purchase method of accounting. In connection with the above transactions, the Company recorded $153 million of goodwill during 2001, representing acquisition costs in excess of the fair value of net assets acquired, and approximately $8 million associated with non-compete agreements. The amounts paid under the non-compete agreements are being amortized on the straight-line basis over their five-year terms. During 2002, the Company recorded approximately $4 million of adjustments to finalize the purchase price allocations associated with the businesses acquired in 2001, primarily related to accruals for integration costs for actions impacting the employees and operations of the acquired businesses, partially offset by adjustments to finalize the deferred tax position of the acquired entities.

The historical financial statements of Quest Diagnostics include the results of operations of each acquired company subsequent to the closing of the respective acquisition.

## 4. INTEGRATION OF ACQUIRED BUSINESSES

In July 2002, the FASB issued SFAS No. 146, "Accounting for Costs Associated with Exit or Disposal Activities" ("SFAS 146"). SFAS 146, which the Company adopted effective January 1, 2003, requires that a liability for a cost associated with an exit activity, including those related to employee termination benefits and contractual obligations, be recognized when the liability is incurred, and not necessarily the date of an entity's

F-16

LX-0650-0085

QUEST DIAGNOSTICS INCORPORATED AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—CONTINUED
(dollars in thousands unless otherwise indicated)

commitment to an exit plan, as under previous accounting guidance. The provisions of SFAS 146 apply to integration costs associated with actions that impact the employees and operations of Quest Diagnostics. Costs associated with actions that impact the employees and operations of an acquired company, such as Unilab, are accounted for as a cost of the acquisition and included in goodwill in accordance with Emerging Issues Task Force No. 95-3, "Recognition of Liabilities in Connection with a Purchase Business Combination".

*Integration of Unilab Corporation*

During the fourth quarter of 2003, the Company finalized its plan related to the integration of Unilab into Quest Diagnostics' laboratory network. As part of the plan, following the sale of certain assets to LabCorp as part of the Divestiture, the Company closed its previously owned clinical laboratory in the San Francisco Bay area and completed the integration of remaining customers in the northern California area to Unilab's laboratories in San Jose and Sacramento. The Company currently operates two laboratories in the Los Angeles metropolitan area. As part of the integration plan, the Company plans to open a new regional laboratory in the Los Angeles metropolitan area into which it will integrate all of its business in the area.

During 2003, the Company recorded $9 million of costs associated with executing the Unilab integration plan. The majority of these integration costs related to employee severance and contractual obligations associated with leased facilities and equipment. Employee groups affected as a result of this plan include those involved in the collection and testing of specimens, as well as administrative and other support functions. Of the $9 million in costs, $7.9 million was recorded in the fourth quarter of 2003 and related to actions that impact the employees and operations of Unilab, was accounted for as a cost of the Unilab acquisition and included in goodwill. Of the $7.9 million, $6.8 million related to employee severance benefits for approximately 150 employees, with the remainder primarily related to contractual obligations. In addition, $1.1 million of integration costs, related to actions that impact Quest Diagnostics' employees and operations and comprised principally of employee severance benefits for approximately 30 employees, were accounted for as a charge to earnings in the third quarter of 2003 and included in "other operating (income) expense, net" within the consolidated statements of operations. As of December 31, 2003, accruals related to the Unilab integration plan totaled $6.6 million. While the majority of the accrued costs at December 31, 2003 are expected to be paid in 2004, there are certain severance costs that have payment terms extending into 2005.

*Integration of American Medical Laboratories, Incorporated*

During the third quarter of 2002, the Company finalized its plan related to the integration of AML into Quest Diagnostics' laboratory network. The plan focused principally on improving customer service by enabling the Company to perform esoteric testing on the east and west coasts of the United States, and redirecting certain physician testing volumes within its national network to provide more local testing. As part of the plan, the Company's Chantilly, Virginia laboratory, acquired as part of the AML acquisition, has become the primary esoteric testing laboratory and hospital service center for the eastern United States, complementing the Company's Nichols Institute esoteric testing facility in San Juan Capistrano, California. Esoteric testing volumes have been redirected within the Company's national network to provide customers with improved turnaround time and customer service. The Company has completed the transition of certain routine clinical laboratory testing previously performed in the Chantilly, Virginia laboratory to other testing facilities within the Company's regional laboratory network. A reduction in staffing occurred as the Company executed the integration plan and consolidated duplicate or overlapping functions and facilities. Employee groups affected as a result of this plan included those involved in the collection and testing of specimens, as well as administrative and other support functions.

In connection with the AML integration plan, the Company recorded $11 million of costs associated with executing the plan. The majority of these integration costs related to employee severance and contractual obligations associated with leased facilities and equipment. Of the total costs indicated above, $9.5 million, related to actions that impact the employees and operations of AML, was accounted for as a cost of the AML acquisition and included in goodwill. Of the $9.5 million, $5.9 million related to employee severance benefits for approximately 200 employees, with the remainder primarily related to contractual obligations associated with leased facilities and equipment. In addition, $1.5 million of integration costs, related to actions that impact

F-17

LX-0650-0086

QUEST DIAGNOSTICS INCORPORATED AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—CONTINUED
(dollars in thousands unless otherwise indicated)

Quest Diagnostics' employees and operations and comprised principally of employee severance benefits for approximately 100 employees, were accounted for as a charge to earnings in the third quarter of 2002 and included in "other operating (income) expense, net" within the consolidated statements of operations. As of December 31, 2003 and 2002, accruals related to the AML integration plan totaled $4.1 million and $8.3 million, respectively. The actions associated with the AML integration plan, including those related to severed employees, were completed in 2003. The remaining accruals at December 31, 2003, substantially all of which represented severance and facility exit costs, are expected to be paid in 2004.

*Integration of Clinical Diagnostic Services, Inc.*

During the fourth quarter of 2002, the Company finalized its plan related to the integration of CDS into Quest Diagnostics' laboratory network in the New York metropolitan area. Of the $13.3 million of costs recorded in the fourth quarter of 2002 in connection with the execution of the CDS integration plan, all of which were associated with actions impacting the employees and operations of CDS, $3 million related to employee severance benefits for approximately 150 employees with the remainder primarily associated with remaining contractual obligations under facility and equipment leases. The costs outlined above were recorded as a cost of the acquisition and included in goodwill. As of December 31, 2003 and 2002, accruals related to the CDS integration plan totaled $5.3 million and $10.3 million, respectively. The actions associated with the CDS integration plan, including those related to severed employees, were completed in 2003. The remaining accruals at December 31, 2003, substantially all of which represented remaining contractual obligations under facility leases, have terms extending beyond 2004.

*Integration of SmithKline Beecham Clinical Laboratory Testing Business*

On August 16, 1999, the Company completed the acquisition of SmithKline Beecham Clinical Laboratories, Inc. ("SBCL"), which operated the clinical laboratory business of SmithKline Beecham plc ("SmithKline Beecham"). During the fourth quarter of 1999, Quest Diagnostics finalized its plan to integrate SBCL into Quest Diagnostics' laboratory network and recorded the estimated costs associated with executing the integration plan. The majority of these integration costs related to employee severance, contractual obligations associated with leased facilities and equipment, and the write-off of fixed assets which management believed would have no future economic benefit upon combining the operations. The plan focused principally on laboratory consolidations in geographic markets served by more than one of the Company's laboratories, and the redirection of testing volume within the Company's national network to provide more local testing and improve customer service. The actions associated with the SBCL integration plan, including those related to severed employees, were completed as of June 30, 2001. During 2001, the Company utilized $27 million of the remaining accruals established in connection with the SBCL integration, principally related to the payment of severance benefits to terminated employees. The remaining accruals associated with the SBCL integration plan, principally comprised of remaining contractual obligations under facility leases, were not material at December 31, 2002.

5.   TAXES ON INCOME

In conjunction with the Spin-Off Distribution, the Company entered into a tax sharing agreement with its former parent and a former subsidiary, that provide the parties with certain rights of indemnification against each other. As part of the SBCL acquisition agreements, the Company entered into a tax indemnification arrangement with SmithKline Beecham that provides the parties with certain rights of indemnification against each other.

The Company's pretax income (loss) consisted of $736 million, $547 million and $290 million from U.S. operations and approximately $1.4 million, $(4.5) million and $6.6 million from foreign operations for the years ended December 31, 2003, 2002 and 2001, respectively.

F-18

556

LX-0650-0087

QUEST DIAGNOSTICS INCORPORATED AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—CONTINUED
(dollars in thousands unless otherwise indicated)

The components of income tax expense for 2003, 2002 and 2001 were as follows:

|  | 2003 | 2002 | 2001 |
|---|---|---|---|
| Current: |  |  |  |
| Federal | $214,729 | $105,799 | $107,629 |
| State and local | 51,771 | 23,396 | 25,727 |
| Foreign | 728 | 627 | 1,490 |
| Deferred: |  |  |  |
| Federal | 29,271 | 73,002 | (452) |
| State and local | 4,582 | 17,399 | (108) |
| Total | $301,081 | $220,223 | $134,286 |

A reconciliation of the federal statutory rate to the Company's effective tax rate for 2003, 2002 and 2001 was as follows:

|  | 2003 | 2002 | 2001 |
|---|---|---|---|
| Tax provision at statutory rate | 35.0% | 35.0% | 35.0% |
| State and local income taxes, net of federal benefit | 5.0 | 5.0 | 5.0 |
| Non-deductible goodwill amortization | - | - | 4.4 |
| Impact of foreign operations | 0.2 | 0.2 | 0.5 |
| Non-deductible meals and entertainment expense | 0.3 | 0.3 | 0.4 |
| Other, net | 0.3 | 0.1 | - |
| Effective tax rate | 40.8% | 40.6% | 45.3% |

The tax effects of temporary differences that give rise to significant portions of the deferred tax assets at December 31, 2003 and 2002 were as follows:

|  | 2003 | 2002 |
|---|---|---|
| Current deferred tax asset: |  |  |
| Accounts receivable reserve | $ 33,797 | $ 30,449 |
| Liabilities not currently deductible | 65,352 | 67,173 |
| Accrued settlement reserves | 4,972 | 3,456 |
| Accrued restructuring and integration costs | 4,854 | 1,622 |
| Total | $108,975 | $102,700 |
| Non-current deferred tax asset: |  |  |
| Liabilities not currently deductible | $ 44,978 | $ 40,422 |
| Net operating loss carryforwards | 17,914 | 1,652 |
| Accrued restructuring and integration costs | 1,613 | 3,334 |
| Depreciation and amortization | (14,870) | (15,652) |
| Total | $ 49,635 | $ 29,756 |

As of December 31, 2003, the Company had estimated net operating loss carryforwards for federal and state income tax purposes of $45 million and $430 million, respectively, which expire at various dates through 2023. As of December 31, 2003 and 2002, deferred tax assets associated with net operating loss carryforwards for federal and state income tax purposes of $51 million and $29 million, respectively, have each been reduced by a valuation reserve of $33 million and $27 million respectively.

Income taxes payable at December 31, 2003 and 2002 were $29 million and $20 million, respectively, and consisted primarily of federal income taxes payable of $22 million and $23 million, respectively.

LX-0650-0088

QUEST DIAGNOSTICS INCORPORATED AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—CONTINUED
(dollars in thousands unless otherwise indicated)

## 6.  SUPPLEMENTAL CASH FLOW AND OTHER DATA

| | 2003 | 2002 | 2001 |
|---|---|---|---|
| Depreciation expense | $ 145,701 | $123,018 | $101,620 |
| Interest expense | (60,630) | (56,347) | (76,765) |
| Interest income | 841 | 2,674 | 6,242 |
| Interest expense, net | (59,789) | (53,673) | (70,523) |
| Interest paid | 59,394 | 56,102 | 58,537 |
| Income taxes paid | 211,966 | 83,710 | 26,384 |
| Businesses acquired: | | | |
| Fair value of assets acquired | $ 989,778 | $561,267 | $182,136 |
| Fair value of liabilities assumed | 391,422 | 215,810 | 29,272 |
| Non-cash financing activities: | | | |
| Fair value of common stock issued to acquire Unilab | $ 372,464 | - | - |
| Fair value of converted options issued in conjunction with the Unilab acquisition | 8,452 | - | - |

## 7.  LOSS ON DEBT EXTINGUISHMENT

On June 27, 2001, the Company refinanced a majority of its long-term debt on a senior unsecured basis to reduce overall interest costs and obtain less restrictive covenants. Specifically, the Company completed a $550 million senior notes offering (the "Senior Notes") and entered into a new $500 million senior unsecured credit facility (the "Credit Agreement") which included a five-year $325 million revolving credit agreement and a $175 million term loan. The Company used the net proceeds from the senior notes offering and the term loan, together with cash on hand, to repay all of the $584 million which was outstanding under its then existing senior secured credit agreement, including the costs to settle existing interest rate swap agreements, and to consummate a cash tender offer and consent solicitation for its 10¾% senior subordinated notes due 2006 (the "Subordinated Notes"). During the remainder of 2001, the Company repaid the $175 million term loan under the Credit Agreement.

In conjunction with its debt refinancing, the Company recorded a loss on debt extinguishment of $42 million, $36 million of which represented the write-off of $23 million of deferred financing costs, associated with the Company's debt which was refinanced, and $13 million of payments related primarily to the tender premium incurred in connection with the Company's cash tender offer of the Subordinated Notes. The remaining $6 million of losses represented amounts incurred in conjunction with the cancellation of certain interest rate swap agreements, which were terminated in connection with the debt that was refinanced. Prior to the Company's debt refinancing in June 2001, the Company's senior secured credit agreement required the Company to maintain interest rate swap agreements to mitigate the risk of changes in interest rates associated with a portion of its variable interest rate indebtedness. These interest rate swap agreements were considered a hedge against changes in the amount of future cash flows associated with the interest payments of the Company's variable rate debt obligations. Accordingly, the interest rate swap agreements were recorded at their estimated fair value in the Company's consolidated balance sheet and the related losses on these contracts were deferred in stockholders' equity as a component of comprehensive income. In conjunction with the debt refinancing, the interest rate swap agreements were terminated and the losses reflected in stockholders' equity as a component of comprehensive income were reclassified to earnings and reflected as a charge within the loss on debt extinguishment in the consolidated statements of operations for the year ended December 31, 2001.

LX-0650-0089

**QUEST DIAGNOSTICS INCORPORATED AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—CONTINUED**
**(dollars in thousands unless otherwise indicated)**

## 8. PROPERTY, PLANT AND EQUIPMENT

Property, plant and equipment at December 31, 2003 and 2002 consisted of the following:

|  | 2003 | 2002 |
|---|---|---|
| Land | $ 34,909 | $ 33,148 |
| Buildings and improvements | 273,548 | 277,565 |
| Laboratory equipment, furniture and fixtures | 670,671 | 569,982 |
| Leasehold improvements | 148,508 | 119,397 |
| Computer software developed or obtained for internal use | 124,469 | 101,594 |
| Construction-in-progress | 40,083 | 40,599 |
|  | 1,292,188 | 1,142,285 |
| Less: accumulated depreciation and amortization | (684,883) | (572,136) |
| Total | $ 607,305 | $ 570,149 |

## 9. GOODWILL AND INTANGIBLE ASSETS

Goodwill at December 31, 2003 and 2002 consisted of the following:

|  | 2003 | 2002 |
|---|---|---|
| Goodwill | $2,706,928 | $1,976,903 |
| Less: accumulated amortization | (188,053) | (188,053) |
| Goodwill, net | $2,518,875 | $1,788,850 |

The changes in the gross carrying amount of goodwill for the years ended December 31, 2003 and 2002 are as follows:

|  | 2003 | 2002 |
|---|---|---|
| Balance as of January 1 | $1,976,903 | $1,539,176 |
| Goodwill acquired during the year | 730,025 | 437,727 |
| Balance as of December 31 | $2,706,928 | $1,976,903 |

Intangible assets at December 31, 2003 and 2002 consisted of the following:

|  | Weighted Average Amortization Period | December 31, 2003 | | | December 31, 2002 | | |
|---|---|---|---|---|---|---|---|
|  |  | Cost | Accumulated Amortization | Net | Cost | Accumulated Amortization | Net |
| Non-compete agreements | 5 years | $44,942 | $(37,947) | $ 6,995 | $44,482 | $(32,268) | $12,214 |
| Customer lists | 15 years | 42,225 | (35,568) | 6,657 | 41,301 | (33,751) | 7,550 |
| Other | 10 years | 5,895 | (2,569) | 3,326 | 4,580 | (2,261) | 2,319 |
| Total | 10 years | $93,062 | $(76,084) | $16,978 | $90,363 | $(68,280) | $22,083 |

Amortization expense related to intangible assets was $8,201, $8,373 and $7,715 for the years ended December 31, 2003, 2002 and 2001, respectively.

F-21

LX-0650-0090

QUEST DIAGNOSTICS INCORPORATED AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—CONTINUED
(dollars in thousands unless otherwise indicated)

The estimated amortization expense related to other intangible assets for each of the five succeeding fiscal years and thereafter as of December 31, 2003 is as follows:

**Fiscal Year Ending
December 31,**

| | |
|---|---:|
| 2004 | 6,558 |
| 2005 | 3,048 |
| 2006 | 1,819 |
| 2007 | 1,035 |
| 2008 | 861 |
| Thereafter | 3,657 |
| Total | $16,978 |

## 10. ACCOUNTS PAYABLE AND ACCRUED EXPENSES

Accounts payable and accrued expenses at December 31, 2003 and 2002 consisted of the following:

| | 2003 | 2002 |
|---|---:|---:|
| Accrued wages and benefits | $255,340 | $250,226 |
| Accrued expenses | 221,783 | 208,037 |
| Trade accounts payable | 118,731 | 111,982 |
| Income taxes payable | 29,073 | 20,268 |
| Accrued restructuring and integration costs | 12,493 | 10,791 |
| Accrued settlement reserves | 12,430 | 8,641 |
| Total | $649,850 | $609,945 |

## 11. DEBT

Long-term debt at December 31, 2003 and 2002 consisted of the following:

| | 2003 | 2002 |
|---|---:|---:|
| Term loan due June 2007 | $ 304,921 | $ - |
| 6¾% Senior Notes due July 2006 | 274,219 | 273,907 |
| 7½% Senior Notes due July 2011 | 274,171 | 274,060 |
| 1¾% Contingent Convertible Debentures due November 2021 | 247,760 | 247,635 |
| Other | 1,586 | 26,937 |
| Total | 1,102,657 | 822,539 |
| Less: current portion | 73,950 | 26,032 |
| Total long-term debt | $1,028,707 | $796,507 |

*Secured Receivables Credit Facility*

On July 21, 2000, the Company completed a receivables-backed financing transaction (the "secured receivables credit facility"), the proceeds of which were used to pay down loans outstanding under the Company's then existing senior secured credit facility that was used to finance the acquisition of SBCL. The secured receivables credit facility is currently being provided by Blue Ridge Asset Funding Corporation, a commercial paper funding vehicle administered by Wachovia Bank, N.A., La Fayette Asset Securitization LLC, a commercial funding vehicle administered by Credit Lyonnais and Jupiter Securitization Corporation, a commercial funding vehicle administered by Bank One, N.A.

Interest on the $250 million secured receivables credit facility is based on rates that are intended to approximate commercial paper rates for highly rated issuers. Borrowings outstanding under the secured receivables credit facility, if any, are classified as a current liability on our consolidated balance sheet since the

F-22

LX-0650-0091

QUEST DIAGNOSTICS INCORPORATED AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—CONTINUED
(dollars in thousands unless otherwise indicated)

lenders fund the borrowings through the issuance of commercial paper which matures at various dates within one year from the date of issuance and the term of the one-year back-up facilities described below. There were no borrowings outstanding as of December 31, 2003 and 2002.

The secured receivables credit facility has the benefit of one-year back-up facilities provided by three banks on a committed basis. On June 27, 2003, the Company extended the expiration date of the back-up facilities of its secured receivables credit facility from July 21, 2003 to April 21, 2004. The Company is currently in discussions with its lenders regarding a replacement for the facility and expects to have a replacement in place during the second quarter of 2004.

### Credit Agreement

The Credit Agreement currently includes a $325 million unsecured revolving credit facility which expires in June 2006. Interest on the unsecured revolving credit facility is based on certain published rates plus an applicable margin that will vary over an approximate range of 50 basis points based on changes in the Company's credit ratings. At the option of the Company, it may elect to enter into LIBOR-based interest rate contracts for periods up to 180 days. Interest on any outstanding amounts not covered under the LIBOR-based interest rate contracts is based on an alternate base rate, which is calculated by reference to the prime rate or federal funds rate (as defined in the Credit Agreement). Additionally, the Company has the ability to borrow up to $200 million under the $325 million unsecured revolving credit facility at rates determined by a competitive bidding process among the lenders. As of December 31, 2003, the Company's borrowing rate for LIBOR-based loans was LIBOR plus 1.1875%. As of December 31, 2003 and 2002, there were no borrowings outstanding under the unsecured revolving credit facility.

Borrowings under the Credit Agreement are guaranteed by our wholly owned subsidiaries that operate clinical laboratories in the United States ("the Subsidiary Guarantors"). The Credit Agreement contains various covenants, including the maintenance of certain financial ratios, which could impact the Company's ability to, among other things, incur additional indebtedness, repurchase shares of its outstanding common stock, make additional investments and consummate acquisitions.

### Term Loan due June 2007

As discussed in Note 3, the Company financed the cash portion of the purchase price and related transaction costs associated with the Unilab acquisition, and the repayment of substantially all of Unilab's outstanding debt and related accrued interest, with the proceeds from a $450 million amortizing term loan facility (the "term loan due June 2007") and cash on-hand. The term loan due June 2007 carries interest at LIBOR plus an applicable margin that can fluctuate over a range of up to 80 basis points, based on changes in the Company's credit rating. At the option of the Company, it may elect to enter into LIBOR-based interest rate contracts for periods up to 180 days. Interest on any outstanding amounts not covered under the LIBOR-based interest rate contracts is based on an alternate base rate, which is calculated by reference to the prime rate or federal funds rate. As of December 31, 2003, the Company's borrowing rate for LIBOR-based loans was LIBOR plus 1.1875%. As of December 31, 2003, the term loan due June 2007 required remaining principal repayments of the initial amount borrowed equal to 16.18%, 16.18%, 17.19% and 18.2% in 2004 through 2007, respectively. The term loan due June 2007 is guaranteed by the Subsidiary Guarantors and contains various covenants similar to those under the Credit Agreement. Through December 31, 2003, the Company has repaid $145 million of principal under the term loan due June 2007. On January 12, 2004, the Company repaid an additional $75 million of principal under the term loan due June 2007 with the proceeds from a lower cost term loan due December 2008. The repayment in 2004 reduces the remaining principal payments of the initial amount borrowed equal to 9.7%, 13.0%, 13.8% and 14.6% in 2004 through 2007, respectively.

### Term Loan due December 2008

On December 19, 2003, the Company entered into a new $75 million amortizing term loan facility (the "term loan due December 2008"), which was funded on January 12, 2004 and the proceeds of which were used to repay $75 million under the term loan due June 2007. The term loan due December 2008 carries a

F-23

LX-0650-0092

QUEST DIAGNOSTICS INCORPORATED AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—CONTINUED
(dollars in thousands unless otherwise indicated)

lower interest rate than the term loan due June 2007 and is based on LIBOR plus an applicable margin that can fluctuate over a range of up to 119 basis points, based on changes in the Company's public debt rating. At the option of the Company, it may elect to enter into LIBOR-based interest rate contracts for periods up to 180 days. Interest on any outstanding amounts not covered under the LIBOR-based interest rate contracts is based on an alternate base rate, which is calculated by reference to the prime rate or federal funds rate. As of December 31, 2003, the Company's borrowing rate for LIBOR-based loans was LIBOR plus 0.55%. The term loan due December 2008 requires principal repayments of the initial amount borrowed equal to 20% on each of the third and fourth anniversary dates of the funding and the remainder of the outstanding balance on December 31, 2008. The term loan due December 2008 is guaranteed by the Subsidiary Guarantors and contains various covenants similar to those under the Credit Agreement.

*Senior Notes*

In conjunction with its 2001 debt refinancing (see Note 7), the Company completed a $550 million senior notes offering in June 2001. The Senior Notes were issued in two tranches: (a) $275 million aggregate principal amount of 6¾% senior notes due 2006 ("Senior Notes due 2006"), issued at a discount of approximately $1.6 million and (b) $275 million aggregate principal amount of 7½% senior notes due 2011 ("Senior Notes due 2011"), issued at a discount of approximately $1.1 million. After considering the discounts, the effective interest rate on the Senior Notes due 2006 and Senior Notes due 2011 are 6.9% and 7.6%, respectively. The Senior Notes require semiannual interest payments which commenced January 12, 2002. The Senior Notes are unsecured obligations of the Company and rank equally with the Company's other unsecured senior obligations. The Senior Notes are guaranteed by the Subsidiary Guarantors and do not have a sinking fund requirement.

*1¾% Contingent Convertible Debentures*

On November 26, 2001, the Company completed its $250 million offering of 1¾% contingent convertible debentures due 2021 (the "Debentures"). The net proceeds of the offering, together with cash on hand, were used to repay all of the $256 million principal that was then outstanding under the Company's secured receivables credit facility. The Debentures, which pay a fixed rate of interest semi-annually commencing on May 31, 2002, have a contingent interest component, which is considered to be a derivative instrument subject to SFAS 133, as amended, that will require the Company to pay contingent interest based on certain thresholds, as outlined in the indenture governing the Debentures. For income tax purposes, the Debentures are considered to be a contingent payment security. As such, interest expense for tax purposes is based on an assumed interest rate related to a comparable fixed interest rate debt security issued by the Company without a conversion feature. The assumed interest rate for tax purposes was 7% for both 2003 and 2002.

The Debentures are guaranteed by the Subsidiary Guarantors and do not have a sinking fund requirement.

Each one thousand dollar principal amount of Debentures is convertible initially into 11.429 shares of the Company's common stock, which represents an initial conversion price of $87.50 per share. Holders may surrender the Debentures for conversion into shares of the Company's common stock under any of the following circumstances: (1) if the sales price of the Company's common stock is above 120% of the conversion price (or $105 per share) for specified periods; (2) if the Company calls the Debentures or (3) if specified corporate transactions have occurred.

The Company may call the Debentures at any time on or after November 30, 2004 for the principal amount of the Debentures plus any accrued and unpaid interest. On November 30, 2004, 2005, 2008, 2012 and 2016 each holder of the Debentures may require the Company to repurchase the holder's Debentures for the principal amount of the Debentures plus any accrued and unpaid interest. The Company may repurchase the Debentures for cash, common stock, or a combination of both. The Company intends to settle any repurchases with a cash payment, funding such payment with a combination of cash on-hand and borrowings under its unsecured revolving credit facility. The Debentures are classified as long-term debt on the consolidated balance sheet at December 31, 2003 due to the Company's existing ability and intent to refinance the Debentures on a long-term basis in the event the Debentures are put to the Company in November 2004.

F-24

LX-0650-0093

QUEST DIAGNOSTICS INCORPORATED AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—CONTINUED
(dollars in thousands unless otherwise indicated)

*Letter of Credit Lines*

In December 2003, the Company entered into two lines of credit with two financial institutions totaling $68 million for the issuance of letters of credit (the "letter of credit lines"). The letter of credit lines mature in December 2004 and are guaranteed by the Subsidiary Guarantors. As of December 31, 2003, there $44 million of outstanding letters of credit under the letter of credit lines.

As of December 31, 2003, long-term debt, including capital leases, maturing in each of the years subsequent to December 31, 2004, is as follows:

| Year ending December 31, | |
| --- | --- |
| 2005 | $ 73,035 |
| 2006 | 351,790 |
| 2007 | 81,951 |
| 2008 | — |
| 2009 and thereafter | 521,931 |
| Total long-term debt | $1,028,707 |

The table above assumes that the Debentures are repaid at their stated maturity in 2021.

## 12. PREFERRED STOCK AND COMMON STOCKHOLDERS' EQUITY

*Series Preferred Stock*

Quest Diagnostics is authorized to issue up to 10 million shares of Series Preferred Stock, par value $1.00 per share. The Company's Board of Directors has the authority to issue such shares without stockholder approval and to determine the designations, preferences, rights and restrictions of such shares. Of the authorized shares, 1,300,000 shares have been designated Series A Preferred Stock and 1,000 shares have been designated Voting Cumulative Preferred Stock. No shares have been issued, other than the Voting Cumulative Preferred Stock.

*Voting Cumulative Preferred Stock*

During the fourth quarter of 2001, the Company redeemed all of the then issued and outstanding shares of preferred stock for $1 million plus accrued dividends. The Voting Cumulative Preferred Stock is generally entitled to one vote per share, voting together as one class with the Company's common stock. Whenever dividends on the Voting Cumulative Preferred Stock are in arrears, no dividends or redemptions or purchases of shares may be made with respect to any stock ranking junior as to dividends or liquidation to the Voting Cumulative Preferred Stock until all such amounts have been paid. The Voting Cumulative Preferred Stock is not convertible into shares of any other class or series of stock of the Company. The Voting Cumulative Preferred Stock ranks senior to the Quest Diagnostics common stock and the Series A Preferred Stock.

*Preferred Share Purchase Rights*

Each share of Quest Diagnostics common stock trades with a preferred share purchase right, which entitles stockholders to purchase one-hundredth of a share of Series A Preferred Stock upon the occurrence of certain events. In conjunction with the SBCL acquisition, the Board of Directors of the Company approved an amendment to the preferred share purchase rights. The amended rights entitle stockholders to purchase shares of Series A Preferred Stock at a predefined price in the event a person or group (other than SmithKline Beecham) acquires 20% or more of the Company's outstanding common stock. The preferred share purchase rights expire December 31, 2006.

F-25

LX-0650-0094

QUEST DIAGNOSTICS INCORPORATED AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—CONTINUED
(dollars in thousands unless otherwise indicated)

*Accumulated Other Comprehensive Income (Loss)*

The components of accumulated other comprehensive income (loss) for 2003, 2002 and 2001 were as follows:

| | Foreign Currency Translation Adjustment | Market Value Adjustment | Accumulated Other Comprehensive Income (Loss) |
|---|---|---|---|
| Balance, December 31, 2000 | $(3,208) | $(2,250) | $(5,458) |
| Translation adjustment | (1,178) | - | (1,178) |
| Market value adjustment, net of tax expense of $2,093 | - | 3,166 | 3,166 |
| Balance, December 31, 2001 | (4,386) | 916 | (3,470) |
| Translation adjustment | 1,906 | - | 1,906 |
| Market value adjustment, net of tax benefit of $2,627 | - | (3,960) | (3,960) |
| Balance, December 31, 2002 | (2,480) | (3,044) | (5,524) |
| Translation adjustment | 2,169 | - | 2,169 |
| Market value adjustment, net of tax expense of $6,201 | - | 9,302 | 9,302 |
| Balance, December 31, 2003 | $ (311) | $ 6,258 | $ 5,947 |

The market value adjustments for 2003, 2002 and 2001 represented unrealized holding gains (losses), net of taxes.

For the year ended December 31, 2001, other comprehensive income included the cumulative effect of the change in accounting for derivative financial instruments upon adoption of SFAS 133, as amended, which reduced comprehensive income by approximately $1 million. In addition, in conjunction with the Company's debt refinancing, the interest rate swap agreements were terminated and the losses reflected in stockholders' equity as a component of comprehensive income were reclassified to earnings and reflected within the loss on debt extinguishment in the consolidated statements of operations for the year ended December 31, 2001 (see Note 7).

*Dividend Policy*

Through October 20, 2003, the Company never declared or paid cash dividends on its common stock. On October 21, 2003, the Company's Board of Directors declared a quarterly cash dividend of $0.15 per common share. The initial $15.4 million quarterly dividend was paid on January 23, 2004 to shareholders of record on January 8, 2004.

*Share Repurchase Plan*

In May 2003, the Company's Board of Directors authorized a share repurchase program, which permits the Company to purchase up to $300 million of its common stock. In October 2003, the Board of Directors increased the share repurchase authorization by an additional $300 million. Through December 31, 2003, the Company has repurchased 4.0 million shares of its common stock at an average price of $64.54 per share for a total of $258 million under the program.

## 13. STOCK OWNERSHIP AND COMPENSATION PLANS

*Employee and Non-employee Directors Stock Ownership Programs*

In 1999, the Company established the 1999 Employee Equity Participation Program (the "1999 EEPP") to replace the Company's prior plan established in 1996 (the "1996 EEPP"). The 1999 EEPP provides for three types of awards: (a) stock options, (b) stock appreciation rights and (c) incentive stock awards. The 1999 EEPP provides for the grant to eligible employees of either non-qualified or incentive stock options, or both, to purchase shares of Quest Diagnostics common stock at no less than the fair market value on the date of grant. The stock options are subject to forfeiture if employment terminates prior to the end of the prescribed vesting

**QUEST DIAGNOSTICS INCORPORATED AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—CONTINUED**
**(dollars in thousands unless otherwise indicated)**

period, as determined by the Board of Directors. The stock options expire on the date designated by the Board of Directors but in no event more than eleven years from date of grant. Grants of stock appreciation rights allow eligible employees to receive a payment based on the appreciation of Quest Diagnostics common stock in cash, shares of Quest Diagnostics common stock or a combination thereof. The stock appreciation rights are granted at an exercise price at no less than the fair market value of Quest Diagnostics common stock on the date of grant. Stock appreciation rights expire on the date designated by the Board of Directors but in no event more than eleven years from date of grant. No stock appreciation rights have been granted under the 1999 EEPP. Under the incentive stock provisions of the plan, the 1999 EEPP allows eligible employees to receive awards of shares, or the right to receive shares, of Quest Diagnostics common stock, the equivalent value in cash or a combination thereof. These shares are generally earned on achievement of financial performance goals and are subject to forfeiture if employment terminates prior to the end of the prescribed vesting period, which ranges primarily from three to four years. The market value of the shares awarded is recorded as unearned compensation. The amount of unearned compensation is subject to adjustment based upon changes in earnings estimates, if any, during the initial year of grant and is amortized to compensation expense over the prescribed vesting period. Key executive, managerial and technical employees are eligible to participate in the 1999 EEPP. The provisions of the 1996 EEPP were similar to those outlined above for the 1999 EEPP.

The 1999 EEPP increased the maximum number of shares of Quest Diagnostics common stock that may be optioned or granted to 18 million shares. In addition, any remaining shares under the 1996 EEPP are available for issuance under the 1999 EEPP.

In 1998, the Company established the Quest Diagnostics Incorporated Stock Option Plan for Non-employee Directors (the "Director Option Plan"). The Director Option Plan provides for the grant to non-employee directors of non-qualified stock options to purchase shares of Quest Diagnostics common stock at no less than fair market value on the date of grant. The maximum number of shares that may be issued under the Director Option Plan is 1 million shares. The stock options expire ten years from date of grant and generally vest over three years. During 2003, 2002 and 2001, grants under the Director Option Plan totaled 94, 94 and 81 thousand shares, respectively.

Transactions under the stock option plans were as follows (options in thousands, except per share amounts):

|  | 2003 | 2002 | 2001 |
|---|---|---|---|
| Options outstanding, beginning of year | 8,922 | 8,695 | 9,246 |
| Options granted | 3,176 | 2,052 | 2,413 |
| Options exercised | (1,616) | (1,543) | (2,576) |
| Options terminated | (242) | (282) | (388) |
| Options outstanding, end of year | 10,240 | 8,922 | 8,695 |
| Exercisable | 5,706 | 3,943 | 3,168 |
| Weighted average exercise price: |  |  |  |
| Options granted | $ 53.33 | $ 74.92 | $ 55.08 |
| Options exercised | 20.29 | 18.70 | 11.37 |
| Options terminated | 58.31 | 26.05 | 25.31 |
| Options outstanding, end of year | 44.85 | 38.83 | 26.33 |
| Exercisable, end of year | 34.01 | 22.09 | 13.97 |
| Weighted average fair value of options at grant date | $ 23.21 | $ 33.74 | $ 25.79 |

F-27

LX-0650-0096

QUEST DIAGNOSTICS INCORPORATED AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—CONTINUED
(dollars in thousands unless otherwise indicated)

The following relates to options outstanding at December 31, 2003:

| | Options Outstanding | | | | Options Exercisable | |
|---|---|---|---|---|---|---|
| Range of Exercise Price | Shares (in thousands) | Weighted Average Remaining Contractual Life (in years) | Weighted Average Exercise Price | | Shares (in thousands) | Weighted Average Exercise Price |
| $ 5.26–$11.28 . . . . . . | 564 | 3.8 | $ 7.91 | | 564 | $ 7.91 |
| $12.92–$19.16 . . . . . . | 2,431 | 5.8 | 14.02 | | 2,431 | 14.02 |
| $28.53–$35.64 . . . . . . | 360 | 6.4 | 30.44 | | 360 | 30.44 |
| $44.00–$60.00 . . . . . | 4,142 | 8.3 | 51.44 | | 1,349 | 53.13 |
| $60.06–$75.94 . . . . . | 2,376 | 8.5 | 68.43 | | 836 | 69.16 |
| $80.95–$94.99 . . . . . . | 367 | 8.4 | 93.06 | | 166 | 91.15 |

The following summarizes the activity relative to incentive stock awards granted in 2003, 2002 and 2001 (shares in thousands):

| | 2003 | 2002 | 2001 |
|---|---|---|---|
| Incentive shares, beginning of year . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 735 | 1,320 | 1,788 |
| Incentive shares granted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 102 | - | - |
| Incentive shares vested . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (533) | (570) | (439) |
| Incentive shares forfeited and canceled . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (16) | (15) | (29) |
| Incentive shares, end of year . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 288 | 735 | 1,320 |
| Weighted average fair value of incentive shares at grant date . . . . . . . . . . . . . . | $49.88 | $ - | $ - |

The balance of the incentive stock awards at December 31, 2003 are subject to forfeiture if employment terminates prior to the end of the prescribed vesting period.

*Employee Stock Purchase Plan*

Under the Company's Employee Stock Purchase Plan ("ESPP"), substantially all employees can elect to have up to 10% of their annual wages withheld to purchase Quest Diagnostics common stock. The purchase price of the stock is 85% of the lower of its beginning-of-quarter or end-of-quarter market price. Under the ESPP, the maximum number of shares of Quest Diagnostics common stock which may be purchased by eligible employees is 4 million. Approximately 272, 236 and 203 thousand shares of common stock were purchased by eligible employees in 2003, 2002 and 2001, respectively.

*Employee Stock Ownership Plan*

Prior to 1999, the Company maintained its Employee Stock Ownership Plan ("ESOP") to account for certain shares of Quest Diagnostics common stock which had been issued for the account of all active regular employees of the Company as of December 31, 1996. Effective with the closing of the SBCL acquisition, the Company modified certain provisions of the ESOP to provide an additional benefit to employees through ownership of the Company's common stock. During the year ended December 31, 2002, the ESOP was merged into the Company's defined contribution plan. Prior to the merger of the ESOP into the Company's defined contribution plan, substantially all of the Company's employees were eligible to participate in the ESOP. The Company's contributions to the ESOP trust were based on 2% of eligible employee compensation for those employees who were actively employed or on a leave of absence on the last day of the Plan year. Company contributions to the trust were made in the form of shares of Quest Diagnostics common stock. The Company's contributions to this plan aggregated $10.4 million and $19.7 million for 2002 and 2001, respectively.

F-28

LX-0650-0097

QUEST DIAGNOSTICS INCORPORATED AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—CONTINUED
(dollars in thousands unless otherwise indicated)

*Defined Contribution Plan*

The Company maintains a qualified defined contribution plan covering substantially all of its employees. During the year ended December 31, 2002, the ESOP, to which the Company made annual contributions equal to 2% of eligible compensation, was merged into the Company's defined contribution plan and the Company increased its maximum matching contribution for its defined contribution plan from 4% to 6% of an employee's eligible wages. The Company's expense for contributions to its defined contribution plan aggregated $54 million, $42 million and $30 million for 2003, 2002 and 2001, respectively.

*Supplemental Deferred Compensation Plan*

The Company's supplemental deferred compensation plan is an unfunded, non-qualified plan that provides for certain management and highly compensated employees to defer up to 50% of their eligible compensation. The compensation deferred under this plan, together with Company matching amounts, are credited with earnings or losses measured by the mirrored rate of return on investments elected by plan participants. Each plan participant is fully vested in all deferred compensation, Company match and earnings credited to their account. Although the Company is currently contributing all participant deferrals and matching amounts to a trust, the funds in the trust, totaling $19.2 million and $14.8 million at December 31, 2003 and 2002, respectively, are general assets of the Company and are subject to any claims of the Company's creditors. The Company's expense for matching contributions to this plan were $0.4 million, $0.4 million and $0.6 million for 2003, 2002 and 2001, respectively.

## 14. RELATED PARTY TRANSACTIONS

As a result of the merger of Glaxo Wellcome and SmithKline Beecham in December 2000, GlaxoSmithKline plc ("GSK") currently beneficially owns approximately 22% of the outstanding shares of Quest Diagnostics common stock.

As part of the SBCL acquisition agreements, SmithKline Beecham and Quest Diagnostics entered into data access agreements under which Quest Diagnostics granted SmithKline Beecham and certain affiliated companies certain non-exclusive rights and access to use Quest Diagnostics' proprietary clinical laboratory information database, which were terminated as of December 31, 2002.

In addition to the contracts outlined above, GSK has a long-term contractual relationship with Quest Diagnostics under which Quest Diagnostics is the primary provider of testing to support GSK's and SmithKline Beecham's clinical trials testing requirements worldwide (the "Clinical Trials Agreements").

Significant transactions with GSK and SmithKline Beecham during 2003, 2002 and 2001 included:

|  | 2003 | 2002 | 2001 |
|---|---|---|---|
| Net revenues, primarily derived under the Clinical Trials Agreements ... | $50,060 | $32,822 | $27,806 |

In addition, under the SBCL acquisition agreements, SmithKline Beecham has agreed to indemnify Quest Diagnostics, on an after tax basis, against certain matters primarily related to taxes and billing and professional liability claims.

At December 31, 2003 and 2002, accounts payable and accrued expenses included $21 million and $26 million, respectively, due to SmithKline Beecham, primarily related to tax benefits associated with indemnifiable matters.

During 2001, the Company received $8.7 million from Corning related to certain indemnified billing-related claims settled in 2001 and 2000.

F-29

LX-0650-0098

QUEST DIAGNOSTICS INCORPORATED AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—CONTINUED
(dollars in thousands unless otherwise indicated)

### 15.  COMMITMENTS AND CONTINGENCIES

Minimum rental commitments under noncancelable operating leases, primarily real estate, in effect at December 31, 2003 are as follows:

| Year ending December 31, | |
|---|---:|
| 2004 | $122,596 |
| 2005 | 96,987 |
| 2006 | 73,249 |
| 2007 | 56,690 |
| 2008 | 44,109 |
| 2009 and thereafter | 136,150 |
| Minimum lease payments | 529,781 |
| Noncancelable sub-lease income | (763) |
| Net minimum lease payments | $529,018 |

Operating lease rental expense for 2003, 2002 and 2001 aggregated $121 million, $97 million and $83 million, respectively.

The Company has certain noncancelable commitments to purchase products or services from various suppliers, mainly for telecommunications and standing orders to purchase reagents and other laboratory supplies. At December 31, 2003, the approximate total future purchase commitments are $75 million, of which $39 million are expected to be incurred in 2004.

In support of its risk management program, the Company has standby letters of credit issued under its letter of credit lines and unsecured revolving credit facility to ensure its performance or payment to third parties, which amounted to $57 million at December 31, 2003, of which $44 million was issued against the letter of credit lines with the remaining $13 million issued against our $325 million unsecured revolving credit facility. The letters of credit, which are renewed annually, primarily represent collateral for current and future automobile liability and workers' compensation loss payments. During January 2004, $13 million in letters of credit issued against the $325 million unsecured revolving credit facility were cancelled and $17 million of letters of credit were issued under the letter of credit lines.

The Company has entered into several settlement agreements with various government and private payers during recent years relating to industry-wide billing and marketing practices that had been substantially discontinued by the mid-1990s. In addition, the Company is aware of several pending lawsuits filed under the qui tam provisions of the civil False Claims Act and has received notices of private claims relating to billing issues similar to those that were the subject of prior settlements with various government payers. Some of the proceedings against the Company involve claims that are substantial in amount. Some of the cases involve the operations of Unilab prior to the closing of the Unilab acquisition.

Although management believes that established reserves for both indemnified and non-indemnified claims are sufficient, it is possible that additional information (such as the indication by the government of criminal activity, additional tests being questioned or other changes in the government's or private claimants' theories of wrongdoing) may become available which may cause the final resolution of these matters to exceed established reserves by an amount which could be material to the Company's results of operations and cash flows in the period in which such claims are settled. The Company does not believe that these issues will have a material adverse effect on its overall financial condition.

In addition to the billing-related settlement reserves discussed above, the Company is involved in various legal proceedings arising in the ordinary course of business. Some of the proceedings against the Company involve claims that are substantial in amount. Although management cannot predict the outcome of such proceedings or any claims made against the Company, management does not anticipate that the ultimate outcome of the various proceedings or claims will have a material adverse effect on our financial position but may be material to the Company's results of operations and cash flows in the period in which such proceedings or claims are resolved.

LX-0650-0099

QUEST DIAGNOSTICS INCORPORATED AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—CONTINUED
(dollars in thousands unless otherwise indicated)

As a general matter, providers of clinical laboratory testing services may be subject to lawsuits alleging negligence or other similar legal claims. These suits could involve claims for substantial damages. Any professional liability litigation could also have an adverse impact on the Company's client base and reputation. The Company maintains various liability insurance programs for claims that could result from providing or failing to provide clinical laboratory testing services, including inaccurate testing results and other exposures. The Company's insurance coverage limits its maximum exposure on individual claims; however, the Company is essentially self-insured for a significant portion of these claims. The basis for claims reserves incorporates actuarially determined losses based upon the Company's historical and projected loss experience. Management believes that present insurance coverage and reserves are sufficient to cover currently estimated exposures. Although management cannot predict the outcome of any claims made against the Company, management does not anticipate that the ultimate outcome of any such proceedings or claims will have a material adverse effect on the Company's financial position but may be material to the Company's results of operations and cash flows in the period in which such claims are resolved.

## 16. SUMMARIZED FINANCIAL INFORMATION

As described in Note 11, the Senior Notes and the Debentures are guaranteed by the Subsidiary Guarantors. With the exception of Quest Diagnostics Receivables Incorporated (see paragraph below), the non-guarantor subsidiaries are primarily foreign and less than wholly owned subsidiaries.

In conjunction with the Company's secured receivables credit facility described in Note 11, the Company formed a new wholly owned non-guarantor subsidiary, Quest Diagnostics Receivables Incorporated ("QDRI"). The Company and the Subsidiary Guarantors, with the exception of AML and Unilab, transfer all private domestic receivables (principally excluding receivables due from Medicare, Medicaid and other federal programs, and receivables due from customers of its joint ventures) to QDRI. QDRI utilizes the transferred receivables to collateralize the Company's secured receivables credit facility. The Company and the Subsidiary Guarantors provide collection services to QDRI. QDRI uses cash collections principally to purchase new receivables from the Company and the Subsidiary Guarantors.

The following condensed consolidating financial data illustrates the composition of the combined guarantors. Investments in subsidiaries are accounted for by the parent using the equity method for purposes of the supplemental consolidating presentation. Earnings (losses) of subsidiaries are therefore reflected in the parent's investment accounts and earnings. The principal elimination entries relate to investments in subsidiaries and intercompany balances and transactions. On April 1, 2002, Quest Diagnostics acquired AML (see Note 3), which has been included in the accompanying condensed consolidating financial data, subsequent to the closing of the acquisition, as a Subsidiary Guarantor. On February 28, 2003, Quest Diagnostics acquired Unilab (see Note 3), which has been included in the accompanying condensed consolidating financial data, subsequent to the closing of the acquisition, as a Subsidiary Guarantor.

LX-0650-0100

## QUEST DIAGNOSTICS INCORPORATED AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—CONTINUED
#### (dollars in thousands unless otherwise indicated)

*Condensed Consolidating Balance Sheet*
*December 31, 2003*

| | Parent | Subsidiary Guarantors | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **Assets** | | | | | |
| **Current assets:** | | | | | |
| Cash and cash equivalents | $ 141,588 | $ 1,991 | $ 11,379 | $ - | $ 154,958 |
| Accounts receivable, net | 17,919 | 164,247 | 427,021 | - | 609,187 |
| Other current assets | 36,576 | 114,758 | 80,307 | - | 231,641 |
| Total current assets | 196,083 | 280,996 | 518,707 | - | 995,786 |
| Property, plant and equipment, net | 228,109 | 350,196 | 29,000 | - | 607,305 |
| Goodwill and intangible assets, net | 158,295 | 2,332,147 | 45,411 | - | 2,535,853 |
| Intercompany receivable (payable) | 510,958 | (106,078) | (404,880) | - | |
| Investment in subsidiaries | 1,929,235 | - | - | (1,929,235) | - |
| Other assets | 73,398 | 50,053 | 39,023 | - | 162,474 |
| Total assets | $3,096,078 | $2,907,314 | $ 227,261 | $(1,929,235) | $4,301,418 |
| **Liabilities and Stockholders' Equity** | | | | | |
| **Current liabilities:** | | | | | |
| Accounts payable and accrued expenses | $ 337,635 | $ 281,753 | $ 30,462 | $ - | $ 649,850 |
| Current portion of long-term debt | - | 73,950 | - | - | 73,950 |
| Total current liabilities | 337,635 | 355,703 | 30,462 | - | 723,800 |
| Long-term debt | 315,844 | 710,908 | 1,955 | - | 1,028,707 |
| Other liabilities | 47,905 | 83,781 | 22,531 | - | 154,217 |
| Common stockholders' equity | 2,394,694 | 1,756,922 | 172,313 | (1,929,235) | 2,394,694 |
| Total liabilities and stockholders' equity | $3,096,078 | $2,907,314 | $ 227,261 | $(1,929,235) | $4,301,418 |

*Condensed Consolidating Balance Sheet*
*December 31, 2002*

| | Parent | Subsidiary Guarantors | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **Assets** | | | | | |
| **Current assets:** | | | | | |
| Cash and cash equivalents | $ 79,015 | $ 7,377 | $ 10,385 | $ - | $ 96,777 |
| Accounts receivable, net | 15,032 | 89,626 | 417,473 | - | 522,131 |
| Other current assets | 52,952 | 63,148 | 89,435 | - | 205,535 |
| Total current assets | 146,999 | 160,151 | 517,293 | - | 824,443 |
| Property, plant and equipment, net | 227,263 | 317,243 | 25,643 | - | 570,149 |
| Goodwill and intangible assets, net | 159,293 | 1,607,767 | 43,873 | - | 1,810,933 |
| Intercompany receivable (payable) | 194,874 | 236,752 | (431,626) | - | |
| Investment in subsidiaries | 1,631,868 | - | - | (1,631,868) | - |
| Other assets | 61,653 | 26,905 | 30,114 | - | 118,672 |
| Total assets | $2,421,950 | $2,348,818 | $ 185,297 | $(1,631,868) | $3,324,197 |
| **Liabilities and Stockholders' Equity** | | | | | |
| **Current liabilities:** | | | | | |
| Accounts payable and accrued expenses | $ 295,479 | $ 287,539 | $ 26,927 | $ - | $ 609,945 |
| Current portion of long-term debt | - | 25,689 | 343 | - | 26,032 |
| Total current liabilities | 295,479 | 313,228 | 27,270 | - | 635,977 |
| Long-term debt | 315,109 | 478,863 | 2,535 | - | 796,507 |
| Other liabilities | 42,499 | 62,339 | 18,012 | - | 122,850 |
| Common stockholders' equity | 1,768,863 | 1,494,388 | 137,480 | (1,631,868) | 1,768,863 |
| Total liabilities and stockholders' equity | $2,421,950 | $2,348,818 | $ 185,297 | $(1,631,868) | $3,324,197 |

F-32

LX-0650-0101

QUEST DIAGNOSTICS INCORPORATED AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—CONTINUED
(dollars in thousands unless otherwise indicated)

*Condensed Consolidating Statement of Operations*
*For the Year Ended December 31, 2003*

| | Parent | Subsidiary Guarantors | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Net revenues | $ 791,399 | $3,709,590 | $467,559 | $(230,590) | $4,737,958 |
| Operating costs and expenses: | | | | | |
| Cost of services | 457,819 | 2,147,387 | 163,417 | - | 2,768,623 |
| Selling, general and administrative | 76,626 | 880,951 | 223,762 | (15,639) | 1,165,700 |
| Amortization of intangible assets | 1,723 | 6,461 | 17 | - | 8,201 |
| Royalty (income) expense | (308,495) | 308,495 | - | - | - |
| Other operating (income) expense, net | 119 | (2,197) | 1,058 | - | (1,020) |
| Total operating costs and expenses | 227,792 | 3,341,097 | 388,254 | (15,639) | 3,941,504 |
| Operating income | 563,607 | 368,493 | 79,305 | (214,951) | 796,454 |
| Non-operating expenses, net | (65,689) | (202,146) | (5,772) | 214,951 | (58,656) |
| Income before taxes | 497,918 | 166,347 | 73,533 | - | 737,798 |
| Income tax expense | 204,795 | 66,539 | 29,747 | - | 301,081 |
| Income before equity earnings | 293,123 | 99,808 | 43,786 | - | 436,717 |
| Equity earnings from subsidiaries | 143,594 | - | - | (143,594) | - |
| Net income | $ 436,717 | $ 99,808 | $ 43,786 | $(143,594) | $ 436,717 |

*Condensed Consolidating Statement of Operations*
*For the Year Ended December 31, 2002*

| | Parent | Subsidiary Guarantors | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Net revenues | $ 749,268 | $3,143,063 | $483,637 | $(267,917) | $4,108,051 |
| Operating costs and expenses: | | | | | |
| Cost of services | 477,683 | 1,804,150 | 150,555 | - | 2,432,388 |
| Selling, general and administrative | 167,736 | 663,560 | 258,667 | (15,122) | 1,074,841 |
| Amortization of intangible assets | 2,154 | 6,219 | - | - | 8,373 |
| Royalty (income) expense | (246,687) | 246,687 | - | - | - |
| Other operating (income) expense, net | 2,527 | (923) | (1,297) | - | 307 |
| Total operating costs and expenses | 403,413 | 2,719,693 | 407,925 | (15,122) | 3,515,909 |
| Operating income | 345,855 | 423,370 | 75,712 | (252,795) | 592,142 |
| Non-operating expenses, net | (73,700) | (220,396) | (8,464) | 252,795 | (49,765) |
| Income before taxes | 272,155 | 202,974 | 67,248 | - | 542,377 |
| Income tax expense | 109,337 | 81,190 | 29,696 | - | 220,223 |
| Income before equity earnings | 162,818 | 121,784 | 37,552 | - | 322,154 |
| Equity earnings from subsidiaries | 159,336 | - | - | (159,336) | - |
| Net income | $ 322,154 | $ 121,784 | $ 37,552 | $(159,336) | $ 322,154 |

F-33

LX-0650-0102

QUEST DIAGNOSTICS INCORPORATED AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—CONTINUED
(dollars in thousands unless otherwise indicated)

*Condensed Consolidating Statement of Operations*
*For the Year Ended December 31, 2001*

| | Parent | Subsidiary Guarantors | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Net revenues | $ 596,909 | $2,862,536 | $451,525 | $(283,199) | $3,627,771 |
| Operating costs and expenses: | | | | | |
| Cost of services | 431,382 | 1,610,902 | 109,310 | - | 2,151,594 |
| Selling, general and administrative | 159,439 | 623,419 | 250,420 | (14,598) | 1,018,680 |
| Amortization of goodwill and other intangible assets | 3,826 | 41,696 | 585 | - | 46,107 |
| Royalty (income) expense | (241,886) | 241,886 | - | - | - |
| Other operating (income) expense, net | (370) | 172 | 38 | - | (160) |
| Total operating costs and expenses | 352,391 | 2,518,075 | 360,353 | (14,598) | 3,216,221 |
| Operating income | 244,518 | 344,461 | 91,172 | (268,601) | 411,550 |
| Non-operating expenses, net | (88,375) | (268,762) | (26,425) | 268,601 | (114,961) |
| Income before taxes | 156,143 | 75,699 | 64,747 | - | 296,589 |
| Income tax expense | 66,345 | 42,645 | 25,296 | - | 134,286 |
| Income before equity earnings | 89,798 | 33,054 | 39,451 | - | 162,303 |
| Equity earnings from subsidiaries | 72,505 | - | - | (72,505) | - |
| Net income | $ 162,303 | $ 33,054 | $ 39,451 | $ (72,505) | $ 162,303 |

*Condensed Consolidating Statement of Cash Flows*
*For the Year Ended December 31, 2003*

| | Parent | Subsidiary Guarantors | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Cash flows from operating activities: | | | | | |
| Net income | $ 436,717 | $ 99,808 | $ 43,786 | $(143,594) | $ 436,717 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | | | |
| Depreciation and amortization | 53,611 | 91,501 | 8,791 | - | 153,903 |
| Provision for doubtful accounts | 4,944 | 64,835 | 158,443 | - | 228,222 |
| Other, net | (78,968) | 2,463 | 18,604 | 143,594 | 85,693 |
| Changes in operating assets and liabilities | 54,277 | (178,027) | (117,986) | - | (241,736) |
| Net cash provided by operating activities | 470,581 | 80,580 | 111,638 | - | 662,799 |
| Net cash used in investing activities | (271,820) | (96,957) | (17,342) | (30,931) | (417,050) |
| Net cash provided by (used in) financing activities | (136,188) | 10,991 | (93,302) | 30,931 | (187,568) |
| Net change in cash and cash equivalents | 62,573 | (5,386) | 994 | - | 58,181 |
| Cash and cash equivalents, beginning of year | 79,015 | 7,377 | 10,385 | - | 96,777 |
| Cash and cash equivalents, end of year | $ 141,588 | $ 1,991 | $ 11,379 | $ - | $ 154,958 |

LX-0650-0103

QUEST DIAGNOSTICS INCORPORATED AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—CONTINUED
(dollars in thousands unless otherwise indicated)

*Condensed Consolidating Statement of Cash Flows*
*For the Year Ended December 31, 2002*

| | Parent | Subsidiary Guarantors | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Cash flows from operating activities: | | | | | |
| Net income | $ 322,154 | $ 121,784 | $ 37,552 | $(159,336) | $ 322,154 |
| Adjustments to reconcile net income to net cash provided by (used in) operating activities: | | | | | |
| Depreciation and amortization | 45,718 | 78,160 | 7,513 | - | 131,391 |
| Provision for doubtful accounts | 7,966 | 29,513 | 179,881 | - | 217,360 |
| Other, net | (52,282) | 15,317 | 35,626 | 159,336 | 157,997 |
| Changes in operating assets and liabilities | 168,559 | (250,548) | (150,542) | - | (232,531) |
| Net cash provided (used in) by operating activities | 492,115 | (5,774) | 110,030 | - | 596,371 |
| Net cash used in investing activities | (439,848) | (2,480) | (6,075) | (28,809) | (477,212) |
| Net cash provided by (used in) financing activities | 26,748 | (94,940) | (105,331) | 28,809 | (144,714) |
| Net change in cash and cash equivalents | 79,015 | (103,194) | (1,376) | - | (25,555) |
| Cash and cash equivalents, beginning of year | - | 110,571 | 11,761 | - | 122,332 |
| Cash and cash equivalents, end of year | $ 79,015 | $ 7,377 | $ 10,385 | $ | $ 96,777 |

*Condensed Consolidating Statement of Cash Flows*
*For the Year Ended December 31, 2001*

| | Parent | Subsidiary Guarantors | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Cash flows from operating activities: | | | | | |
| Net income | $ 162,303 | $ 33,054 | $ 39,451 | $ (72,505) | $ 162,303 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | | | |
| Depreciation and amortization | 40,726 | 102,020 | 4,981 | - | 147,727 |
| Provision for doubtful accounts | 627 | 21,198 | 196,446 | - | 218,271 |
| Loss on debt extinguishment | 12,464 | 25,945 | 3,603 | - | 42,012 |
| Other, net | 34,863 | 35,735 | (40,087) | 72,505 | 103,016 |
| Changes in operating assets and liabilities | (84,349) | (40,535) | (82,642) | - | (207,526) |
| Net cash provided by operating activities | 166,634 | 177,417 | 121,752 | - | 465,803 |
| Net cash used in investing activities | (395,196) | (45,293) | (4,087) | 147,960 | (296,616) |
| Net cash provided by (used in) financing activities | 228,562 | (185,416) | (113,518) | (147,960) | (218,332) |
| Net change in cash and cash equivalents | - | (53,292) | 4,147 | - | (49,145) |
| Cash and cash equivalents, beginning of year | - | 163,863 | 7,614 | - | 171,477 |
| Cash and cash equivalents, end of year | $ - | $ 110,571 | $ 11,761 | $ - | $ 122,332 |

LX-0650-0104

## QUEST DIAGNOSTICS INCORPORATED AND SUBSIDIARIES
### (in thousands, except per share data)
### Quarterly Operating Results (unaudited)

| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter | Total Year |
|---|---|---|---|---|---|
| **2003(a)** | | | | | |
| Net revenues | $1,092,797 | $1,219,935 | $1,221,221 | $1,204,005 | $4,737,958 |
| Gross profit | 444,700 | 516,811 | 510,041 | 497,783 | 1,969,335 |
| Net income | 88,036 | 120,412 | 120,024 | 108,245 | 436,717 |
| Basic earnings per common share: | | | | | |
| Net income | 0.88 | 1.15 | 1.15 | 1.04 | 4.22 |
| Diluted earnings per common share: | | | | | |
| Net income | 0.86 | 1.12 | 1.12 | 1.02 | 4.12 |

| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter | Total Year |
|---|---|---|---|---|---|
| **2002(b)** | | | | | |
| Net revenues | $ 946,762 | $1,068,810 | $1,058,714 | $1,033,765 | $4,108,051 |
| Gross profit | 389,024 | 438,552 | 433,639 | 414,448 | 1,675,663 |
| Net income | 66,689 | 87,151 | 86,617 | 81,697 | 322,154 |
| Basic earnings per common share: | | | | | |
| Net income | 0.70 | 0.90 | 0.89 | 0.84 | 3.34 |
| Diluted earnings per common share: | | | | | |
| Net income | 0.67 | 0.87 | 0.87 | 0.82 | 3.23 |

(a) On February 28, 2003, Quest Diagnostics completed the acquisition of Unilab. The quarterly operating results include the results of operations of Unilab subsequent to the closing of the acquisition (see Note 3).

(b) On April 1, 2002, Quest Diagnostics completed its acquisition of AML. The quarterly operating results include the results of operations of AML subsequent to the closing of the acquisition (see Note 3).

LX-0650-0105

## QUEST DIAGNOSTICS INCORPORATED AND SUBSIDIARIES
## SCHEDULE II—VALUATION ACCOUNTS AND RESERVES
### (in thousands)

| | Balance at 1-1-03 | Provision for Doubtful Accounts | Net Deductions and Other | Balance at 12-31-03 |
|---|---|---|---|---|
| Year ended December 31, 2003 | | | | |
| Doubtful accounts and allowances............... | $193,456 | $228,222 | $209,939 | $211,739 |

| | Balance at 1-1-02 | Provision for Doubtful Accounts | Net Deductions and Other | Balance at 12-31-02 |
|---|---|---|---|---|
| Year ended December 31, 2002 | | | | |
| Doubtful accounts and allowances............... | $216,203 | $217,360 | $240,107 | $193,456 |

| | Balance at 1-1-01 | Provision for Doubtful Accounts | Net Deductions and Other | Balance at 12-31-01 |
|---|---|---|---|---|
| Year ended December 31, 2001 | | | | |
| Doubtful accounts and allowances............... | $204,358 | $218,271 | $206,426 | $216,203 |

F-37

575

LX-0650-0106

## QUEST DIAGNOSTICS INCORPORATED AND SUBSIDIARIES
## RECONCILIATION OF NON-GAAP MEASURES

The following is a reconciliation of non-GAAP measures presented in the financial highlights to their most comparable measure under generally accepted accounting principles.

| | Year ended December 31, | | | | |
|---|---|---|---|---|---|
| | (in thousands, except per share data) | | | | |
| | 2003 | 2002 | 2001 | 2000 | 1999 |
| Net income (loss) | $436,717 | $322,154 | $162,303 | $102,052 | $ (3,413) |
| Add: | | | | | |
| Amortization of goodwill, net of taxes | - | - | 35,964 | 36,023 | 22,013 |
| Provision for restructuring and other special charges, net of taxes | - | - | - | 1,260 | 44,118 |
| Loss on debt extinguishment, net of taxes | - | - | 25,207 | 2,896 | 2,139 |
| Adjusted net income | $436,717 | $322,154 | $223,474 | $142,231 | $ 64,857 |
| Diluted earnings per common share | | | | | |
| Reported net income (loss) | $ 4.12 | $ 3.23 | $ 1.66 | $ 1.08 | $ (0.05) |
| Adjusted diluted earnings per common share | $ 4.12 | $ 3.23 | $ 2.29 | $ 1.51 | $ 0.91 |
| Weighted average number of common shares outstanding-diluted | 105,932 | 99,790 | 97,610 | 94,300 | 71,655 |
| Operating income | $796,454 | $592,142 | $411,550 | $317,527 | $ 78,980 |
| Add: | | | | | |
| Amortization of goodwill | - | - | 38,392 | 37,862 | 23,530 |
| Provision for restructuring and other special charges | - | - | - | 2,100 | 73,385 |
| Adjusted operating income | $796,454 | $592,142 | $449,942 | $357,489 | $175,895 |

Reconciliation of Non-GAAP Measures

**576**

LX-0650-0107

## INVESTOR INFORMATION

### COMMON STOCK

Quest Diagnostics Incorporated
(ticker symbol: "DGX") shares
are listed on the New York Stock
Exchange. Options on
Quest Diagnostics shares are
traded on the Chicago Board
Options Exchange.



**DGX**
**LISTED**
**NYSE**

### ANNUAL MEETING

The annual meeting of
stockholders will be held on
Tuesday, May 4, 2004, at the
Short Hills Hilton, Short Hills,
New Jersey at 10:30 A.M. A proxy
statement and annual report were
mailed to stockholders of record
as of March 8, 2004.

### CORPORATE GOVERNANCE

Corporate Governance Guidelines,
the Code of Business Ethics and
Committee Charters are available
at the Quest Diagnostics web site
on the Internet:
www.questdiagnostics.com

Inquiries to the Board of
Directors may be sent via e-mail to:
LeadIndependentDirector@
questdiagnostics.com

### ADDITIONAL INFORMATION

Address all inquiries to:
Investor Relations Department
Quest Diagnostics Incorporated
One Malcolm Avenue
Teterboro, New Jersey 07608
(201) 393-5030

E-mail:
investor@questdiagnostics.com

### ANNUAL REPORT ON FORM 10-K

A copy of the Quest Diagnostics
2003 Annual Report on Form 10-K
filed with the Securities and
Exchange Commission, is contained
within this Annual Report.
Additional copies are available
without charge by contacting the
Investor Relations Department.

### INTERNET ACCESS

Corporate news releases, our
Annual Report, Forms 10-K and
10-Q and other information
about the company, including
locations of facilities, are available
at the Quest Diagnostics web site
on the Internet:
www.questdiagnostics.com

### TRANSFER AGENT
### AND REGISTRAR

National City Bank acts as transfer
agent and registrar and dividend
paying agent, and maintains
all stockholder records for
Quest Diagnostics. If you have
questions about the shares of stock
that you own, wish to report a
change of address or lost stock
certificates or dividend checks
or would like to enroll in the
company's automatic dividend
reinvestment or direct deposit
program, please contact
National City Bank directly:

National City Bank
Shareholder Services
P.O. Box 92301
Cleveland, Ohio 44193-0900
(800) 622-6757

E-mail:
shareholder.inquiries@nationalcity.com

### CORPORATE HEADQUARTERS

One Malcolm Avenue
Teterboro, New Jersey 07608
(201) 393-5000

### TRADEMARKS

Quest Diagnostics, Quest, the
Sun-Q logo, eMaxx, ChartMaxx,
Quest on Demand, Nichols Institute
and Unilab are registered
trademarks of Quest Diagnostics.

MedPlus is a registered trademark
of MedPlus, Inc., a wholly-owned
subsidiary of Quest Diagnostics.

Cardio CRP is a trademark of
Quest Diagnostics.

InSure is a trademark of
Enterix Inc.

Neither this report nor any
statement contained herein is
furnished in connection with any
offering of securities or for the
purpose of promoting or
influencing the sale of securities.

© 2004 Quest Diagnostics Incorporated.
All rights reserved.

Design: INC DESIGN, incdesign.com

♲ Printed on recycled paper.

LX-0650-0108



**QUEST DIAGNOSTICS INCORPORATED**
One Malcolm Avenue
Teterboro, NJ 07608
www.questdiagnostics.com

MI1338

578